**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEONA HUNTER and ANNE MARIE VILLA, on behalf of themselves and all others similarly situated, | Case No. 1:15-cv-06445-JPO-JLC |
| Plaintiffs, | |
| v. | |
| TIME WARNER CABLE INC., | |
| Defendant. | |

### DEFENDANT TIME WARNER CABLE INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................5

    A.    Section 227(b)(1)(A)(iii) Draws Facial Distinctions Based on Content and Discriminates Against Non-Government Speakers in a Way That Unlawfully Reflects a Content Preference, and Thus Is Subject to Strict Scrutiny ........................................................................................................5

    B.    Section 227(b)(1)(A)(iii) Does Not Withstand Strict Scrutiny............................13

        1.    The provision's content-based distinctions do not advance any compelling state interest. ...........................................................13

        2.    The provision's content-based distinctions are not narrowly tailored to any asserted state interests. .......................................17

            a.    Section 227(b)(1)(A)(iii)'s discriminatory application to select private messages is fatally underinclusive...........................18

            b.    Section 227(b)(1)(A)(iii) also is overinclusive. ............................21

CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Benzion v. Vivint, Inc.*,
No. 12-61826-CIV, 2014 WL 11531368 (S.D. Fla. Jan. 17, 2014) ......................................... 15

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................................................ passim

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..................................................................................................................... 6

*Cahaly v. Larosa*,
796 F.3d 399 (4th Cir. 2015) ....................................................................................... 4, 19, 23

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016) .............................................................................................................. 9

*Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) .................................................................................................... 4, 19, 20

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980) .......................................................................................................... 13, 15

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) .......................................................................................................... 4, 21

*Doe v. Bin Laden*,
663 F.3d 64 (2d Cir. 2011) ...................................................................................................... 9

*Edenfield v. Fane*,
507 U.S. 761 (1993) .......................................................................................................... 13, 16

*Fl. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995) .............................................................................................................. 14

*Free Speech Coalition, Inc. v. AG United States*,
825 F.3d 149 (3d Cir. 2016) .............................................................................................. 10, 11

*Frisby v. Schultz*,
487 U.S. 474 (1988) .......................................................................................................... 15, 16

*Gomez v. Campbell-Ewald Co.*,
768 F.3d 871 (9th Cir. 2014), *aff'd on other grounds,* 136 S. Ct. 663 (2016) ........................... 2

ii

*Greater New Orleans Broad. Ass'n v. United States,*
  527 U.S. 173 (1999) .................................................................................. 4, 13, 21

*Gresham v. Rutledge,*
  No. 4:16-CV-00241 JLH, 2016 WL 4027901 (E.D. Ark. July 27, 2016) ...................... 4, 19, 23

*Hays County Guardian v. Supple,*
  969 F.2d 111 (5th Cir. 1992) ............................................................................... 6

*Kirkeby v. Furness,*
  92 F.3d 655 (8th Cir. 1996) .............................................................................. 16

*Moser v. FCC,*
  46 F.3d 970 (9th Cir. 1995) ................................................................................ 2

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015) ........................................................................... passim

*Republican Party v. White,*
  536 U.S. 765 (2002) ................................................................................. 4, 17, 20

*Rubin v. Coors Brewing Co.,*
  514 U.S. 476 (1995) ..................................................................................... 4, 20

*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989) ..................................................................................... 17, 23

*Solantic, LLC v. City of Neptune Beach,*
  410 F.3d 1250 (11th Cir. 2005) ........................................................................ 11

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ......................................................................................... 11

*United States v. Playboy Entm't Grp., Inc.,*
  529 U.S. 803 (2000) .............................................................................. 17, 21, 23

*Vt. Agency of Nat. Resources v. United States ex rel. Stevens,*
  529 U.S. 765 (2000) ......................................................................................... 9

## STATUTES

47 U.S.C. § 151 *et seq.* ....................................................................................... 9

47 U.S.C. § 153(39) ............................................................................................... 9

47 U.S.C. § 227 *et seq.* ....................................................................................... 1

47 U.S.C. § 227(a)(1)(A) ..................................................................................... 10

47 U.S.C. § 227(b)(1) ................................................................................. 8, 9, 12, 21

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................................ passim

47 U.S.C. § 227(b)(2)(C) ........................................................................................... 7

47 U.S.C. § 227(d)(3)(B) ......................................................................................... 21

Pub. L. 102-243, 105 Stat. 2394 (1991) .......................................................... passim

## OTHER AUTHORITIES

137 Cong. Rec. 18,123 (1991) .......................................................................... 15, 22

137 Cong. Rec. 35,306 (1991) .......................................................................... 15, 22

Letter from Reps. David Price, G.K. Butterfield, and Renee Ellmers, U.S. Congress, to
    Tom Wheeler, Chairman, FCC, CG Docket No. 02-278 (Jan. 8, 2015) ................................. 10

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    CG Docket No. 02-278, Declaratory Ruling, FCC 16-72 (July 5, 2016)........................ passim

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    CG Docket No. 02-278, Report and Order, FCC 16-99 (Aug. 11, 2016) ................ 7, 14, 19, 22

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    Declaratory Ruling and Order, CG Docket No. 02-278, WC Docket No. 07-135, 30
    FCC Rcd 7961 (2015) ..................................................................................... 8

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    *Cargo Airline Association Petition for Expedited Declaratory Ruling*,
    Order, CG Docket No. 02-278, 29 FCC Rcd 3432 (2014)...................................................... 8

Urja Mittal, *The "Supreme Board of Sign Review": Reed and Its Aftermath*, 125 YALE
    L.J.F. 359 (2016) ......................................................................................... 10

## INTRODUCTION

Plaintiffs allege that Time Warner Cable Inc. ("TWC")[1] accidentally placed wrong-number phone calls to their mobile phones in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. (the "TCPA").  For this, Plaintiffs seek to recover millions of dollars in "damages" on behalf of themselves and a putative class.  First Amended Complaint, ECF No. 45, ¶¶ 30, 47, 62, 82-89.  But the relevant provision of the TCPA under which Plaintiffs seek to impose liability on TWC is unconstitutional and cannot form a basis for liability against TWC because the statute imposes fatally underinclusive (and overinclusive) content-based restrictions on speech that cannot withstand strict scrutiny.

