## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEONA HUNTER and ANNE MARIE VILLA, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>TIME WARNER CABLE INC.,<br><br>      Defendant. | Case No. 1:15-cv-06445-JPO-JLC<br><br>Oral Argument Requested |

## DEFENDANT TIME WARNER CABLE INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Peter L. Winik (*pro hac vice*)
Matthew A. Brill (*pro hac vice*)
Andrew D. Prins (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200

*Attorneys for Defendant Time Warner Cable Inc.*

December 9, 2016

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT .........................................................................................................................8

I.      PLAINTIFFS CANNOT ESTABLISH THAT THE TCPA APPLIES TO ALL
        OR MOST OF THE CALLS AT ISSUE HERE ....................................................8

        A.      **Plaintiffs Cannot Show That TWC Used An ATDS To Make Any Call** ..........9
                1.      IVR Platform ...................................................................................11
                2.      NobelBiz Platform ...........................................................................14
                3.      eClerx Platform ...............................................................................16
                4.      Meridian Platform ...........................................................................17
                5.      InfoCision Platform .........................................................................18

        B.      **Plaintiffs Cannot Establish That TWC Played A Prerecorded Or**
                **Artificial Voice On Many Calls** ................................................................18
                1.      Plaintiff Villa ...................................................................................19
                2.      Plaintiff Hunter ...............................................................................20

        C.      **Several Calls Fall Within The FCC-Created Safe Harbor** ............................23

II.     TWC HAD VALID CONSENT TO CALL THE SUBJECT PHONE NUMBERS ........24

III.    PLAINTIFFS LACK ARTICLE III STANDING .......................................................26

IV.     PLAINTIFFS' "DO-NOT-CALL" LIST CLAIMS FAIL ...............................................30

V.      PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF ...............................33

CONCLUSION .....................................................................................................................35

# TABLE OF AUTHORITIES

**Pages**

## <u>CASES</u>

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105 (2d Cir. 2016)..........................35

*Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016)....................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)................................................. 8

*Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-CV-1721-BEN (WVG), 2014 WL 1744136
    (S.D. Cal. Apr. 30, 2014) ......................................................26

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) .................................26

*Danehy v. Time Warner Cable Enters.*, No. 5:14-CV-133-FL, 2015 WL 5534094
    (E.D.N.C. Aug. 6, 2015), *report and recommendation adopted*, 2015 WL 5534285
    (E.D.N.C. Sept. 18, 2015) ............................................... 13, 25, 26

*Estrella v. Ltd Fin. Servs., LP*, No. 8:14-cv-2624-T-27AEP, 2015 WL 6742062
    (M.D. Fla. Nov. 2, 2015)................................................ 10, 15, 17

*Ewing v. SQM US, Inc.*, ___ F. Supp. 3d ___, 2016 WL 5846494 (S.D. Cal. Sept. 29, 2016) .............28

*Friedman v. Nat'l Programming Serv. LLC*, No. CV 15-4866 DMG (JEMx), 2016 WL 1211779
    (C.D. Cal. Mar. 25, 2016)..................................................11

*Gaza v. LTD Fin. Servs., L.P.*, No. 8:14-CV-1012-T-30JSS, 2015 WL 5009741
    (M.D. Fla. Aug. 24, 2015) ............................................... 11, 16, 17

*Gillard v. Receivables Performance Mgmt., LLC*, No. 14–02392, 2015 WL 3456751
    (E.D. Pa. June 1, 2015)......................................................11

*Goad v. Censeo Health, LLC*, No. 3:15CV00197 JLH, 2016 WL 2944658
    (E.D. Ark. May 19, 2016)....................................................11

*Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014).............................. 9

*Gubala v. Time Warner Cable, Inc.*, No. 15-CV-1078-PP, 2016 WL 3390415
    (E.D. Wis. June 17, 2016) ...................................................34

*Hamilton v. Spurling*, No. 3:11CV00102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013)...............30

*Hudson v. Babilonia*, ___ F. Supp. 3d ____, 2016 WL 3264150 (D. Conn. June 14, 2016)..........8, 11

i

*Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697-WMA, 2013 WL 5230061
(N.D. Ala. Sept. 17, 2013) ................................................................................. 9

*Jenkins v. mGage, LLC*, No. 1:14-CV-2791-WSD, 2016 WL 4263937
(N.D. Ga. Aug. 12, 2016) ...................................................................................15

*Juarez v. Citibank, N.A.*, No. 16-cv-01984-WHO, 2016 WL 4547914
(N.D. Cal. Sept. 1, 2016) ....................................................................................28

*Leung v. XPO Logistics, Inc.*, 164 F. Supp. 3d 1032 (N.D. Ill. 2015) ........................................28

*Leyse v. Bank of Am., Nat'l Ass'n*, No. 09- Civ. 7654(JGK), 2010 WL 23824004
(S.D.N.Y. June 14, 2010) ...................................................................................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................................................................26

*Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288 (S.D. Cal. 2014) ............. 9, 12-13, 15, 16

*McKenna v. WhisperText*, No. 5:14–cv–00424–PSG, 2015 WL 5264750
(N.D. Cal. Sept. 9, 2015) ...................................................................................10

*Meadows v. Franklin Collection Serv., Inc.*, 414 F. App'x 230 (11th Cir. 2011) .......................31

*Messina v. Green Tree Servicing, LLC*, __ F. Supp. 3d __, 2016 WL 6089821
(N.D. Ill. Sept. 28, 2016) ................................................................................ *Passim*

*N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306 (1984) ...............................33

*Nieto v. Allied Interstate, Inc.*, No. CCB-13-3495, 2014 WL 4980376 (D. Md. Oct. 3, 2014),
*aff'd*, 599 F. App'x 74 (4th Cir. 2015) ..............................................................11

*Roberts v. Medco Health Sols., Inc.*, No. 4:15 CV 1368 CDP, 2016 WL 3997071
(E.D. Mo. July 26, 2016) ...............................................................................19, 22

*Romero v. Dep't Stores Nat'l Bank*, __ F. Supp. 3d __, 2016 WL 4184099
(S.D. Cal. Aug. 5, 2016) ................................................................................27, 28

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................................................34

*Simmons v. Charter Commc'ns, Inc.*, No. 3:15-CV-317 (SRU), 2016 WL 1257815
(D. Conn. Mar. 30, 2016) ..............................................................................30, 32

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ..........................................................26, 27, 28

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..............................................................27

*Wattie-Bey v. Modern Recovery Solutions*, No. 1:14-CV-01769, 2016 WL 1253489 (M.D. Pa. Mar. 10, 2016)......................................................................................................13

*Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635 (5th Cir. 2015)................................................8, 18

## OTHER AUTHORITIES

47 C.F.R. § 64.1200(d)......................................................................................... 3, 30, 31, 32

47 C.F.R. § 64.1200(f)(12)........................................................................................30

Telephone Consumer Protection Act, 47 U.S.C. § 227 ............................................................ 1

47 U.S.C. § 227(a)(1)......................................................................................................9, 10

47 U.S.C. § 227(b)(1)(A)(iii) ............................................................................... *Passim*

47 U.S.C. § 227(b)(3).....................................................................................................3, 34

Cable Privacy Act, 47 U.S.C. § 551....................................................................................... 3

## INTRODUCTION

Time Warner Cable Inc. ("TWC")[1] provides Internet, cable, home phone, and other residential services to millions of subscribers across the United States.  In connection with these services, TWC places calls to its customers for many routine business purposes, including scheduling installations, arranging service visits, and providing payment reminders so that service is not unexpectedly cut off.  TWC's customers benefit from these important, time-sensitive calls, and expressly consent to receive them.

TWC takes many steps to ensure that it calls only those individuals who have agreed to be contacted by telephone; among other things, calls are generally directed to customers at the phone numbers they provide to TWC and that are documented in their TWC account records as their primary or home phone numbers.  But customers sometimes change phone providers or discontinue phone service, and their numbers are then sometimes reassigned by their phone carriers to new subscribers without TWC's knowledge.  Although TWC attempts to ascertain when this happens, there is no foolproof means to do so.  This creates a risk that, on occasion, the person answering a call from TWC may differ from the intended recipient of the call.