The First Amendment generally prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citation omitted).  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id*.  Section 227(b)(1)(A)(iii) of the Communications Act of 1934 (which contains the codified TCPA provisions) cannot withstand that strict scrutiny because it embodies content-based and speaker-based preferences without a sufficient justification.  Several recent developments bring into focus that provision's constitutional infirmity, including (1) the Supreme Court's clarification in *Reed* that laws drawing distinctions based on subject matter and speaker are content-based and thus trigger strict scrutiny; (2) Congress's 2015 amendment to the TCPA to exempt certain calls based on their subject matter and viewpoint (namely, calls promoting the collection of government-backed debts) from the strictures at issue in this case; (3) the

---

[1] As TWC previously informed the Court, it merged with Charter Communications, Inc. in May 2016, but we refer herein to TWC for sake of continuity.

confirmation earlier this year by the Supreme Court and the Federal Communications Commission ("FCC") that *all* calls by government speakers are exempt from that provision; and (4) other federal courts' recognition that such content-based and speaker-based distinctions render state-law analogs to the TCPA unconstitutional.

Although enacted with a legitimate goal—eliminating the robotic dialing of random or sequential numbers—the TCPA has developed into a patchwork of prohibitions that exempts from liability preferred speakers calling for preferred reasons or conveying preferred messages, while threatening crippling class-action liability for disfavored speakers conveying disfavored messages. In particular, Section 227(b)(1)(A)(iii) imposes broad restrictions on private entities that place calls to wireless numbers using an automatic telephone dialing system or an artificial or prerecorded voice, but, pursuant to a 2015 amendment, exempts such entities from liability whenever the content of such calls involves the collection of debts guaranteed by or owed to the government.[2]  47 U.S.C. § 227(b)(1)(A)(iii).  And as the recent rulings by the Supreme Court and the FCC discussed herein have made clear, the statute also exempts from liability all calls made by the government itself (and its agents), regardless of the purpose of the calls.  The statute thus results in a regime that anoints favored speakers and messages and imposes significant liability on private speakers expressing disfavored messages.  While some courts have previously held the provision at issue to be constitutional,[3] none of those decisions evaluated these recently enacted and judicially clarified content-based distinctions.

---

[2] TWC disputes Plaintiffs' assertion that the calls at issue in this case were made using an "automatic telephone dialing system," and that issue will be addressed in separate summary judgment proceedings.  For purposes of this motion, however, TWC assumes based on the pleadings that calls to Plaintiffs were made using such an autodialer and/or were prerecorded.

[3] *See, e.g., Moser v. FCC*, 46 F.3d 970, 971 (9th Cir. 1995); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014), *aff'd on other grounds,* 136 S. Ct. 663, 672 (2016).

The statute's content-based nature is particularly apparent in light of the Supreme Court's recent decision in *Reed v. Town of Gilbert*, which clarified that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," and that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."  135 S. Ct. at 2227, 2230-31.  Here, the relevant provision of the TCPA includes *both* a facially content-based restriction on speech (restricting all private speech except that relating to collection of government debt) *and* a speaker-based restriction on speech that expresses a content preference (restricting only private speech).   Such stark content-based and speaker-based preferences subject § 227(b)(1)(A)(iii) to strict scrutiny under the First Amendment.

Section 227(b)(1)(A)(iii) cannot satisfy that demanding standard.  Although the statute's restrictions on autodialed and prerecorded voice calls are supposedly justified by privacy and safety concerns, those purported interests are directly undermined by the statute's own *exemptions* from liability for both calls by private speakers conveying government-favored messages (*e.g.*, concerning the collection of government-owned or -guaranteed debts) and calls by *all* government speakers for any purpose—both of which implicate the *exact same concerns* as private speech that is not exempt.  This differential treatment is not only unjustified; it renders the speech restriction prototypically underinclusive and results in an irrational, ineffective, and patently unfair regime.  Such underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011) (invalidating state law restricting sale of violent video games, but not other forms of violent media, as "wildly underinclusive when judged against" the state's compelling interest in protecting children from

3

violent content); *see also Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 (1993) (finding it to be "insufficient justification" for a content-based restriction on speech that "every decrease in the number of [commercial newsracks] necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape," given that the banned newsracks "are no more harmful than the permitted newsracks"). In case after case, the Supreme Court has struck down similarly underinclusive restrictions on speech.[4] And, following *Reed,* two courts have recently struck down state law analogs to the TCPA, highlighting the underinclusiveness of those statutes. *See Cahaly v. Larosa*, 796 F.3d 399, 402, 406 (4th Cir. 2015) (holding that state robocalling statute "suffers from underinclusiveness because it restricts two types of robocalls— political and consumer—but permits 'unlimited proliferation' of all other types" (citation omitted)); *Gresham v. Rutledge*, No. 4:16-CV-00241 JLH, 2016 WL 4027901, at *3-5 (E.D. Ark. July 27, 2016) (finding that statute restricting use of autodialers for commercial purposes or political campaigns was fatally underinclusive, because "if the interests of privacy and safety warrant restriction of automated calls made for a commercial purpose or in connection with a political campaign, they also warrant restriction of other types of automated calls"). In addition,