Here, TWC attempted to contact two different, active customers in support of its routine business purposes—in most instances, to remind them that payments were due in order to avoid a an interruption in service.  As it turns out, TWC accidentally reached Plaintiffs at its customers' phone numbers of record.  For this, Plaintiffs seek to recover millions in "damages" under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"), on behalf of themselves and various putative classes.  First Am. Compl., ECF No. 45, ¶¶ 30, 47, 62, 82-89.

---

[1] As TWC previously informed the Court, it completed a merger with Charter Communications, Inc. in May 2016, but we refer herein to TWC for the sake of continuity.

Plaintiffs' claims, however, have multiple, independent defects that warrant summary judgment in TWC's favor.

*First*, Plaintiffs argue that TWC violated the TCPA by using an automatic telephone dialing system ("ATDS") or by playing an artificial or prerecorded voice during calls to which they did not consent.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  But Plaintiffs cannot satisfy their burden of establishing that TWC used an ATDS on any call to them.  The attached declarations demonstrate that the dialing systems at issue here lack both the present ability, as well as the potential capacity, "to store or produce telephone numbers to be called, using a random or sequential number generator."  47 U.S.C. § 227(a)(1)(A).  Likewise, even assuming *arguendo* that TWC plays prerecorded or artificial voices during some calls, the undisputed evidence shows that TWC would not have played such a voice on the vast majority of calls here.  And for several of the calls, there can be no potential TCPA liability in any case because of the FCC's regulatory safe harbor for calls to re-assigned numbers.

*Second*, even if the TCPA does apply to some of the calls at issue, TWC had prior express consent to contact the phone numbers at issue here.  Under the correct interpretation of the TCPA, TWC had adequate consent to make the calls because it had the permission of its subscribers and was intending to call those subscribers.  This consent should bar Plaintiffs' claims under 47 U.S.C. § 227(b)(1)(A)(iii).

*Third*, Plaintiffs lack standing to assert the subject claims, because they cannot establish Article III injury for each of the calls for which they seek damages.  TWC therefore cannot be held liable for those calls, even if some of them arguably come within the scope of the statutory prohibition.

*Fourth*, Plaintiffs claim that TWC did not maintain adequate do-not-call policies under the TCPA's implementing regulations.  *See* 47 C.F.R. § 64.1200(d).  But that claim fails as a matter of law because those do-not-call regulations apply only to telemarketing calls, and Plaintiffs did not develop, and therefore cannot adduce, evidence demonstrating that TWC made any such calls to them.  In any event, there is no genuine factual dispute that TWC maintains a robust and fully compliant do-not-call program.

*Finally*, Plaintiffs' request for injunctive relief is improper.  Should the Court determine that TWC is liable for placing any of the calls at issue, Plaintiffs have an adequate remedy at law—statutory damages under 47 U.S.C. § 227(b)(3)—that precludes the availability of injunctive relief.  And their request is also moot because TWC discontinued calling them almost a year ago and has implemented controls to ensure that they will not be called again.  There is thus no reasonable prospect that TWC will resume calling Plaintiffs.

Because there is no genuine issue of material fact as to any of these issues, TWC is entitled to summary judgment.

## STATEMENT OF FACTS

On September 21, 2015, a new TWC customer, "A.S.,"[2] signed up for TWC service and established an account listing the phone number that is the subject of Plaintiff Villa's claim (ending in 5900) as his primary contact number.  *See* Ex. A. to Peppercorn Decl., A.S. Account Screenshot; Flores Decl. ¶¶ 9-10.  At that time, A.S. granted TWC consent to contact that phone number, *inter alia*, by voluntarily providing the subject phone number to TWC, and by agreeing to be bound by the then-applicable TWC Residential Services Subscriber Agreement

---

[2] Given its subscribers' interest in confidentiality, including under the Cable Privacy Act, 47 U.S.C. § 551, TWC refers to customers who are third parties to this lawsuit by their initials.  The identity of these third parties is immaterial to the present controversy.

("Subscriber Agreement"), which explicitly granted such consent to TWC.  Flores Decl. ¶¶ 4-8,

10-12; Ex. A to Flores Decl., Subscriber Agreement at Provision 12.   Subsequently, on

November 23, 2015, the 5900 number was reassigned to Plaintiff Villa when she signed up for

MetroPCS phone service.  *See* Ex. A to Prins Decl., Villa MetroPCS Subscriber Records; Ex. B

to Prins Decl., Villa Dep. Tr. 36:10-20.   Notwithstanding that the 5900 phone number was

reassigned to Plaintiff Villa, A.S. remained an active TWC customer, and continued to list that

phone number as his primary contact number on his TWC account.  Flores Decl. ¶ 10; Ex. A to

Peppercorn Decl., A.S. Account Screenshot.  Around the same time that Plaintiff Villa obtained

the 5900 phone number, in November 2015, A.S.'s TWC account became delinquent.  Ex. A to

Peppercorn Decl., A.S. Account Screenshot; Flores Decl. ¶ 13.   That customer's delinquency

was the driver for seven payment reminder calls that TWC and its vendor, Meridian, placed to

the 5900 number between November 27, 2015 and December 9, 2015, as set forth in Table 1

below.

**Table 1**

| Call No. | Timestamp | Platform[3] |
|----------|-----------|-------------|
| 1 | 11/27/2015 13:26:51 | IVR |
| 2 | 11/27/2015 19:27:34 | IVR |
| 3 | 12/02/2015 14:52:56 | IVR |
| 4 | 12/02/2015 20:53:11 | IVR |
| 5 | 12/08/2015 14:40:41 | IVR |
| 6 | 12/08/2015 20:41:20 | IVR |
| 7 | 12/09/2015 14:35:39 | Meridian |

*See* Peppercorn Decl. ¶ 6; Ex. B to Peppercorn Decl., Villa IVR Call Records; Ex. C to Prins

Decl., Villa MetroPCS Call Records at 64-68;[4] Bennett Decl. ¶ 9.

---

[3] The details of the particular platforms listed in Table 1 and Table 2 are described in more detail
*infra* at 11-18.

At no point during these seven calls did TWC or its vendor succeed in reaching a live person. Peppercorn Decl. ¶¶ 9, 34; Bennett Decl. ¶ 9. Nor did TWC receive any calls from the 5900 phone number during that time period. Peppercorn Decl. ¶ 7; Ex. C to Peppercorn Decl., Villa TWC Inbound Call Log at 1 (reflecting no inbound calls); Ex. C to Prins Decl., Villa MetroPCS Call Records at 68 (reflecting that the 5900 phone number was used in an attempt to dial TWC's phone number only once, on December 8, 2015 at 21:35:16 UTC, but that call did not successfully complete, and had no duration). As a result of A.S.'s continued delinquency, TWC discontinued calls to the 5900 phone number on December 9, 2015, in accord with its standard practice. Peppercorn Decl. ¶ 8. Since that date, TWC has not attempted any further calls to A.S. using that phone number. *Id.* On or around December 24, 2015, TWC disconnected A.S.'s account due to his delinquency. *Id.* ¶ 10. And on February 4, 2016, TWC removed the 5900 phone number from its billing system to ensure that Plaintiff Villa would not be inadvertently contacted again. *Id.* ¶ 11; Green Decl. ¶ 12.