---

[4] *See, e.g.*, *Discovery Network*, 507 U.S. at 418; *Brown*, 564 U.S. at 802; *Republican Party v. White*, 536 U.S. 765, 780-781 (2002) (restrictions on judicial candidates' discussion of legal issues during their candidacy (but not other times) failed under strict scrutiny absent any evidence that "campaign statements are uniquely destructive of [perceptions of] openmindedness;" those restrictions were "so woefully underinclusive as to render belief in that purpose [of promoting 'openmindedness'] a challenge to the credulous"); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (ban on alcohol content labels that applied to beer but not to wine and spirits failed to "directly and materially advanc[e] its aim" of averting "strength wars" among alcohol producers); *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 190 (1999) (legislation banning advertisements for private casino gambling, but not other types of gambling, was not even rationally related to the state's interest in reducing gambling); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 756 (1996) (law requiring cable operators to block sexual material on leased channels, but not on unleased channels, was underinclusive and not sufficiently tailored to serve the state's compelling interest in protecting children).

§ 227(b)(1)(A)(iii) is also fatally *overinclusive*, as it goes well beyond implementing the least restrictive means of accomplishing its purported goals (*i.e.* enhancing privacy and safety).

While the government unquestionably has the power to address intrusive or dangerous calling practices, it cannot do so in a way that privileges favored speakers, content, and viewpoints, while imposing crippling liability on disfavored messages and speakers.[5]  But this is exactly what the government does here.   Accordingly, as it stands, § 227(b)(1)(A)(iii) is unconstitutional under the First Amendment and judgment on the pleadings is therefore warranted.

## ARGUMENT

A.   **Section 227(b)(1)(A)(iii) Draws Facial Distinctions Based on Content and Discriminates Against Non-Government Speakers in a Way That Unlawfully Reflects a Content Preference, and Thus Is Subject to Strict Scrutiny**

The provision of the TCPA at issue here is precisely the sort of content-based and speaker-based restriction on speech that is "presumptively unconstitutional" under the First Amendment.   *Reed*, 135 S. Ct. at 2226.   The Supreme Court in *Reed* confirmed that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," and that such laws are subject to strict scrutiny "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."   *Reed*, 135 S. Ct. at 2227-28 (internal citations omitted).   Moreover, because "'[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,'" the Court also held that "'laws favoring some speakers over others demand strict scrutiny'" and are presumptively

---

[5]  For example, Congress likely could constitutionally adopt time-of-day limitations, disconnection requirements, or prohibitions on calls to emergency lines, among other content- and speaker-neutral restrictions that do not single out disfavored speakers and messages.

unconstitutional where "'the legislature's speaker preference reflects a content preference.'" *Reed*, 135 S. Ct. at 2230 (citation omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."); *Hays County Guardian v. Supple*, 969 F.2d 111, 121 (5th Cir. 1992) (invalidating university's limitations on distribution of newspapers containing advertisements and rejecting the view that a university may "enhance the popularity of its own publication by burdening the distribution of other publications"). Here, Section 227(b)(1)(A)(iii) is presumptively unconstitutional under each of the two independent grounds identified in *Reed*; that is, the law *both* draws a facial distinction based on the content of the message *and* discriminates among speakers in a manner that reflects a content preference.

*First*, § 227(b)(1)(A)(iii) facially discriminates based on a call's content. The provision imposes liability for autodialed and prerecorded calls placed by private actors, without the recipient's prior express consent, "unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). In other words, a private debt collection agency may call the same consumer twice in a row, once to collect a government debt and once to collect a private debt not guaranteed by the government, but, absent prior express consent, may place only the first call using an autodialer or prerecorded voice. That is a prototypical, "facial" content-based restriction that "draws distinctions based on the message a speaker conveys" and is subject to strict scrutiny, regardless of Congress's motive, content-neutral justification, or lack of animus toward the ideas expressed. *Reed*, 135 S. Ct. at 2227-28 (quotation marks omitted) (stating that facial content-based distinctions are "obvious" where they "defin[e] regulated speech by particular subject matter"). Indeed, because

6

§ 227(b)(1)(A)(iii) exempts only calls that *promote and enhance* the collection of government-owned and -guaranteed debts—but not those calls concerning consolidating, contesting, or discharging such debts—it even discriminates among viewpoints, based on "the opinion or perspective of the speaker," thus establishing a "more blatant" and "egregious form of content discrimination." *Reed*, 135 S. Ct. at 2230 (citation omitted); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 16-99, *passim* (Aug. 11, 2016) ("Aug. 2016 TCPA Order") (discussing what content and viewpoints fall within the statutory exception).   While that viewpoint-based distinction may simplify collections for the government and private lenders issuing government-backed debt, it is of little or no benefit to the consumers whom the statute is supposedly designed to protect; indeed, the exempt calls are no less intrusive than the calls that are subject to liability.   Given that a caller's liability turns not only on "the topic discussed" and the "message expressed," but also on the "perspective of the speaker," it is all the more clear that § 227(b)(1)(A)(iii) draws a facial, content-based distinction and is subject to strict scrutiny, regardless of whether Congress's motivation in enacting this provision reflects animus toward particular ideas or viewpoints.  *Reed*, 135 S. Ct. at 2227-28, 2230.