Plaintiff Hunter likewise was a recipient of phone calls due to a reassigned phone number. Before Plaintiff Hunter was assigned the phone number ending in 1089, the number belonged to a TWC customer, "A.F." *See* Flores Decl. ¶ 14. A.F. signed up for TWC service on or about April 13, 2014, and provided TWC consent to call the phone number ending in 1089. Peppercorn Decl. ¶ 12; Ex. D to Peppercorn Decl., A.F. Account Screenshot-1; Flores Decl. ¶¶ 14-16; Ex. A to Flores Decl., Subscriber Agreement at Provision 12. Plaintiff Hunter later was assigned A.F.'s phone number when she signed up for MetroPCS mobile phone service on May 18, 2015. *See* Ex. D to Prins Decl., Hunter MetroPCS Subscriber Records. But A.F. did not

---

[4] The subject MetroPCS records produced by T-Mobile (the corporate entity controlling the MetroPCS brand) express time in Coordinated Universal Time (UTC), and the times expressed therein must be converted to local time in order to match TWC's internal records.

notify TWC of the change to his telephone number.  *See* Flores Decl. ¶ 17.  As relevant here, A.F. became delinquent on his TWC bills multiple times from approximately May 2015 to February 2016.  *See* Peppercorn Decl. ¶ 13; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 2-3 (documenting outbound collections calls).  His delinquency was the reason for nearly all of the calls that were inadvertently received by Plaintiff Hunter from May 2015 to February 2016, listed in Table 2 below.  *See* Peppercorn Decl. ¶¶ 13, 19; Ex. G to Peppercorn Decl., Hunter TWC Call Records  at 2-3.

On or about February 5, 2016, A.F. appears to have moved out of his residence and established TWC service at his new residence, which was connected on or about February 10, 2016.  Flores Decl. ¶ 18; Ex. E to Peppercorn Decl., A.F. Account Screenshot-2 at 1; Ex. F to Peppercorn Decl., A.F. Account Screenshot-3 at 1.  During that timeframe, the calls TWC placed to the 1089 number were related to the disconnection and re-connection of A.F.'s services.  *See* Peppercorn Decl. ¶ 14; ███████████████  During a call on February 9, 2016, Plaintiff Hunter told TWC that it had called the wrong number and asked TWC to stop calling, and since February 10, 2016, TWC has not placed any further calls to the 1089 phone number.  *See* Peppercorn Decl. ¶ 16; Ex. G to Prins Decl., Hunter MetroPCS Call Records-3 at 88-190.  The following calls were placed by TWC or its vendors to the 1089 phone number:

**Table 2**

| Call  No. | Timestamp | Platform |
|---|---|---|
| 1 | 05/28/2015 13:36:52 | IVR |
| 2 | 05/28/2015 17:06:25 | IVR |
| 3 | 05/28/2015 20:35:41 | IVR |
| 4 | 06/04/2015 15:57:27 | IVR |
| 5 | 06/04/2015 19:26:33 | IVR |
| 6 | 06/04/2015 22:56:50 | IVR |
| 7 | 06/10/2015 15:02:35 | IVR |
| 8 | 06/10/2015 18:31:39 | IVR |
| 9 | 06/10/2015 22:02:05 | IVR |

| 10 | 06/13/2015 15:04:55 | IVR |
|----|---------------------|-----|
| 11 | 06/15/2015 15:34:09 | IVR |
| 12 | 06/15/2015 19:03:36 | IVR |
| 13 | 06/15/2015 22:33:09 | IVR |
| 14 | 06/18/2015 14:56:40 | IVR |
| 15 | 07/28/2015 13:19:00 | IVR |
| 16 | 08/01/2015 12:27:38 | IVR |
| 17 | 08/04/2015 14:05:24 | IVR |
| 18 | 08/07/2015 14:23:21 | IVR |
| 19 | 08/13/2015 14:54:04 | IVR |
| 20 | 08/18/2015 17:36:57 | IVR |
| 21 | 08/22/2015 22:28:06 | eClerx |
| 22 | 08/23/2015 17:17:01 | IVR |
| 23 | 08/24/2015 15:33:47 | IVR |
| 24 | 08/24/2015 21:32:25 | IVR |
| 25 | 08/28/2015 13:01:26 | IVR |
| 26 | 10/28/2015 12:56:43 | IVR |
| 27 | 11/07/2015 17:05:27 | IVR |
| 28 | 11/13/2015 16:02:45 | IVR |
| 29 | 11/28/2015 13:12:51 | IVR |
| 30 | 12/02/2015 13:02:36 | IVR |
| 31 | 12/08/2015 12:46:24 | IVR |
| 32 | 12/14/2015 16:23:30 | IVR |
| 33 | 12/28/2015 16:13:34 | IVR |
| 34 | 01/07/2016 16:38:07 | IVR |
| 35 | 01/13/2016 16:20:08 | IVR |
| 36 | 01/28/2016 14:22:36 | IVR |
| 37 | 01/28/2016 20:22:52 | IVR |
| 38 | 02/01/2016 15:35:08 | IVR |
| 39 | 02/06/2016 14:26:15 | InfoCision |
| 40 | 02/08/2016 13:10:26 | InfoCision |
| 41 | 02/09/2016 12:45:59 | InfoCision |
| 42 | 02/09/2016 16:14 | NobelBiz |
| 43 | 02/09/2016 16:37:51 | IVR |
| 44 | 02/10/2016 21:43:57 | IVR |

*See* Peppercorn Decl. ¶¶ 13-14; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 2-4;

Ex. H to Peppercorn Decl., Hunter TWC Survey Call Requests at 1; White Decl. ¶ 5; Bakshi

Decl. ¶ 13; Ex. E to Prins Decl., Hunter MetroPCS Call Records-1; Ex. F to Prins Decl., Hunter

MetroPCS Call Records-2; Ex. G to Prins Decl., Hunter MetroPCS Call Records-3 at 1-89.

## ARGUMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment also is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. Summary judgment is warranted here on all of Plaintiffs' claims.

## I.   PLAINTIFFS CANNOT ESTABLISH THAT THE TCPA APPLIES TO ALL OR MOST OF THE CALLS AT ISSUE HERE

For the TCPA to apply to the calls at issue in this case, Plaintiffs bear the burden of showing that TWC either used an ATDS to make a call to them, or played an artificial or prerecorded voice during a call to them. *See* 47 U.S.C. 227(b)(1)(A)(iii); *Hudson v. Babilonia*, ___ F. Supp. 3d ____, 2016 WL 3264150, at *14-15 (D. Conn. June 14, 2016)); *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635, 641 (5th Cir. 2015) ("[M]aking a call in which a prerecorded voice might, but does not, play is not a violation of the TCPA. Instead, the prerecorded voice must 'speak' during the call."). Here, Plaintiffs cannot carry their burden of establishing that TWC used an ATDS on any call, or played an artificial or prerecorded voice during many, if not all, of the calls. In addition, the FCC has established a regulatory safe harbor from liability for certain calls to a reassigned number. *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd 7961, ¶¶ 72, 82-84 (2015) (declaratory ruling)

("*FCC July 2015 Order*").  Pursuant to that safe harbor, TWC is entitled to summary judgment as to the first call received by each Plaintiff and two other calls to Plaintiff Hunter.

### A.   Plaintiffs Cannot Show That TWC Used An ATDS To Make Any Call

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).  The meaning of the statutory term "ATDS" has been the subject of much dispute, and the FCC's July 2015 Order's broad construction of that term is currently on appeal in the D.C. Circuit.  *See ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. filed July 10, 2015).  Because the FCC's July 2015 Order may be set aside on this point,[5] TWC herein briefs the ATDS issues under both the statutory standard and the FCC's interpretation.  But TWC is entitled to summary judgment under either standard.

Prior to the FCC's July 2015 Order, many courts had held that, to qualify as an ATDS, a system must have the *present ability* to store or produce numbers "using a random or sequential number generator." *See, e.g., Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1291-92 (S.D. Cal. 2014); *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192-93 (W.D. Wash. 2014); *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697-WMA, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013).  Under that standard, a system need not actually use a random or sequential number generator, but it must have that latent functionality.  This interpretation is faithful to the statute's purpose, which was to combat the particular problem of telemarketers indiscriminately dialing

---

[5]   An audio transcript of the 2.5+ hour oral argument is available at https://www.cadc.uscourts.gov/recordings/recordings2017.nsf/DCF7D286EBE49FC1852580510 05ED50F/$file/15-1211.mp3.  The panel expressed significant reservations about various aspects of the FCC's July 2015 Order.  Judge Edwards, for example, stated that the idea that liability could attach for use of a device with the mere *capacity* to use a random or sequential number generator (whether present or potential) "makes no sense" and "isn't what Congress was going after." *Id.* 10:15.

random telephone numbers and sequentially dialing large blocks of telephone numbers in the hopes of reaching someone on the other end. This interpretation is also faithful to the statute's plain language, which specifically states that an ATDS must have "the capacity" to "store or produce" numbers "using a random or sequential number generator." 47 U.S.C. § 227(a)(1).