While the statutory exemption for calls concerning government debts may be the most blatant content preference in § 227(b), the authorization for the FCC to establish additional content-based exemptions compounds the problem.[6]   The FCC now has invoked that authority to

---

[6] *See* 47 U.S.C. § 227(b)(2)(C) (providing that the Commission "may … exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party….").

establish exemptions for certain package-delivery notification calls;[7] certain billing calls related to collect calls placed by prison inmates;[8] calls by financial institutions relating to identity theft, data breaches, and money transfers;[9] and "appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results," and other healthcare-related calls.[10]   The upshot of this patchwork of prohibitions and exemptions is that the lawfulness of an autodialed or prerecorded call turns entirely on its subject matter (*i.e.*, content).

*Second*, § 227(b)(1)(A)(iii) imposes a speaker-based preference for government messages over private messages, which unlawfully "reflects a content preference" by suppressing certain disfavored private messages.  As noted above, recent judicial and FCC decisions leave no doubt that the TCPA's restrictions on speech under § 227(b)(1), including the restriction on calls to wireless numbers set forth in § 227(b)(1)(A)(iii), apply only to some speakers (*e.g.*, private speakers like TWC conveying disfavored, but nevertheless legitimate and useful, messages) and not to others (*e.g.*, governmental speakers).  The TCPA makes it unlawful for "any *person* within the United States" to place any non-emergency autodialed or prerecorded calls to certain telephones, including cell phones, without the "prior express consent of the called party."  47 U.S.C. § 227(b)(1) (emphasis added).   The statute unambiguously excludes the federal government from the definition of a "person."  The TCPA amended the Communications Act of

---

[7]  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Cargo Airline Association Petition for Expedited Declaratory Ruling*, Order, CG Docket No. 02-278, 29 FCC Rcd 3432, ¶ 18 (2014).

[8]  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, CG Docket No. 02-278, WC Docket No. 07-135, 30 FCC Rcd 7961, ¶¶ 44-45 (2015).

[9]  *Id.* ¶¶ 129-138.

[10]  *Id.* ¶¶ 146-48.

1934, Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended at 47 U.S.C. § 151 *et seq.*), which defines "person" as "includ[ing] an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39).   "Government" does not appear on that list.  *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions…."); *Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) (applying the *expressio unius est exclusio alterius* canon to find that a statutory list provided by Congress was exclusive).   This textual exclusion of the government from liability is confirmed by the longstanding rule of interpretation that the word "person," when used in a statute or regulation, "does not include the sovereign … [except] upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 780-81 (2000).   And the FCC recently confirmed this interpretation, relying on its congressionally delegated authority to construe the TCPA.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling, FCC 16-72, ¶ 10 (July 5, 2016) ("July 2016 TCPA Order") (acknowledging that liability under § 227(b)(1) does not attach to the federal government because the term "person," as used in § 227(b)(1), "does not include the federal government or [its] agents acting within the scope of their agency").

The legislative history makes clear that Congress enacted a speaker-based restriction on dialer technology for the specific purpose of suppressing certain disfavored private messages. As the FCC has observed, "[t]he TCPA's legislative history lacks any indication that Congress sought to impede … government communications, *as opposed to telemarketing and other calls by private entities*." July 2016 TCPA Order ¶ 15 (emphasis added); *see also id.* ¶ 18 (concluding based on legislators' statements that Congress did not wish to interfere with "'communications

from the federal government,'" including messages that aid "'government research'" or promote "democratic participation in government" (quoting Letter from Reps. David Price, G.K. Butterfield, and Renee Ellmers, U.S. Congress, to Tom Wheeler, Chairman, FCC, CG Docket No. 02-278, at 1 (Jan. 8, 2015))).  Indeed, in restricting technologies that "us[e] a random or sequential number generator," Congress specifically targeted technologies that were used predominantly, if not exclusively, to convey private telemarketing messages.  47 U.S.C. § 227(a)(1)(A); *see also* Pub. L. 102-243, § 2, ¶ 1, 105 Stat. 2394 (1991) ("The use of the telephone to *market goods and services to the home and other businesses* is now pervasive due to the increased use of *cost-effective telemarketing techniques*." (emphases added)).  By contrast, the government and its agents are not subject to liability.  The FCC itself has acknowledged that Congress's intent was to restrict *only* private speakers from accessing "the most cost-efficient method of communicating with the public."  July 2016 TCPA Order ¶ 19.

Strict scrutiny applies here regardless of whether the speech at issue is purportedly "commercial" or "non-commercial" in nature.  To be sure, after *Reed*, some have questioned whether the Supreme Court's traditional view that intermediate scrutiny applies to distinctions between commercial and non-commercial speech remains good law.  *See, e.g.*, Urja Mittal, *The "Supreme Board of Sign Review": Reed and Its Aftermath*, 125 YALE L.J.F. 359 (2016), (discussing the inconsistent application of *Reed*, including with respect to "commercial" speech); *Free Speech Coalition, Inc. v. AG United States*, 825 F.3d 149, 164 (3d Cir. 2016) (holding that recordkeeping and labeling requirements applicable to production of commercial and noncommercial pornographic images were subject to strict scrutiny); *id.* at 176 n.7 (Rendell, J., dissenting) (noting that some lower courts have found that "*Reed* does not compel strict scrutiny for laws affecting commercial speech").  But the Court need not resolve that question here,

10

where the relevant statutory provision restricts vast amounts of private speech *regardless* of whether such speech is commercial or non-commercial. *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 n.15 (11th Cir. 2005) ("Because the sign code does not regulate commercial speech as such, but rather applies without distinction to signs bearing commercial and noncommercial messages, the *Central Hudson* test has no application here" (applying strict scrutiny)); *Free Speech Coalition, Inc.*, 825 F.3d at 164 (content-based restrictions on production of both commercial and noncommercial pornographic images were subject to strict scrutiny under *Reed*). Section 227(b)(1)(A)(iii) facially applies to *any* autodialed or prerecorded voice call initiated by any private actor that does not convey a government-favored message; as such, it subjects to liability calls by political action committees, politicians, and others communicating political speech and other core protected speech, including calls by TWC. In addition, to the extent that commercial speech is subject to liability under the statute, § 227(b)(1)(A)(iii) discriminates *among* different "commercial" messages (*e.g.*, between speech intended to collect a government-guaranteed private debt, and speech intended to collect other private debts), and thus is subject to strict scrutiny even under the Supreme Court's traditional framework regulating commercial speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-67 (2011) (law singling out pharmaceutical manufacturers promoting brand-name drugs for disfavored treatment was subject to strict scrutiny because it "impose[d] a burden based on the content of speech and the identity of the speaker"); *Reed*, 135 S. Ct. at 2230 ("[A] law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based."); *Brown*, 564 U.S. at 802 ("Here, California has singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and has given no persuasive reason why.").