The FCC's July 2015 Order, by contrast, takes a broader view of the meaning of ATDS. Under the FCC's interpretation, a telephone system is an ATDS as long as it could be modified to include a random or sequential number generator—*i.e.*, it has the *potential ability* to perform those functions. *See* FCC July 2015 Order ¶¶ 10-20. But even the FCC conceded in its July 2015 Order that this standard does not "extend to every piece of malleable and modifiable dialing equipment that conceivably could be considered to have some capacity, however small, to store and dial telephone numbers." FCC July 2015 Order ¶ 18. The potential capacity to use a random or sequential number generator must not be "too attenuated" or merely "theoretical." *Id.* And various fact-specific, case-by-case criteria, such as the involvement of "human intervention" in making the calls, can demonstrate that a system is too far removed from random or sequential number generation to fall within the reach of the standard. *Id.* ¶ 17 (explaining that whether the potential functionality of particular equipment includes the requisite "capacity" to perform random or sequential number generation is "a case-by-case determination"); *id.* ¶ 20 (same); *McKenna v. WhisperText*, No. 5:14–cv–00424–PSG, 2015 WL 5264750, at *3-5 (N.D. Cal. Sept. 9, 2015) (dismissing TCPA claim where plaintiff's allegations showed that dialer at issue sent text messages only via "human intervention"); *Estrella v. Ltd Fin. Servs., LP*, No. 8:14-cv-2624-T-27AEP, 2015 WL 6742062, at *3 (M.D. Fla. Nov. 2, 2015) (granting defendant summary judgment on TCPA claim because "the evidence demonstrates, at most, that the calls were placed manually with the use of human intervention through a 'point and click function.'").

Use of an ATDS is an essential element of Plaintiffs' claims. *See, e.g., Friedman v. Nat'l Programming Serv. LLC*, No. CV 15-4866 DMG (JEMx), 2016 WL 1211779, at *3 (C.D. Cal. Mar. 25, 2016) ("Since the use of an ATDS is a necessary element of a TCPA claim, the absence of any evidence on that element defeats Friedman's claim with regard to the text message."); *Gaza v. LTD Fin. Servs., L.P.*, No. 8:14-CV-1012-T-30JSS, 2015 WL 5009741, at *1 (M.D. Fla. Aug. 24, 2015). As explained below, and as the attached declarations demonstrate, none of the phone systems at issue is an ATDS under either standard. Because Plaintiffs did not develop, and therefore cannot adduce, evidence to the contrary, summary judgment must be entered in TWC's favor. *See, e.g., Hudson*, 2016 WL 3264150, at *14 ("[T]here [] must be evidence in the record that enables a reasonable jury to find that the Noble system used by NSI to call Mr. Hudson was an ATDS."); *Goad v. Censeo Health, LLC*, No. 3:15CV00197 JLH, 2016 WL 2944658, at *2 (E.D. Ark. May 19, 2016) ("Uncontroverted testimony that a system is very clearly not an automatic telephone dialing system warrants summary judgment."); *Nieto v. Allied Interstate, Inc.*, No. CCB-13-3495, 2014 WL 4980376, at *3 (D. Md. Oct. 3, 2014), *aff'd*, 599 F. App'x 74 (4th Cir. 2015) (granting summary judgment where defendant presented evidence that its phone system was not an ATDS and plaintiff presented no evidence to the contrary); *Gillard v. Receivables Performance Mgmt., LLC*, No. 14–02392, 2015 WL 3456751, at *3 (E.D. Pa. June 1, 2015).

### 1.   IVR Platform

"IVR" is a generic term that means "interactive voice response." Peppercorn Decl. ¶ 20 n.3. The "IVR platform" is the colloquial name of one of TWC's primary inbound and outbound telephone infrastructures. *Id.* ¶ 19. As relevant here, the IVR platform is used for calling telephone numbers associated with delinquent accounts in TWC's billing system and making survey calls. *Id.* █████████████████



The IVR platform therefore cannot be an ATDS under the statutory definition. *See*

*Marks*, 55 F. Supp. 3d at 1292 ("Numbers only enter the system through [methods requiring] human curation and intervention. None could reasonably be termed a 'random or sequential number generator.' Thus, because the Textmunication platform lacks a random or sequential number generator, it is not currently an ATDS.") (citation omitted); *Danehy v. Time Warner Cable Enters.*, No. 5:14-CV-133-FL, 2015 WL 5534094, at *8 (E.D.N.C. Aug. 6, 2015) (granting summary judgment where defendant offered evidence and plaintiff did not rebut that phone system at issue did not use random or sequential number generator, "as required to come under the definition of ATDS in the TCPA"), *report and recommendation adopted*, 2015 WL 5534285 (E.D.N.C. Sept. 18, 2015).

Nor is the IVR platform an ATDS under the FCC's July 2015 standard. ██████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████; *see Wattie-Bey v. Modern Recovery Solutions*, No. 1:14-CV-01769, 2016 WL 1253489, at *4 (M.D. Pa. Mar. 10, 2016) (granting summary judgment where there was no evidence that "the standalone SV8100 phone system used by MRS was 'hardware, when paired with certain software, [that] has the capacity to store or produce numbers and dial those numbers.'" (alteration in original) (citation omitted)). ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Under these circumstances, the possibility of the IVR platform being modified to include a random or sequential number generator is too "theoretical" or "attenuated" to satisfy the FCC's standard.   FCC July 2015 Order ¶ 18.   Plaintiffs did not develop, and therefore cannot adduce, any evidence to the contrary.  *See Messina v. Green Tree Servicing, LLC*, __ F. Supp. 3d __, 2016 WL 6089821, at *6 (N.D. Ill. Sept. 28, 2016) (granting summary judgment because "plaintiffs have done nothing more than allege a theoretical possibility as to how the click-to-dial equipment could be modified").

Moreover, even if Plaintiffs had adduced some evidence about the potential capacity of the IVR platform, there is enough human involvement in the existing process for dialing numbers to negate a finding that the platform is an ATDS. ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

Because the IVR platform is not an ATDS, TWC is entitled to summary judgment with respect to ATDS liability for Call Nos. 1-6 to the 5900 number, and Call Nos. 1-20, 22-38, and 43-44 to the 1089 number.

### 2.   NobelBiz Platform

As relevant here, the NobelBiz platform, known as NobelBiz's Enterprise SingleTouch solution, was used for a call following up on A.F.'s new service request after he relocated. Tinnel Decl. ¶ 2; █████████████████████████████████████████

██████████████████████████████████████████████████████



Accordingly, the system cannot be an ATDS under the statutory definition.  *See Marks*, 55 F. Supp. 3d at 1292.

The NobelBiz platform also is not an ATDS under the FCC's July 2015 standard,

Plaintiffs did not develop, and therefore cannot adduce, any evidence to the contrary.  *See Messina*, 2016 WL 6089821, at *6 (granting summary judgment because "plaintiffs have done nothing more than allege a theoretical possibility as to how the click-to-dial equipment could be modified.").

Moreover, even if Plaintiffs had evidence about the potential capacity of the platform,

negating any possibility that it is an ATDS.  *See Jenkins v. mGage, LLC*, No. 1:14-CV-2791-WSD, 2016 WL 4263937, at *1, *7 (N.D. Ga. Aug. 12, 2016) (granting summary judgment in favor of defendant where the agent had to log into a system, decide whom to text, write the message, and send the message); *Estrella*, 2015 WL 6742062, at *3 (granting summary judgment in favor of defendant when "the evidence demonstrates, at most, that the calls were placed manually with the use of human intervention through a 'point and click

function.'"); *Gaza*, 2015 WL 5009741, at *1, *4 (granting summary judgment in favor of the defendant when "the agent pulled up the subject account from a database and then used his mouse to manually click on the phone number associated with the account to launch the call").