11

Plaintiffs' claims in this case directly implicate both of the principal distinctions discussed above (*i.e.*, the preference for calls by government speakers and all calls aimed at collecting government-related debts). Plaintiffs Hunter and Villa both contend that TWC placed unlawful debt collection calls to them without their prior express consent. *See* Amended Complaint at 1, ¶¶ 1, 18. But the government is categorically exempt from liability for use of an autodialer or prerecorded voice to place similar calls under § 227(b)(1)(A)(iii), because it is not a "person" subject to liability. *See* July 2016 TCPA Order ¶ 10. Likewise, if TWC or any other private actor placed calls seeking to collect a customer's private debt that was *guaranteed by the government*, or a debt *owed to the government*, those messages too would be free from liability. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Whether TWC might be held liable for the payment reminder calls at issue here necessarily depends on an examination of the content of those calls to determine to whom the debt was owed, and whether such debt was government-guaranteed. Likewise, Plaintiffs seek to impose class-wide liability for "telemarketing" calls. Amended Complaint at 1, ¶¶ 59, 61.[11] But § 227(b)(1) permits the government to place similar autodialed and prerecorded voice calls providing information and encouraging citizens to make choices that it prefers through otherwise prohibited means. *See* July 2016 TCPA Order ¶¶ 5, 11 (stating that calls from the government or its agents to Social Security beneficiaries "to inform them about their options for returning to self-supporting employment" are exempt from the TCPA). TWC's alleged liability in this case hinges precisely on the content-based distinctions embedded in § 227(b)(1)(A)(iii), which are subject to strict scrutiny.

---

[11] TWC takes the position that Plaintiffs fail to sufficiently allege that they *themselves* received any telemarketing calls, and denies that it placed any telemarketing calls to Plaintiffs. However, for the purposes of this motion, TWC assumes, without conceding, that Plaintiffs may have received telemarketing calls.

### B.       Section 227(b)(1)(A)(iii) Does Not Withstand Strict Scrutiny

The TCPA's restrictions on private speech under § 227(b)(1)(A)(iii) cannot survive strict scrutiny because the federal government has no plausible interest in "significantly constrain[ing]" and "severely" "impair[ing]" private callers' "ability to communicate with … citizens" by prohibiting use of an autodialer or prerecorded voice without prior express consent, while permitting government entities themselves and private speakers that disseminate government-favored messages to place calls through the exact same channels.  July 2016 TCPA Order ¶ 15.  And even if such a state interest were present, these distinctions between favored and disfavored speech do not directly advance, and are not narrowly tailored to, any such interest.[12]

### 1.       The provision's content-based distinctions do not advance any compelling state interest.

In order to withstand strict scrutiny, a content-based regulation must be narrowly tailored to serve a compelling government interest.  *Reed*, 135 S. Ct. at 2230-31.  The reviewing court "must identify with care the interests the State itself asserts" in maintaining the speech restriction, and may not "supplant the precise interests put forward by the State with other suppositions."  *Edenfield v. Fane*, 507 U.S. 761, 768 (1993); *see also Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest.").  In enacting § 227(b)(1), Congress identified two principal interests: (1) reducing congestion of emergency telephone lines, which could harm public safety, and (2)

---

[12] Indeed, § 227(b)(1)(A)(iii) could not survive even *intermediate* scrutiny, because it does not directly and materially advance any substantial governmental interest, and is more extensive than necessary to serve the interests that purportedly support it.  *See, e.g.*, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190 (1999) (restriction on advertising of private casino gambling was "so pierced by exemptions and inconsistencies that the Government [could] not hope to exonerate it").

13

protecting residential privacy.  *See* Pub. L. 102-243, § 2, ¶¶ 5-6, 9-10, 12-14, 105 Stat. 2394-95 (1991).  When Congress amended § 227(b)(1)(A)(iii) in 2015 to exempt calls by private actors that are "made solely to collect a debt owed to or guaranteed by the United States," it did not provide any explicit indicia of its intent, aside from the text of the statute itself.  *See* Aug. 2016 TCPA Order ¶ 5 ("While no legislative history exists that lays out the legislative intent, we believe two reasonable interpretations of the statute are to: (1) make it easier for owners of debts owed to or guaranteed by the United States and their contractors to make calls to collect the debts; and (2) make it easier for consumers to obtain useful information about debt repayment, which may be conveyed in these calls.").  With respect to the content- and speaker-based distinctions drawn by § 227(b)(1)(A)(iii), none of these asserted interests is remotely "compelling."