Because the NobelBiz platform is not an ATDS, TWC is entitled to summary judgment with respect to ATDS liability for Call No. 42 to the 1089 number.

### 3.    eClerx Platform

eClerx is a third-party vendor █████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████    Thus, the platform cannot be an ATDS under the statutory definition. *See*

*Marks*, 55 F. Supp. 3d at 1292.

Likewise, the eClerx platform is not an ATDS under the FCC's July 2015 standard.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Plaintiffs did not develop, and therefore cannot adduce, any evidence to the contrary. *See*

*Messina*, 2016 WL 6089821, at *6.

Moreover, even if Plaintiffs had evidence about the potential capacity of the platform, █

███████████████████████████████████████████████████████████████

█████████████████████████████ negating any possibility that it is an ATDS, *see, e.g., Gaza*,

2015 WL 5009741, at *1, *4; *Estrella*, 2015 WL 6742062, at *3.  Indeed, after completing a call,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

TWC is therefore entitled to summary judgment with respect to ATDS liability for Call

No. 21 to the 1089 number.

### 4.    Meridian Platform

Meridian is a third-party vendor that contacts certain TWC customers with delinquent

accounts.  Bennett Decl. ¶¶ 1, 4.  ████████████████████████████████

███████████████████████████████████████████████████████████████

████████   The Meridian call at issue here was manually dialed ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Based

on the foregoing, the phone cannot be an ATDS under any standard.  Plaintiffs did not develop,

and therefore cannot adduce, any evidence to the contrary.  *See Messina*, 2016 WL 6089821, at

*6.  Similarly, Plaintiffs did not develop, and therefore cannot adduce, any evidence indicating

that  TWC is therefore entitled to summary judgment with respect to ATDS liability for Call No. 7 to the 5900 number.

### 5.   InfoCision Platform

InfoCision is a third-party vendor that called the 1089 number regarding the disconnection of A.F.'s prior service and installation of A.F.'s new service request after he relocated.   White Decl. ¶¶ 1, 5.



Thus, the InfoCision platform at issue is not an ATDS under any standard.   Plaintiffs did not develop, and therefore cannot adduce, any evidence to the contrary.   *See Messina*, 2016 WL 6089821, at *6. TWC is therefore entitled to summary judgment with respect to ATDS liability for Call Nos. 39-41 to the 1089 number.

### B.   Plaintiffs Cannot Establish That TWC Played A Prerecorded Or Artificial Voice On Many Calls

Plaintiffs also allege that TWC violated the TCPA by calling them and playing an "artificial or prerecorded voice" without their prior express consent.   First Am. Compl. ¶¶ 2, 19, 27, 39, 51, 56; *see also* 47 U.S.C. § 227(b)(1)(A)(iii).   To establish TWC's potential liability under this prong for a particular call that they received, Plaintiffs must show that an artificial or prerecorded voice actually played on that particular call. *Ybarra*, 807 F.3d at 641.   It necessarily

18

follows that any call that disconnects without playing such a voice, or that is blocked by a call-blocking application, cannot form a basis for liability.  *Id.*; *see also Roberts v. Medco Health Sols., Inc.*, No. 4:15 CV 1368 CDP, 2016 WL 3997071, at *2 (E.D. Mo. July 26, 2016).  Here, even assuming *arguendo* that TWC sometimes plays an artificial or prerecorded voice on certain calls, the evidence shows that TWC did not play such a voice on many of the calls at issue.

### 1.    Plaintiff Villa

TWC placed six payment reminder calls to the 5900 number through the IVR platform, on November 27, December 2, and December 8, 2015.  *See* Table 1 and sources cited therein.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

Call No. 2 to the 5900 number was the second payment reminder call placed to that number on November 27, 2015 that is coded with the result "ANSWERING_MACHINE" in TWC's calls records.  Ex. B to Peppercorn Decl., Villa IVR Call Records at 1.  Likewise, Call No. 6 to the 5900 number was the second payment reminder call placed on December 8, 2015 that is coded with result "ANSWERING_MACHINE" in TWC's calls records.  *Id*. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████

Calls No. 3 and 4 to the 5900 number are coded with result "DISCONNECT" in TWC's calls records, ████████████████████████████████████████████████

████████  ██████████████████████████; Ex. B to Peppercorn Decl., Villa IVR Call Records at 1.

[REDACTED]

[REDACTED]

Call No. 7 to the 5900 number was placed by TWC's vendor, Meridian, on December 9, 2015.  *See* Bennett Decl. ¶ 9; Ex. C to Prins Decl., Villa MetroPCS Call Records at 68.  That call was placed by a live Meridian agent, who contemporaneously left a live voicemail, without using any prerecorded or artificial voice.  *Id.* ¶¶ 9-10.

Because Plaintiff Villa did not develop, and therefore cannot adduce, evidence that TWC played a prerecorded or artificial voice on Call Nos. 2, 3, 4, 6, and 7, TWC is entitled to summary judgment with respect to prerecorded or artificial voice liability for those calls. Summary judgment is appropriate as to the remaining calls, Call Nos. 1 and 5, for the reasons discussed *supra* at 11-14 and *infra* at 23-29, 31-33.

### 2.      Plaintiff Hunter

TWC or its vendors placed 44 calls to the 1089 number during the relevant time period. *See* Table 2 and sources cited therein.

Call No. 2 to the 1089 number was the second payment reminder call placed to the 1089 number on May 28, 2015 that is coded with the result "ANSWERING_MACHINE" in TWC's calls records.  Ex. G to Peppercorn Decl., Hunter TWC Call Records at 2.  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Call No. 3, also on May 28, 2015, was also a payment reminder coded with the result "DISCONNECT," [REDACTED]

[REDACTED]; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 2[REDACTED]

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

Call No. 5 and No. 6 to the 1089 number were the second and third payment reminder calls on June 4, 2015 that are coded with the result "ANSWERING_MACHINE" in TWC's records.  *See* Ex. G to Peppercorn Decl., Hunter TWC Call Records at 2-3.  Likewise, Call No. 8 and No. 9 were the second and third payment reminder calls on June 10, 2015 coded with the result "ANSWERING_MACHINE" in TWC's records.  *Id.* at 3.  ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

Call No. 12 was the second payment reminder call on June 15, 2015 coded with the result "ANSWERING_MACHINE" in TWC's records.  *See* Ex. G to Peppercorn Decl., Hunter TWC Call Records at 3.  ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████  Call No. 13 was the third payment reminder call on June 15, 2015 coded with the result "DISCONNECT" in TWC's records, ███████████████████████████████████████████████████

██████████████████████; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 3.  ██████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

On June 15, 2015, Plaintiff Hunter blocked the primary phone number used by TWC's IVR platform using the Metro Block-It application.  *See* Ex. H to Prins Decl., First Orion Affidavit of Business Records at 2.  The business records of the company which makes Metro Block-It, as well as Plaintiff Hunter's T-Mobile phone records (which show the duration of the calls as 0 seconds) demonstrate that Call Nos. 14-20 were successfully blocked by the application, and thus no prerecorded or artificial voice could have played.  *See id.*; Ex. E to Prins Decl., Hunter MetroPCS Call Records-1 at 75-268.  *See Roberts*, 2016 WL 3997071, at *2 ("any calls that were blocked by the call-blocking application do not constitute violations").

Call No. 21 was placed by TWC's vendor, eClerx, on August 22, 2015.  *See* Bakshi Decl. ¶ 13.  ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.  But eClerx did not play an artificial or prerecorded voice on this call.  Bakshi Decl. ¶¶ 6, 13.

Call Nos. 24-38, occurring between August 24, 2015 and February 1, 2016, also show as blocked by the Metro Block-It application.  *See* Ex. H to Prins Decl., First Orion Affidavit of Business Records at 2-3.

Call Nos. 39-42 were placed by TWC's vendor, InfoCision, between February 6, 2016 and February 9, 2016.  ████████████████  InfoCision never uses prerecorded or artificial voices for calls made to TWC customers.  *Id.* ¶¶ 13, 17.