To the extent the government's interest in maintaining public safety is "compelling" in the abstract, *see, e.g., Fl. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995), nothing in the statute or the legislative history indicates a public safety rationale underlying the statute's distinctions between government and private speakers conveying favored messages, on the one hand, and private speakers conveying disfavored messages, on the other.  That interest simply is not implicated in the provision that is the subject of this suit.  Notably, Plaintiffs do not allege that TWC violated § 227(b)(1)(A)(i) by placing calls "to any emergency telephone line." Plaintiffs instead seek to impose liability pursuant to § 227(b)(1)(A)(iii), for alleged autodialed and prerecorded voice calls placed to a "telephone number assigned to a … cellular telephone service" absent prior express consent.  Amended Complaint ¶¶ 39, 56.  But Congress did not justify *that* provision by reference to a public safety interest, nor could it have.  *See* Pub. L. 102-

243, § 2, ¶ 5, 105 Stat. 2394 (noting "a risk to public safety" only in connection with instances "when an emergency or medical assistance telephone line is seized").[13]

Likewise, there is no compelling "privacy" interest in the context of consumers' receipt of mobile phone calls. Traditionally, the Supreme Court has granted the greatest protection to the privacy of individuals within their own homes when held "captive" to receive the speech at issue, while acknowledging diminished privacy interests beyond those circumstances. *See Frisby v. Schultz*, 487 U.S. 474, 487 (1988). Calls placed to mobile phones do not implicate the same set of concerns as calls to the home; for example, mobile subscribers may silence or turn off their phones, or use pre-installed or third party applications to block callers; mobile phone users are hardly "captive," unwilling listeners. *See id.*; *see also Consol. Edison Co.*, 447 U.S. at 541-42 (finding no compelling interest in residential privacy with respect to restriction prohibiting electrical utility from including informational inserts in billing mailers, and holding that "[w]here a single speaker communicates to many listeners, the First Amendment does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid

---

[13] *See also Benzion v. Vivint, Inc.*, No. 12-61826-CIV, 2014 WL 11531368, at *3 (S.D. Fla. Jan. 17, 2014) (noting, based on the legislative history, that autodialed and prerecorded voice calls may create "an intrusive invasion of privacy *and a risk to public safety if the calls are made to emergency or medical-assistance telephones*" (citing Pub. L. No. 102–243, § 2, 105 Stat. 2394) (emphasis added)). To the extent that individual legislators identified additional public safety interests served by the TCPA (for example, related to the possibility that then-current calling technology might have "seized" a telephone line away from emergency use), those interests related to still other provisions of the legislation not at issue here. *See, e.g.*, 137 Cong. Rec. 35,306 (1991) (statement of Rep. Margaret Roukema) ("S. 1462 also contains a provision *requiring computer-generated calls to disconnect as soon as the receiver seeks to terminate the message. This is a commonsense provision which **ensures** the safety of telephone customers* who may have received unsolicited and unwanted computer-generated calls." (emphasis added)); 137 Cong. Rec. 18,123 (1991) (statement of Sen. Fritz Hollings) ("These computers often call and then do not hang up the line. … This can prevent the person called from using the telephone at all, which is of special concern in emergency situations. *As a result, the bill requires automated calls to disconnect the telephone within 5 seconds of the time the machine is notified that the called party has hung up the phone*." (emphasis added)).

objectionable speech" by "simply averting their eyes" or throwing the objectionable message in the trash (quotation marks and citation omitted)).  And even assuming that mobile subscribers' interests in avoiding unwanted calls both within and beyond the home were analogous to the traditional interest in residential privacy, that interest is ultimately only a "substantial" or "significant" one.  *See Frisby*, 487 U.S. at 484 (identifying residential privacy as a "significant government interest"); *Kirkeby v. Furness*, 92 F.3d 655, 659 (8th Cir. 1996) ("[T]he Supreme Court has never held that [residential privacy and tranquility] is a compelling interest, and we do not think that it is." (citation omitted)).

As noted above, Congress's amendment of § 227(b)(1)(A)(iii) in 2015 to exempt calls by private actors that are "made solely to collect a debt owed to or guaranteed by the United States" was not accompanied by any explicit indicia of the interests it hoped to serve.  It necessarily follows that Congress failed to adduce evidence that differentiating between debt-collection calls benefitting the government and those benefitting private creditors is necessary to prevent any cognizable harms or "that its restriction" on the latter type of calls "will in fact alleviate [those harms] to a material degree."  *Edenfield*, 507 U.S. at 770-71.  But even assuming, *arguendo*, that Congress had properly demonstrated an interest in making it easier for owners of debts owed to or guaranteed by the United States to collect, or to inform consumers about payment options (suppositions which are not supported by any factual findings or evidence in the congressional record), those too have not been identified by the Supreme Court as compelling state interests justifying restrictions on speech.

Because the government has no compelling interest in restricting private autodialed and prerecorded voice calls, while at the same time exempting from liability calls placed by the

government and private actors conveying government-favored messages, § 227(b)(1)(A)(iii) cannot withstand strict scrutiny.

> **2.    The provision's content-based distinctions are not narrowly tailored to any asserted state interests.**

Even if the government arguably has some compelling interest in generally restricting private autodialed and prerecorded calls to non-emergency numbers while permitting the government and private actors conveying favored messages to place such calls, those distinctions are not narrowly tailored to such an interest. *See Reed*, 135 S. Ct. at 2230–31. To survive narrow tailoring analysis, the government may not restrict constitutionally protected speech unless "it chooses the least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). Moreover, the congressional record must contain evidence that the distinctions in question are narrowly drawn to address actual harm; anecdote and supposition will not suffice. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000); *Sable*, 492 U.S. at 130. Of particular relevance here, a regulation cannot be *underinclusive*, meaning that it cannot leave "appreciable damage to [the government's] interest unprohibited." *Reed*, 135 S. Ct. at 2232 (citation omitted). A statute's underinclusiveness is an often-fatal defect because it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. Nor can the restriction be *overinclusive*, meaning that it cannot "unnecessarily circumscribe protected expression." *Republican Party v. White*, 536 U.S. 765, 775 (2002) (citation omitted). Here, the speech restrictions at issue are both hopelessly underinclusive and overinclusive and therefore fail both modes of narrow tailoring analysis.