██████████████████████████████████████████████████████

████████████████████████████████████████  Call Nos. 2-3, 5-6, 8-9, 12-21, and 24-42, TWC is entitled to summary judgment with respect to prerecorded or artificial voice liability for

22

those calls.  Summary judgment is appropriate as to the remaining calls, Call Nos. 1, 4, 7, 10-11,

22-23, and 43-44 for the reasons discussed *supra* at 11-14, 17-18 and *infra* at 23, 24-29, 31-33.

### C.   Several Calls Fall Within The FCC-Created Safe Harbor

The FCC has established a one-call safe harbor for calls to any reassigned number; only

after the first call might a caller have "constructive knowledge of the reassignment" and

potentially be held liable for those calls.  FCC July 2015 Order ¶¶ 72, 82-83.  It is undisputed

that TWC had valid consent to contact its customers, A.F. and A.S.  *See* Flores Decl. ¶¶ 4-12, 14-

18.  Their numbers were reassigned to Plaintiffs Hunter and Villa on May 18, 2015 and

November 23, 2015, respectively.  Ex. A to Prins Decl., Villa MetroPCS Subscriber Records;

Ex. D to Prins Decl., Hunter MetroPCS Subscriber Records.  Because Call No. 1 reaching each

Plaintiff falls within the FCC-created safe harbor, TWC is entitled to summary judgment with

respect to any TCPA liability for those calls.[6]

Additionally, TWC's subscriber A.F. called TWC once on January 31, 2016 and three

times on February 5, 2016, each time providing TWC with the 1089 number.  Peppercorn Decl. ¶

15; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 1.  By doing so, A.F. renewed his

consent for TWC to call that number.  FCC July 2015 Order at ¶ 49 ("neither the Commission's

rules nor its orders require any specific method by which a caller must obtain [] prior express

---

[6] The D.C. Circuit may conclude that the FCC safe harbor is arbitrary and capricious because it is too narrowly drawn—it assumes without any rational basis that constructive knowledge of a number's reassignment is gained after the first call, regardless of what happened on that call.  For example, during oral argument in the *ACA International* appeal, Judge Edwards stated, in response to the FCC's explanation of the justification for limiting the TCPA's safe harbor for calls to re-assigned numbers to one call, "[y]ou know in all due respect, I think there are probably a lot of business people out there saying, is he kidding me. . . It's just not a viable suggestion.  It really isn't."  Transcript of Oral Argument at 108:16-24, *ACA Int'l v. FCC*, No. 15-1211, (D.C. Cir. Oct. 25, 2016), ECF No. 1642856.  TWC reserves the right to move for summary judgment under any revised safe harbor standard that develops in the wake of the D.C. Circuit's decision in *ACA International*.

consent"); *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 344 (6th Cir. 2016) ("We recently (and [u]nsurprisingly) held…that a person gives his prior express consent under the [TCPA] if he gives a company his number before it calls him.") (internal quotation marks and citation omitted) (alterations in original).  It is undisputed that A.F. told TWC the 1089 number was associated with his account on January 31, 2016 and February 5, 2016.  *See* Peppercorn Decl. ¶ 15; Ex. G to Peppercorn Decl., Hunter TWC Call Records at 1; ███████████████████████████████ ████████████████████.  Each of these incoming calls should therefore trigger a new FCC safe harbor for the subsequent outbound call, because TWC once again had a "reasonable basis to believe that [it had] valid consent" to contact the 1089 number.  FCC July 2015 Order at ¶ 72.  TWC "would have had the valid prior express consent of the subscriber or customary user" of the 1089 number "but for the reassignment," and it is undisputed that TWC was "unaware of the reassignment" when A.F. called TWC on January 31, 2016 and February 5, 2016.  *Id.* at ¶ 72 n.262.  Thus, TWC should also receive summary judgment on Call No. 38, on February 1, 2016, and Call No. 39, on February 6, 2016.

## II.   TWC HAD VALID CONSENT TO CALL THE SUBJECT PHONE NUMBERS

The TCPA does not prohibit any calls that the "called party" consented to receive.  47 U.S.C. § 227(b)(1)(A)(iii).  Properly interpreted, the relevant "called party" whose consent is required by the statute is the intended recipient of the call.  *See* Dissenting Statement of Commissioner Ajit Pai, FCC July 2015 Order, at *84-85 (arguing that the statutory term "called party" refers to the expected recipient of a call); *see also Leyse v. Bank of Am., Nat'l Ass'n*, No. 09- Civ. 7654(JGK), 2010 WL 2382400, at *4 (S.D.N.Y. June 14, 2010) (holding that plaintiff was "not a 'called party' within the meaning of § 227(b)(1)(B)" insofar as "he was an unintended and  incidental  recipient  of  the  call").   Here,  TWC  had  the  prior  express  consent  of  its customers—the intended recipients of the subject calls—to call the numbers that are the subject

of this suit.  *See* Flores Decl. ¶¶ 4-12, 14-18; Ex. A to Flores Decl., Subscriber Agreement at Provision 12 (providing subscribers' consent to receive calls).  Thus, TWC should not have any TCPA liability for calls to those numbers.  Admittedly, the FCC disagrees with this "called party" interpretation of the TCPA, and purported to interpret the term to refer instead to "the subscriber and customary users" of a telephone number.  FCC July 2015 Order ¶ 74.  The validity of the FCC's purported interpretation is now pending on appeal before the D.C. Circuit. *See* Joint Brief for Petitioners at 41-47, *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. Nov. 25, 2015), ECF No. 1585568.  TWC raises the issue here to preserve it in the event the FCC's interpretation is reversed.

Regardless of the D.C. Circuit's decision in *ACA International*, TWC's good faith belief that it had the called party's consent should preclude liability here.  The FCC's July 2015 Order does not address this issue, and even after that Order, courts have continued to find that good-faith callers who place calls without knowledge that they are dialing a wrong number are not liable under the statute.  *See, e.g., Danehy*, 2015 WL 5534094, at *6 ("Even assuming that the prior express consent of TWC's Customer did not operate as consent by plaintiff, it is undisputed that defendant believed in good faith not only that it did have consent to call the 704–421–6235 number, but also that the calls were being made for a service TWC's Customer had requested. Moreover, defendant acted reasonably based on its good faith belief.").  The record evidence shows that TWC stopped calling Plaintiff Villa even before Plaintiff Villa could contact TWC and request that it do so.  Peppercorn Decl. ¶¶ 8-11.  And TWC discontinued calling Plaintiff Hunter the day after TWC learned that it was reaching the wrong number.  *Id.* ¶ 16.  Nothing in the FCC's July 2015 Order overrules or forecloses courts from applying this longstanding interpretation of the statute: *i.e.*, that wrong-number calls made in good faith reliance on a

reasonable belief that the caller had the called party's consent are not subject to liability. *Danehy*, 2015 WL 5534094, at \*6; *see also Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-CV-1721-BEN (WVG), 2014 WL 1744136, at \*12 (S.D. Cal. Apr. 30, 2014) ("Even if Plaintiff is correct in stating that she never gave Defendant or Enterprise consent to call, and there was no actual prior consent from Plaintiff, Defendant is not liable for acting in good faith upon the information provided to it.").  Because TWC had effective prior express consent to contact Plaintiffs, or at least a good faith belief that it did, TWC is entitled to summary judgment on Plaintiffs' claim under 47 U.S.C. § 227(b)(1)(A)(iii).

## III.   PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' lack of any concrete injury from the calls in question denies them standing and thus provides an additional basis on which to grant summary judgment to TWC.  In order to have standing in the federal courts, a plaintiff must show that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing" the elements of standing.  *Lujan*, 504 U.S. at 561.  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*  At the summary judgment stage, plaintiffs cannot "rest on . . . mere allegations." *Id.*  And because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  In this TCPA context, these principles mean that for each separate call for which Plaintiffs seek to recover, they must prove with actual evidence that they have

suffered an injury-in-fact that is traceable to the specific TWC call. *See, e.g., Romero v. Dep't Stores Nat'l Bank*, __ F. Supp. 3d __, 2016 WL 4184099, at *3 (S.D. Cal. Aug. 5, 2016) ("[F]or each call Plaintiff must establish an injury in fact as if that was the only TCPA violation alleged in the complaint.").  Because they cannot do so, summary judgment must be entered in TWC's favor.