          *a.*    *Section 227(b)(1)(A)(iii)'s discriminatory application to select private messages is fatally underinclusive.*

The TCPA's selective restrictions on autodialed and prerecorded voice calls under § 227(b)(1)(A)(iii) are not narrowly drawn to advance the government's identified privacy or public safety interests because large gaps in that provision's coverage seriously and unnecessarily limit its effectiveness.  As discussed above, § 227(b)(1)(A)(iii) does not restrict any calls made by the government, including payment reminder calls, survey calls, or informational calls similar to those that private actors, including TWC, frequently place.  *See* July 2016 TCPA Order ¶ 11.  To the extent that such calls allegedly invade subscribers' privacy or pose public safety concerns, those concerns are present whether the calls originate from a private caller, the government, or private actors seeking to collect a government-guaranteed or -owned debt.  But among those three types of speakers, only the first group—private callers conveying disfavored messages—is barred by statute from placing autodialed or prerecorded calls absent the called party's prior express consent.  By exempting a vast amount of government speech (and private, government-favored speech) that engenders these same asserted risks, § 227(b)(1)(A)(iii) "is wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it."  *Brown*, 564 U.S. at 802.

For example, even assuming there were a compelling public safety interest in reducing autodialed and prerecorded voice calls as a general matter, there is no evidence that government calls and private calls collecting government-guaranteed or -owned debt pose any less of a safety risk than private calls using the same technology.  There is simply no plausible safety interest— much less any in the congressional record—in a rule that broadly prohibits autodialed and prerecorded voice calls placed by private parties yet permits the same types of purportedly harmful calls to be placed by the government (and private actors collecting government-related

debts) using identical technology.   And while it might be the case that some limitations on autodialed and prerecorded voice calls to cell phones could advance an interest in subscribers' privacy, a statutory scheme that contains a sweeping prohibition on all autodialed and prerecorded voice calls by private parties, but nevertheless permits such purportedly intrusive calls to be placed by the government (or its agents), or by private actors to collect government-related debts, does not rationally serve any privacy interest at all.  *See* Pub. L. 102-243, § 2, ¶ 10, 105 Stat. 2394 (1991) (stating that "[e]vidence … indicates that residential telephone subscribers consider automated or prerecorded telephone calls, *regardless of … the initiator of the message*, to be a nuisance and an invasion of privacy."); Aug. 2016 TCPA Order ¶ 9 (noting that during the FCC's consideration of rules governing calls relating to debts guaranteed by or owed to the government, the FCC received 12,500 comments expressing "general dislike for robocalls"); *see also Discovery Network*, 507 U.S. at 418 (rejecting the justification that "every decrease in the number of [commercial newsracks] necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape," given that the banned newsracks "are no more harmful than the permitted newsracks").

Noting the incoherence and ineffectiveness of selective content- and speaker-based restrictions affecting the use of dialer technology, other courts—including the Fourth Circuit—have recently found that similar state-level restrictions on "robocalls" failed to withstand strict scrutiny on this very basis.  *See Cahaly*, 796 F.3d at 406 (invalidating application of state robocalling statute under strict scrutiny because "the statute suffers from underinclusiveness because it restricts two types of robocalls—political and consumer—but permits 'unlimited proliferation' of all other types" (citation omitted)); *Gresham*, 2016 WL 4027901, at *4 (finding that statute restricting use of autodialers for commercial purposes or political campaigns was

fatally underinclusive, because "[i]f the interests of privacy and safety warrant restriction of automated calls made for a commercial purpose or in connection with a political campaign, they also warrant restriction of other types of automated calls").

More generally, the Supreme Court's underinclusiveness cases from a variety of factual contexts—applying both strict and intermediate scrutiny—confirm that § 227(b)(1)(A)(iii) fails the narrow-tailoring analysis.  For example, in *Discovery Network*, the Court held that an ordinance banning commercial newsracks but not non-commercial newsracks on the basis of safety and aesthetics concerns was fatally underinclusive because the banned newsracks "[we]re no more harmful than the permitted newsracks."  507 U.S. at 418, 424.  Similarly, in *Republican Party v. White*, the Court concluded that restrictions on judicial candidates' discussion of legal issues during their candidacy (but not before or thereafter) failed under strict scrutiny absent any evidence that "campaign statements are uniquely destructive of [perceptions of] openmindedness;" the Court found that those restrictions were "so woefully underinclusive as to render belief in that purpose [of promoting 'openmindedness'] a challenge to the credulous."  536 U.S. 765, 780-81 (2002).  Likewise, in *Rubin v. Coors Brewing Co.*, the Court held that a ban on alcohol content labels that applied to beer but not to wine and spirits was underinclusive and not even rationally related to the state's interest in preventing "strength wars" among alcohol producers; as such, that law failed to "directly and materially advance its aim" in preventing such strength wars and was invalidated on that basis.  *See* 514 U.S. 476, 489 (1995).   In *Brown*, the Supreme Court invalidated a state law restricting the sale of violent video games, but not other forms of violent media, as "wildly underinclusive when judged against" the state's compelling interest in protecting children from violent content. 564 U.S. at 802 ("Here, California has singled out the purveyors of video games for disfavored treatment—at least when compared to

booksellers, cartoonists, and movie producers—and has given no persuasive reason why."). And in *Greater New Orleans Broadcasting Ass'n*, the Supreme Court held that legislation banning advertisements for private casino gambling, but not other types of gambling (including state-run gambling), was underinclusive and not even rationally related to the state's interest in reducing gambling because the law addressed only part of the purported problem.  527 U.S. 173, 190 (1999).[14]

These cases demonstrate that the government may not restrict disfavored speakers and messages while exempting favored speakers and messages that implicate the very same asserted government interests.  And as *Greater New Orleans* demonstrates, such speech preferences are no more permissible when the government seeks to favor its *own* speech over private speech, as occurs based on the TCPA's exemptions of calls by government speakers and any calls concerning the collection of government debt.  *See id.* (relying on an exemption of state-owned casinos from an advertising ban for casino gambling as a basis to declare the law unconstitutional).