 "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* (citation omitted).  Therefore, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549.  "[A] bare procedural violation, divorced from any concrete harm" cannot constitute an injury in fact. *Id.*; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.").

 It is undisputed that both Plaintiff Villa and Plaintiff Hunter had unlimited phone plans that do not incur costs for usage by the minute, and that they suffered no financial loss as a result of TWC's calls.  *See* Ex. B to Prins Decl., Villa Dep. Tr. 37:17-38:14 (admitting she has unlimited phone plan); *id.* at 145:2-10 (describing only non-financial injuries); Ex. J to Prins Decl., Hunter Dep. Tr. 36:6-19 (admitting she has unlimited phone plan); *id.* at 109:16-21 (admitting no financial loss).  Accordingly, Plaintiffs cannot demonstrate a concrete injury to their financial interests, and they cannot base their standing on this ground. *See Leung v. XPO*

*Logistics, Inc.*, 164 F. Supp. 3d 1032, 1039 (N.D. Ill. 2015) ("Missing is any allegation that Leung had to pay anything extra because of what XPO did . . . . Leung has failed to allege that he paid money because of XPO's call that he would not have otherwise paid."); *Ewing v. SQM US, Inc.*, __ F. Supp. 3d __, 2016 WL 5846494, at *2 (S.D. Cal. Sept. 29, 2016) ("Plaintiff does not, and cannot, allege that Defendants' use of an ATDS to dial his number caused him to incur a charge that he would not have incurred had Defendants manually dialed his number, which would not have violated the TCPA.").

Plaintiffs likewise cannot demonstrate standing based on non-financial injuries. At her deposition, Plaintiff Hunter testified that the only injury she suffered as a result of TWC's calls was feeling irritated, agitated, and frustrated from the calls.[7] *See* Ex. J to Prins Decl., Hunter Dep. Tr. 108:14-23. But because Plaintiff Hunter must prove her standing to pursue every alleged violation of the TCPA, she must be able to prove that each call for which she seeks to recover caused these injuries. *See*, *e.g.*, *Romero*, 2016 WL 4184099, at *4 ("To the extent Plaintiff[s] [were] unaware of any of Defendant['s] calls either because [their] ringer[s] or phone[s] were turned off, or because [they] did not have [their] phone[s] with [them] when the calls occurred, none of [their] alleged injuries in fact are plausible or could be traceable to the alleged TCPA violation."); *Juarez v. Citibank, N.A.*, No. 16-cv-01984-WHO, 2016 WL 4547914, at *3 (N.D. Cal. Sept. 1, 2016) ("[C]alls made to a neglected phone that go unnoticed or calls that are dropped before they connect may violate the TCPA but not cause any concrete injury."). Plaintiff Hunter cannot do so here, because, except for the first call she received (which is

---

[7] She testified that she "possibly" had headaches as a result of the agitation, but did not seek medical treatment for those headaches. Ex. J to Prins Decl., Hunter Dep. Tr. 108:25-109:15. "Possibly" having headaches is not a concrete enough injury for standing purposes. *See Spokeo*, 136 S. Ct. at 1548 (holding that injury must be "actual" and not "conjectural").

covered by the safe harbor, *supra* at 23), she admits that she has no specific memory of any phone call she received.  Ex. J to Prins Decl., Hunter Dep. Tr. 105:3-7 ("Q   Okay. It's no problem. I'm just trying to establish whether for any particular call here you have a memory of the specific call. And I think the answer is no, you don't; is that correct?   A  I don't.").  Indeed, many of the calls to Plaintiff Hunter were blocked by her call blocking application, meaning she could not possibly have been annoyed by those calls.  *See supra* at 22.

The situation with Plaintiff Villa is similar.  As an initial matter, Plaintiff Villa testified that she had no recollection at all of Call Nos. 5 and 6.  Ex. B to Prins Decl., Villa Dep. Tr. 107:19-108:3, 108:5-17.  Thus, it would be impossible for her to trace any injury-in-fact to those calls.  She claimed that in general the calls were disruptive and invaded her privacy, but she could not recall which TWC calls caused those impacts.  *Id.* at 145:19-22, 146:14-16.  She also testified that TWC's calls caused her to miss two calls from a dialysis center regarding her father's medical care, but she could not recall when those calls occurred.  *Id.* at 146:17-149:14.  When pressed, she admitted that she determined she missed the calls by looking in her call log and seeing that she had missed calls from both the dialysis center and TWC.  *Id.* at 148:19-149:11.  Her phone records, however, demonstrate that she did not receive any phone calls in close proximity to the TWC calls.  *See* Ex. C to Prins Decl., Villa MetroPCS Call Records at 64-68.  Each of Call Nos. 1-7 occurred hours—and in some instances, roughly a full day—before or after any other incoming call from any phone number to the 5900 number.  *See id.*  Thus, TWC could not have been the cause of the missed calls from the dialysis center.

Because Plaintiffs cannot trace any concrete injury to TWC's calls, summary judgment is appropriate on this basis as well.

## IV.    PLAINTIFFS' "DO-NOT-CALL" LIST CLAIMS FAIL

Plaintiffs appear to bring claims for internal "do-not-call" list ("IDNC") violations pursuant to 47 C.F.R. § 64.1200(d), alleging that TWC "contact[ed] individuals listed on its IDNC; or Defendant has simply ignored the TCPA and failed to implement a legally compliant IDNC altogether."[8]  First Am. Compl. ¶¶ 15, 19, 21, 62 & p. 18.  That provision provides that no "person or entity *shall initiate any call for telemarketing purposes* to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."  47 C.F.R. § 64.1200(d) (emphasis added).  The burden is on Plaintiffs to establish that TWC lacks sufficient IDNC procedures.  *See Hamilton v. Spurling*, No. 3:11CV00102, 2013 WL 1164336, at *12 (S.D. Ohio Mar. 20, 2013); *Simmons v. Charter Commc'ns, Inc.*, No. 3:15-CV-317 (SRU), 2016 WL 1257815, at *6 (D. Conn. Mar. 30, 2016).

As an initial matter, by its plain terms, the regulatory provision that Plaintiffs rely on imposes liability only where an entity places *telemarketing* calls without adequate do-not-call list procedures; non-telemarketing calls cannot give rise to a do-not-call violation.  *See* 47 C.F.R. § 64.1200(d) ("No person or entity *shall initiate any call for telemarketing purposes* . . . ." (emphasis added)).  Under the applicable FCC rules, "[t]he term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12).  In essence, "telemarketing" refers to sales calls.  Plaintiffs do not even *allege* that they *themselves* received any telemarketing calls, and summary judgment is merited on that

---

[8] These allegations are made in the body of the complaint, and Plaintiffs have pled only a single claim for violations of the TCPA.

basis alone.  *See, e.g.*, First Am. Compl. at 1 & ¶¶ 2, 59 (discussing an alleged practice of placing telemarketing calls to "consumers nationwide," but failing to allege that either Plaintiff received a single telemarketing call).  But in all events, Plaintiffs' claim fails because they cannot establish that TWC made any such calls here.