> b.      *Section 227(b)(1)(A)(iii) also is overinclusive.*

In at least two important ways, § 227(b)(1) also is fatally *overinclusive*.  *First*, to the extent that there remains today some safety risk posed by autodialed and prerecorded voice calls "seizing" a non-emergency phone line, such behavior is already categorically prohibited by

---

[14] *See also Playboy Entm't Grp.*, 529 U.S. at 812 (finding that restrictions on the transmission of pornography over cable television were not only impermissibly overinclusive, but also constitutionally suspect insofar as they "single[d] out particular programmers" whose channels were "'*primarily* dedicated to sexually-oriented programming'" but did not restrict other channels that transmitted a lesser quantity of the same, objectionable content (emphasis added, citation omitted));  *Denver Area Educ. Telecomms Consortium, Inc. v. FCC*, 518 U.S. 727, 756 (1996) (law requiring cable operators to block sexual material on leased channels, but not on unleased channels, was underinclusive and not narrowly tailored to serve the state's compelling interest in protecting children).

statute and rule.  Section 227(d)(3)(B) requires that the FCC must promulgate rules for systems that are used to "transmit any artificial or prerecorded voice messages" requiring that "any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls."  As the congressional record makes clear, *that* provision effectively prohibits callers from tying up recipients' phone lines.  *See* 137 Cong. Rec. 35,306 (1991) (statement of Rep. Margaret Roukema) ("S. 1462 also contains a provision requiring computer-generated calls to disconnect as soon as the receiver seeks to terminate the message. *This is a commonsense provision which **ensures** the safety of telephone customers* who may have received unsolicited and unwanted computer-generated calls." (emphasis added)); 137 Cong. Rec. 18,123 (1991) (statement of Sen. Fritz Hollings) (similar).  In short, not only is there a plausible, less-restrictive alternative to severely curtailing private callers' ability to communicate through use of autodialers and prerecorded voice messages, but that alternative already has been identified by Congress and given the force of law.

*Second*, although Congress did not identify any evidence or interests supporting the 2015 amendment, the FCC identifies interests in "mak[ing] it easier for owners of debts owed to or guaranteed by the United States and their contractors to make calls to collect the debts" and to provide consumers with "useful information about debt repayment."  Aug. 2016 TCPA Order ¶ 5.  While this may be a valid (albeit not compelling) interest, a broad restriction on private uses of autodialer and prerecorded voice technology to disseminate private messages—which may be substantially more useful or important to consumers than the exempt government debt collection calls—is not necessary to achieve that valid aim.  And there is simply no evidence in the legislative record that the content- and speaker-based distinctions at issue here are the least

restrictive means of achieving that aim, or of advancing *any* of the other interests discussed above. *See Sable*, 492 U.S. at 129-130 ("aside from conclusory statements during the debates by proponents of the bill … the congressional record presented to us contains no evidence as to how effective or ineffective the … [alternative] regulations were or might prove to be"); *Playboy Entm't Group*, 529 U.S. at 822 (2000) (same).   Indeed, there are a host of less restrictive alternatives that would allow the government to limit allegedly intrusive calls, while at the same time achieving these valid interests.   *See Cahaly*, 796 F.3d at 405-06 (enumerating less restrictive alternatives including time-of-day limitations, mandatory disclosure of the caller's identity, and do-not-call lists); *Gresham*, 2016 WL 4027901, at *4 (listing plausible less restrictive alternatives including time-of-day restrictions, disconnection requirements, prohibitions on calls to emergency lines, caller I.D. laws, and internal and external do-not-call lists).   These examples indicate that the government has ample options available to regulate invasive calls in a manner that is appropriately tailored to the government's asserted interests. But in attempting to regulate such calls, the state cannot starkly discriminate against disfavored speakers and messages and impose severe liability on them; the government is not free to pick and choose which speakers and messages it wishes to advance, while suppressing the remainder.

## CONCLUSION

Because § 227(b)(1)(A)(iii) effects a facial content-based restriction on speech, as well as a speaker-based restriction that expresses a content-based preference for government messages and certain private messages over other, disfavored private messages, and those distinctions are not narrowly tailored to any compelling state interest, § 227(b)(1)(A)(iii) is unconstitutional and cannot impose liability on TWC for the calls that are the subject of this suit.   Accordingly, TWC's motion for judgment on the pleadings should be granted.

Dated: October 21, 2016                    Respectfully Submitted,

                                           LATHAM & WATKINS LLP

                                           By  /s/ Andrew D. Prins

                                           Peter L. Winik (*pro hac vice*)
                                           Matthew A. Brill (*pro hac vice*)
                                           Andrew D. Prins (*pro hac vice*)
                                           555 Eleventh Street, NW, Suite #1000
                                           Washington, DC 20004
                                           Telephone: (202) 637-2200
                                           Facsimile: (212) 637-2201
                                           peter.winik@lw.com
                                           matthew.brill@lw.com
                                           andrew.prins@lw.com

                                           *Attorneys for Defendant*
                                           *Time Warner Cable Inc*.