Indeed, all seven calls that TWC (or its vendor) placed to the 5900 phone number that was reassigned to Plaintiff Villa were made for purposes of reminding TWC's subscriber A.S. that his bills were past due.  Peppercorn Decl. ¶ 6; Bennett Decl. ¶¶ 4, 6-9.  It is well established that such calls are not "telemarketing" calls.  *See, e.g., Meadows v. Franklin Collection Serv., Inc.*, 414 F. App'x 230, 236 (11th Cir. 2011) (noting that "calls solely for the purpose of debt collection . . .  do not constitute telemarketing") (quoting *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565, ¶ 11 (Jan. 4, 2008)).  And Plaintiff Villa testified that the sole call that she answered contained a message concerning a third party's debts to TWC.  *See* Ex. B to Prins Decl., Villa Dep. Tr. 104:01-11.  Likewise, the vast majority of calls placed to the 1089 phone number that was reassigned to Plaintiff Hunter were to remind TWC's customer A.F. of a past due balance.  Peppercorn Decl. ¶ 13.  Plaintiff Hunter testified that "[t]he calls were about a billing issue."  Ex. J to Prins Decl., Hunter Dep. Tr. 118:20-21.  And when asked whether TWC did "ever, in fact, try to convince you to sign up for services," Plaintiff Hunter responded that "[w]e didn't get that far in the conversation."  *Id.* at 127:14-17.  Because Plaintiffs cannot establish that they received any telemarketing call, they lack any right of action to pursue a claim for a do-not-call list violation.  47 C.F.R. § 64.1200(d).

But even assuming that either Plaintiff received a telemarketing call from TWC, Plaintiffs' IDNC claim under section 64.1200(d) also fails on the independent ground that Plaintiffs cannot establish that TWC does not maintain sufficient IDNC procedures.  A violation

of section 64.1200(d) may arise only from a systematic failure to implement an internal DNC program that complies with relevant regulatory standards; individual phone calls placed in violation of a do-not-call request do not, standing alone, establish a regulatory violation.  47 C.F.R. § 64.1200(d) (violation arises only where person has not "instituted procedures for maintaining a list of persons who request not to receive telemarketing calls" that comply with specified "minimum standards"); *Simmons*, 2016 WL 1257815, at \*13 ("[I]n order to prove a subsection (d)(3) violation, a plaintiff cannot rely solely on the fact that a provider failed to record or honor an individual's request to be placed on a DNC list.  Rather, the plaintiff must establish that the calls he or she received were initiated prior to the implementation of proper procedures." (citation omitted)).

Subsections 64.1200(d)(1)-(6) provide the "minimum standards" for IDNC procedures, including maintaining a written IDNC policy, conducting IDNC training, recording IDNC requests and honoring them within thirty days, and identifying the caller during any telemarketing call.  Plaintiffs cannot establish that TWC lacked a compliant DNC program prior to calling them.  On the contrary, the affirmative evidence produced by TWC establishes beyond genuine dispute that TWC's IDNC procedures were compliant with these standards throughout the time period that Plaintiffs received calls.  *See, e.g.*, Green Decl. ¶¶ 7-11; Ex. A to Green Decl., TWC Corporate Telemarketing and Do Not Call Policy (Revised 6/12/2012).  For example, TWC's then-applicable Corporate Telemarketing and Do Not Call Policy required TWC to maintain an IDNC, and requires that TWC employees engaged in telemarketing must be trained in TWC's IDNC policies and the use of TWC's IDNC.  Green Decl. ¶¶ 8-10; Ex. A to Green Decl., TWC Corporate Telemarketing and Do Not Call Policy.  That document requires that when TWC and its vendors receive a do-not-call request, the request must be recorded

immediately in TWC's Do Not Call Database (IDNC), including the name and number of the call recipient, and that such requests will be honored as soon as possible (and at least within 30 days), for a period of five years. *Id.* The document also provides that TWC and its vendors must identify themselves to call recipients by their name and associated entity, and provide recipients with a TWC callback phone number during any telemarketing calls. *Id.* Those same procedures and policies are contractually binding on TWC's vendors. *Id.* There simply can be no genuine dispute that TWC's DNC procedures meet the relevant regulatory requirements. TWC therefore is entitled to summary judgment on Plaintiffs' § 64.1200(d) claim even if "telemarketing" calls were potentially at issue.

## V.   PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

Finally, Plaintiffs' request for injunctive relief also fails as a matter of law. Plaintiffs request "injunctive relief enjoining Defendant . . . from . . . continuing to engage in the unlawful calls made with automated dialing systems to cellular phones without prior express consent, placing calls to the wrong number, and placing calls to members of Defendant's IDNC." Amended Complaint at 18. But injunctive relief is not available when a party has an adequate remedy at law. *See, e.g., N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984) ("A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."). That rule applies even where, as here, the statute under which a plaintiff brings a claim authorizes *both* damages and injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 & n.2 (2006) (where Patent Act provided that courts "may grant injunctions in accordance with the principles of equity," party seeking permanent injunction was required to first establish traditional prerequisites of equity, including "irreparable injury" and that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," prior to issuance of an injunction). And while the

Second Circuit has not yet expressly addressed this question, it has strongly suggested that it would apply the rule articulated in *eBay* to issuance of injunctions "in any context" when presented with an appropriate case. *See Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010) (stating that "although today we are not called upon to extend *eBay* beyond the context of copyright cases, we see no reason that *eBay* would not apply with equal force to an injunction in *any* type of case.").

Issuance of an injunction would not be proper here because Plaintiffs have an adequate remedy (should the Court determine that TWC is liable for any of the calls at issue), in the form of substantial statutory damages under the TCPA. *See* 47 U.S.C. § 227(b)(3) (providing for the award of statutory damages up to $1,500 for each willful or knowing violation, and $500 or greater for other violations of the statute); *Gubala v. Time Warner Cable, Inc.*, No. 15-CV-1078-PP, 2016 WL 3390415, at *7 (E.D. Wis. June 17, 2016) ("Because the CCPA provides for money damages for violations of the information destruction provision of the CCPA, therefore, the plaintiff has an adequate remedy at law. That means that he cannot prove one of the two necessary elements for obtaining injunctive relief—even if he did have standing.").

And even if Plaintiffs lacked an effective remedy at law, their claim for injunctive relief is now moot. TWC stopped calling the 5900 number *one year ago*, prior to service of the summons in Plaintiff Villa's original action against TWC. *See* Table 1 and sources cited therein; Ex. I to Prins Decl., *Villa v. TWC*, Case No. 1:15-cv-09576-UA, Summons in a Civil Action (Dec. 9, 2015), ECF No. 6. And TWC stopped calling the 1089 number *over nine months ago*, and approximately a *month and a half* prior to Plaintiff Hunter's joinder to this lawsuit on March 28, 2016. *See* Table 2 and sources cited therein; First Am. Compl. at 1. TWC long ago removed the telephone numbers that were reassigned to Plaintiff Villa and Plaintiff Hunter from its

internal calling systems and account records, on February 4 and March 21, 2016, respectively. Peppercorn Decl. ¶¶ 11, 17; Green Decl. ¶ 12.  In accordance with TWC's policies and internal controls, Plaintiffs will not receive future calls from TWC, unless the Plaintiffs re-initiate contact with TWC and consent to receive further calls.  Peppercorn Decl. ¶ 18; Green Decl. ¶ 12.

Given the lapse of time since TWC's last calls to Plaintiffs, and its policies and internal controls to prevent any further calls, Plaintiffs' claim for injunctive relief is moot.  Courts will find a claim for injunctive relief moot where, as here, "there is no reasonable expectation that the alleged violation will recur" and "events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (quotation marks omitted).  Because TWC's internal policies prevent it from contacting the instant phone numbers again, TWC has established internal controls to prevent such calls, and there is no plausible motive for TWC to carry on calling Plaintiffs, there is "no reasonable expectation that [TWC] will revert to" calling Plaintiffs.  *Id.* at 110; *see also* Green Decl. at ¶¶ 8-12 (discussing do-not-call policies); Peppercorn Decl. ¶ 18 (discussing TWC's policies not to contact numbers at which an individual has requested not to be contacted).  Any claim that TWC may attempt to call Plaintiffs' phone numbers again is too remote and speculative to rescue from mootness their claim for injunctive relief.

## CONCLUSION

For the foregoing reasons, TWC's motion for summary judgment should be granted.

Dated: December 9, 2016

Respectfully Submitted,

LATHAM & WATKINS LLP

By

Peter L. Winik (admitted *pro hac vice*)
Matthew A. Brill (admitted *pro hac vice*)
Andrew D. Prins (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
peter.winik@lw.com
matthew.brill@lw.com
andrew.prins@lw.com

*Attorneys for Defendant Time Warner Cable Inc.*