# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEONA HUNTER and ANNE MARIE VILLA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

TIME WARNER CABLE INC.,

Defendant.

Case No. 1:15-cv-06445-JPO

**DECLARATION OF RANDALL A. SNYDER**

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1.      My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify, I could and would testify competently about them.

2.      I am an independent telecommunications technology consultant and I reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Bursor & Fisher, P.A. in the matter *Hunter v. Time Warner Cable Inc.* No. 1:15-cv-06445-JPO (S.D.N.Y.) to provide my opinions relating to technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). In particular, I have been asked to determine whether Time Warner Cable Inc. ("TWC" or Defendant") operated equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers. In addition, I have been asked to provide my opinions relating to data analysis capabilities regarding telephone numbers.

3.      My ███████████████████████████████████████████████████ ██████████████████████████████████████████ in this case: First Amended Class Action Complaint; Defendant Time Warner Cable Inc.'s Responses to Plaintiffs' First Requests

for Admissions; Defendant Time Warner Cable Inc.'s Responses to Plaintiffs' First Set of Interrogatories; Defendant Time Warner Cable Inc.'s Supplemental Responses to Plaintiffs' First Set of Interrogatories; Defendant Time Warner Cable Inc.'s Responses to Plaintiffs' Request for Production of Electronically Stored Information ("ESI") and Documents; Defendant Time Warner Cable Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment; Defendant Time Warner Cable Inc.'s Statement of Material Facts Pursuant to Rule 56.1; King v. Time Warner Cable, 113 F.Supp.3d 718, No. 14 Civ.2018(AKH); Deposition Transcript of David Zitko (King v. Time Warner Cable);

1

2

3

4                                                                              the Telephone

Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated

thereunder; the Federal Communications Commission's ("FCC") Report and Order in the Matter

of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated

October 16, 1992; the FCC's Report and Order in the Matter of Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991 dated July 3, 2003; the FCC's

Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone

Consumer Protection Act of 1991 Request of ACA International for Clarification and

Declaratory Ruling dated January 4, 2008; the Appeal from the United States District Court for

the Northern District of California, No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed

June 19, 2009; the FCC's Report and Order in the Matter of Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991 dated February 15, 2012; the

FCC's Notice of Proposed Rulemaking in the Matter of the Middle Class Tax Relief and Job

Creation Act of 2012, Establishment of a Public Safety Answering Point Do-Not-Call Registry

dated May 22, 2012; the FCC's Declaratory Ruling in the Matter of Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications,

Inc. Petition for Expedited Declaratory Ruling dated November 29, 2012; and the FCC's

Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone

Consumer Protection Act of 1991 dated July 10, 2015.

4.      I have over 30 years of experience in telecommunications network architecture,

system architecture, engineering, design and technology. I am an expert in the fields of both

wireline and wireless telecommunications networking technology. I have been retained by both

plaintiffs and defendants as a testifying or consulting expert in over 135 cases regarding cellular

telecommunications technology, including nearly 100 TCPA cases.

5.      I have taught many classes and seminars on both wireline and wireless

telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA"). I spent seven years developing standards within the American National Standards Institute's ("ANSI") subsidiary organization, the Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute ("ANSI").

6.      I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. I have 29 patents on telecommunications networking technology and currently have five additional published patents pending. I have also authored several articles on telecommunications technology and have been frequently quoted in industry trade publications. I have consulted for the CTIA and many wireline and wireless telecommunications companies, including IBM, Bell Laboratories, McCaw Cellular, AirTouch, AirTouch International, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Motorola, Samsung, Siemens, Nextwave, MCI, Daewoo, Globalstar, T-Mobile, Sprint, U.S. Cellular, Teleglobe Canada, Teledesic and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc.

7.      Additional details, including authored publications within at least the past ten years, are provided in my attached *curriculum vitae* (a true and correct copy of which is attached hereto as Exhibit A) along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $475 per hour for my study, analysis and testimony in this case.

8.      I understand that fact discovery in this case is ongoing and I also understand that there may be documents and/or evidence that have yet to be produced. To the extent that I cannot currently opine on the technical issues in this case, I hereby reserve the right to supplement this Declaration with both my conclusions and opinions in a detailed and additional supplementary declaration in the future.

**INTRODUCTION**

9.      It is my understanding that the TCPA defines an automatic telephone dialing system ("ATDS") as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." Additionally, it is my understanding that the Federal Communications Commission ("FCC") has issued regulations that also define an ATDS as including the capacity to dial telephone numbers from a provided list or database of telephone numbers without human intervention.

10.      Based on my review of the relevant documents and the facts described above, it is my opinion that the Defendant utilized equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers without human intervention. I base this opinion on my knowledge, education, experience, expertise, training and on the evidence I have reviewed.

11.      Furthermore, based on my knowledge, education, experience, expertise and training, it is my opinion that telephone numbers can be determined to be either cellular or landline telephone numbers and the ability to do so is a commonly-practiced and straightforward administrative process.

12.      In addition, based on my knowledge, education, experience, expertise and training, it is my opinion that telephone numbers can be determined to have been reassigned at some time in the past and the ability to do so is a commonly-practiced and straightforward administrative process.

13.      Moreover, based on my knowledge, education, experience, expertise and training, it is my opinion that current contact information about individuals can be clearly and definitively

1    ascertained based solely on a telephone number and the ability to do so is a commonly-practiced
2    and straightforward administrative process.

3    **TELEPHONE NUMBER DIALING**

4    14.     To make landline telephone calls using a traditional rotary dial telephone, a caller
5    first lifts the receiver of the telephone handset, causing an off-hook signal to be sent directly to a
6    "switching system" as the access point within the aptly named public switched telephone
7    network ("PSTN"). The switching system residing within the PSTN responds to the telephone
8    handset with an audible dial tone signal informing the caller that it is now ready to receive dialed
9    telephone number digits. The caller then places a finger in one of ten finger holes marked 0
10   through 9 around the circumference of the dial and rotates the dial in an increasingly progressive
11   circular distance to provide an increasingly higher voltage pulse signal. Each of the ten distinct
12   dial pulse signals, based on the distinct voltage per the distance the dial is rotated, represents
13   each of the digits symbolized by a telephone number. When the switching system receives the
14   first digit of the called party telephone number, it disconnects the dial tone and registers that
15   digit. After the remaining digits (dial pulse signals) of the telephone number are sent from the
16   handset, the switching system residing in the PSTN sets up a particular outbound telephone
17   channel to establish a call to the party represented by the dialed digits. The PSTN represents the
18   conglomerate of telephone carrier networks that enable calls to be made from one party within a
19   particular carrier network to any other party in any other carrier network.

20   15.     In the early 1960s, dual tone multifrequency ("DTMF") dialing—commonly known
21   as TouchTone™ dialing—was introduced and used as the method to transmit telephone number
22   digits into the PSTN from a telephone handset. To make landline telephone calls using a DTMF
23   phone, a caller pushes one of ten buttons, each button representing a telephone number digit
24   marked 0 through 9. Each of ten distinct audio tone signals are generated from the handset when
25   the corresponding button representing a digit of a telephone number is pushed. These distinct
26   audio tone signals communicate directly with the telephone network in a similar manner to dial
27   pulse signals. The process for establishing a call using DTMF dialing is essentially the same as
28   rotary pulse dialing except that each digit of the telephone number is transmitted directly to the

PSTN using special audio tone frequencies rather than voltage pulses. The caller simply presses a button on the handset to transmit the corresponding unique audio tone frequency representing the telephone number digit.

16.     Both of these dialing methods (*i.e.*, rotary dial pulse signals and push-button audio tone signals) used for making landline telephone calls are known as *post-origination* dialing. To make a call from a landline telephone, the initial off-hook signal and corresponding dial tone response establishes an open connection to the PSTN. These two methods are called post-origination dialing because the digits of the telephone number are provided by the calling party directly, and one at a time, *after* a connection has already been originated and established between the telephone handset and the PSTN. The described post-origination dialing methods used to initiate calls from a landline telephone are the only two signaling methods used to transmit telephone number digits to the PSTN to establish calls.

17.     Computerized telephone dialing systems used to initiate automatic calls *en masse* are based on this fundamental landline dialing protocol. In some cases, internet-based telephony systems use alternative dialing protocols; however this typically occurs only when the switching system access point within the PSTN (*i.e.*, the carrier) supports direct internet protocol access dialing.

18.     The term "dial" has become a common colloquial verb in our lexicon to mean initiating a telephone call by sending signals representing telephone number digits directly into the PSTN to originate a call.

19.     Some medium-to-large businesses require more extensive telecommunications capabilities due to serving many employees making and receiving calls within the business. These enterprises may maintain their own small computerized switching system residing at the business and known as a private branch exchange ("PBX"). A PBX switch connects directly to the external PSTN just like a basic landline telephone handset does; the primary difference being that it supports multiple and aggregated landline telephone channels that connect directly to the PSTN. A PBX can support multiple simultaneous outbound calls from within the business to parties being contacted outside the business that can only be reached via the PSTN.

20.     Among the functions that a PBX provides to callers within the business is automatic outbound dialing of telephone numbers using dial pulse signals and DTMF signals so that calls can be initiated into the PSTN. In many cases, the PBX performs the actual outbound dialing of telephone numbers that can be sent to it in various ways, such as from a software-based computer application.

21.     For example, internet-based telephone systems may or may not connect directly to the PSTN to make and receive calls. This is because the PSTN is a "circuit-switched" network and does not always support the architecture, technology and protocols for internet-based "packet-switched" data networks. Internet-based telephone systems are inherently incompatible with the technology used to establish and complete calls via the PSTN. Hence, a specialized PBX is used to perform the actual telephone number signaling in order to automatically dial and establish PSTN calls when a telephone number is passed to it as a simple data message via a software application.

## AUTOMATIC TELEPHONE DIALING FUNCTIONS

22.     Automatic telephone dialing systems used by companies that perform telemarketing, information surveys and debt collection services typically fall into several fundamental types of computerized telephone number dialing: *preview* dialing, *basic* automatic dialing, *predictive* dialing, *unattended message* dialing and *manual* dialing. Note that telephone numbers to be dialed using these dialing functions are organized as "campaigns." A campaign is simply an electronic list of telephone numbers organized by some defined criteria that are to be called for a specific purpose. Each distinct campaign calls the telephone numbers in the list using the same dialing method, which is defined within the campaign setup parameters.

23.     Preview dialing is a method for dialing individual telephone numbers by call center agents. When preview dialing is used, each individual call center agent can "preview" a computerized call record and has the ability to originate a call to the consumer. For example, the call center agent may be able to enter the individual digits of a full 10-digit telephone number. The entered digits are sent as a message into the automatic dialing system to be subsequently dialed by the system. Furthermore, the call center agent can "invoke" the automatic sending of

1
2
3
4
5
6
7
8
9
10
11
12
13

all the individual digits of the telephone number into the system at one time without entering the individual digits. The telephone number to be called may be displayed on the computer screen and the call center agent sends the digits into the automatic dialing system by clicking the displayed number itself or, for example, by clicking a "submit" button for the displayed telephone number. This sends a message containing the entire telephone number into the automatic dialing system to be subsequently dialed by the system. In addition, sometimes preview dialing can be fully automated. This automation is sometimes known as "timed preview dialing." Timed preview dialing automatically processes the next telephone number in the list once the agent has concluded a call. The next telephone number to be called is processed at some predefined time limit, for example 90 seconds. If the agent does not call the next number within 90 seconds, the preview dialing system automatically processes the next telephone number in the list. This mechanism is typically used to maximize the number of calls made and to ensure call center agents are moving quickly through their call record list.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

24.     Basic automatic dialing (sometimes known as "progressive dialing," "power dialing" or "war dialing") is a computerized method for automatically dialing lists of telephone numbers commonly used in call center operations. Basic automatic dialing is a type of automatic telephone dialing whereby the equipment initiates outbound telephone calls for sales, telemarketing, collections, information surveys or other purposes. Using this very basic type of automatic dialing, the computerized system dynamically regulates the number of calls to be automatically dialed by maintaining a simple balance among the number of call center agents currently available, the number of calls currently in progress and the "dial ratio." The dial ratio is simply the ratio of telephone lines configured per call center agent involved in a particular calling campaign. Using this basic mechanism, the number of automatic outbound telephone calls to be dialed by the computer system can be dynamically regulated (*i.e.*, increased or decreased) over time simply based on the number of calls in progress, the number of agents and the number of telephone lines available per agent. Basic automatic dialing can sometimes use an interactive voice response ("IVR") system, whereby an artificial or prerecorded voice message is used to communicate with the called party and computerized prompts may be used to enable the

called party to provide responses. The artificial or prerecorded voice messages are recorded before the calling campaign is executed and are stored in audio files that are configured as part of the IVR calling campaign.

25. Predictive dialing is a computerized method for automatically dialing lists of telephone numbers commonly used in call center operations. Predictive dialing is a type of automatic telephone dialing as defined by the FCC to make outbound telephone calls for sales, telemarketing, collections, information surveys or other purposes. Predictive dialing provides the capability to "predict" the availability of call center agents that can respond to the outbound calls that have been dialed by the predictive dialing system and answered by the called party. Prerecorded voice technology may also be used to announce to the called party to wait for a call center agent to respond. Called parties that answer a predictively dialed outbound call typically experience a distinctive and recognizable pause due to the time interval during which the call is redirected back and connected to an available call center agent. In addition, predictive dialing methods enable a variety of programmatic ways to treat calls that have not been answered by the called party. As examples, calls that may be answered by voicemail, calls that receive a busy signal and calls that are not answered, may all be treated and managed differently by the automatic dialing system. "Predictive" dialing necessarily requires certain algorithmic and computerized functionality to operate properly. For example, predictive dialing requires the equipment to perform call progress analysis for each call made to detect ring-back tones, busy tones and the difference of whether a person, answering machine or voicemail system has answered a call. Additionally, automatic predictive dialing requires a "pacing" algorithmic function. Pacing algorithms are the statistical models that perform as the primary function enabling the automatic dialing system to predict the availability and increase the efficiency of the call agents. These complex algorithms are based on various factors such as average call time, number of agents available, number of expected abandoned calls, average number of answering machines detected, time of day, day of week and many, many other factors.

26. Note that the actual *predictive* functionality of predictive dialers occurs *after* the equipment automatically dials telephone numbers from a list of numbers. Therefore, the

automatic telephone dialing function of the equipment, *i.e.*, the ability to automatically dial telephone numbers from a list of numbers, occurs prior to the call being connected and *predictively* redirected back to an available call center agent. Thus, predictive dialing is identical to basic automatic dialing with the addition of the automated capability of connecting the called party back to an algorithmically predicted call center agent.

27.    Unattended message dialing (sometimes known as a "message blast" or a "phone blast") is a computerized method for automatically dialing electronic lists of telephone numbers with the intent to only transmit a prerecorded voice message to the called parties once the call is answered. If an answering machine or voicemail system answers the call, the prerecorded voice message can be left as a recording for the called party to listen to later. No call center agents are required and there are no inbound calls to the system. Unattended message calls are always outbound, from an automatic telephone dialing system to a stored electronic list of telephone numbers. The prerecorded voice message is recorded before the calling campaign is executed and is stored in an audio file that is automatically played when the call is answered.

28.    Manual dialing, performed through an automatic dialing system, is a computerized method for automatically dialing electronic lists of telephone numbers. Although automatic dialing systems may use the term "manual" dialing, there is still programmatic control and automatic functionality to perform the actual dialing process. When manual dialing is used, each individual call center agent has the ability to originate a call in typically two ways. Using the first method, the call center agent can enter the individual digits of a full 10-digit telephone number for an account to be called. The entered digits are sent as a message into the automatic dialing system to be subsequently dialed by the system. Using the second method, the call center agent can "invoke" the automatic sending of all the individual digits of the telephone number into the system at one time without entering the individual digits. The telephone number to be called may be displayed on the computer screen and the call center agent sends the digits into the automatic dialing system by clicking the displayed number itself or, for example, by clicking a "submit" button for the displayed telephone number. This sends a message containing the entire telephone number into the automatic dialing system to be subsequently dialed by the system. Furthermore,

since manual dialing still has automatic functionality, the types of calls and the digits that can be entered by a call center agent are entirely programmable within the dialing system.

29.    Both basic and predictive automatic dialing require the equipment to perform *call progress analysis* for each automatically initiated call. Call progress analysis automatically detects ring-back tones, busy tones, fast-busy tones, special information tones, answering machines, voicemail systems, a person answering a call, etc. The equipment itself essentially *listens* to the initiated call that is in progress and can be programmed to act in a particular way depending on the result of the call attempt. Call progress analysis capability is a key characteristic of automatic telephone dialing systems. The presence of this function is inherent in the process of automatic dialing and clearly implies the capability of the equipment to automatically dial telephone numbers. This is because the functional process to analyze call progress tones is established prior to the process of electronically signaling out (*i.e.*, dialing) the ten digits of a telephone number. Computerized call progress analysis is inextricably tied to the process of automatic electronic dialing.

30.    Additionally, unattended message dialing, predictive dialing and basic automatic dialing can use prerecorded voice technology to leave a message on an answering machine or a voicemail system if a person does not answer the call. This function, of course, is based on the ability of the equipment to perform call progress analysis, so different prerecorded messages can be left when the automatic dialing system detects a person answering versus a voicemail system answering. For example, prerecorded voice technology can be used for predictive dialing to announce to the called party to wait on the line for a call center agent to respond or to leave a prerecorded message on an answering machine.

31.    These types of computerized dialing (*i.e.*, preview, basic, predictive, unattended message and manual dialing) require the automatic system to store telephone numbers to be called. The numbers stored electronically are automatically and directly dialed by the dialing system equipment. The list of telephone numbers to be called by the equipment is made available to the dialing system as part of setting up each call or calling campaign.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THE TCPA AND AUTOMATIC TELEPHONE DIALING SYSTEMS

32.    For ease of reference, this section simply presents the TCPA and FCC definitions that I understand, from Plaintiff's attorneys, to be the most applicable to my analysis in this case.

33.    The TCPA defines an ATDS as "equipment which has the capacity— (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." *See* 47 U.S.C. § 227(a)(1)).

34.    In the FCC's Report and Order of July 3, 2003, 18 FCC Rcd. 14014 (2003), the Commission stated the following:

> "The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have the '*capacity* to store or produce telephone numbers (emphasis added)...' It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop." (¶ 132.)

> "[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (¶ 133.)

35.    The FCC's Report and Order of January 4, 2008, 23 FCC Rcd. 559 (2008), stated the following:

"The commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology." (¶ 13.)

"…calls to emergency numbers, health care facilities, and wireless numbers are permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists, would be inconsistent with the avowed purpose of the TCPA and the intent of Congress in protecting consumers from such calls." (¶ 14.)

36.     In the FCC's Notice of Proposed Rulemaking of May 22, 2012, the Commission stated the following:

"Under the TCPA, the term "automatic telephone dialing system" is defined as 'equipment which has the capacity– (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' Id. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists." (p.4, footnote 12.)

37.     In the FCC Declaratory Ruling and Order of July 10, 2015, 30 FCC Rcd. 7961 (2015), the Commission stated the following:

"We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers. We also reiterate that predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of 'autodialer' for the same reason. We also find that callers cannot avoid obtaining consent by dividing ownership of pieces of dialing equipment that work in concert among multiple entities." (¶ 10.)

"The Commission declined to distinguish between calls to wireless telephone numbers made by dialing equipment 'paired with predictive dialing software and a database of numbers' and calls made 'when the

equipment operates independently of such lists and software packages.' Recognizing the developments in calling technology, the Commission found that '[t]he basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention.' The Commission found it troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time and that construing the autodialer definition to exclude predictive dialers could harm public safety by allowing such equipment to be used to place potentially large numbers of non-emergency calls to emergency numbers, a result the TCPA was intended to prevent. The Commission concluded that the TCPA's unqualified use of the term 'capacity. was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones and emergency numbers and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (¶ 14.)

38.   Furthermore, in the same Declaratory Ruling and Order, the commission stated:

"We also find that parties cannot circumvent the TCPA by dividing ownership of dialing equipment. (¶ 23.)

"We conclude that such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. The fact that two separate entities have voluntarily entered into an agreement to provide such functionality does not alter the analysis… As a result, the Commission has recognized that various pieces of different equipment and software can be combined to form an autodialer, as contemplated by the TCPA. The fact that these individual pieces of equipment and software might be separately owned does not change this analysis." (¶ 24.)

## INTERACTIVE VOICE RESPONSE ("IVR") SYSTEMS

39.   An IVR system, when used as an integral part of an outbound telephone dialing campaign and as described above, can be deployed as a function of basic (or "progressive") automatic telephone dialing and predictive dialing. Outbound calling campaigns using IVR technology are usually designed to play a prerecorded voice message regardless of whether a live person answers the call or a voicemail system or answering machine answers the call. In addition, in these cases, different prerecorded voice messages can be programmed to be played.

For example, if a live person answers, the prerecorded voice message may announce choices to be electronically selected by the person. If a voicemail system answers and is detected, announcing such choices would be useless. Furthermore, if a live person answers, electronically selecting a particular service may cause the call to be predictively redirected back to a call center agent in a particular department associated with the person's selection.

40.     IVR systems are used in automatic outbound calling campaigns to initiate communications with consumers for various reasons, for example: when the same prerecorded voice announcement is designed to be sent *en masse* to consumers when a dialog with the calling party is not required (*i.e.*, unattended message dialing); when a dialog with the calling party is required but call center agents for predictively dialed calls are dedicated to particular services based on a selection provided by the consumer (*i.e.*, attended message dialing), and; when a dialog with the calling party is required but the consumer is not expected to either answer or engage in a dialog, *i.e.*, consumers are expected to abandon the calls if answered, such as for debt collections. In this case, the calling party realizes outbound dialing efficiencies by conveying the voice message to the consumer informing them of the need to talk while simultaneously minimizing abandoned live calls with agents.

41.     The ability of a dialing system to deliver (*i.e.*, play) a prerecorded voice message at the beginning of a particular outbound call, as previously described, is dependent on the ability of the dialing system to analyze call progress tones for that call. Therefore, if a prerecorded voice message is played when an outbound call is answered, the call must be an automatically dialed call. Furthermore, when a prerecorded message is played at the beginning of an outbound call, the automatic dialing system must transfer the call back to an agent in order for there to be a dialog between the consumer and the call center agent—the fundamental function of predictive dialers.

42.     In many cases, the automatic IVR dialing campaigns for both unattended and attended outbound message dialing use telephone numbers that are stored in a separate account record database. These telephone numbers can be electronically imported into the IVR function directly and automatically from the account record database or they can be extracted from the

account record database and electronically imported into the IVR function as separate exercises. In either case, both unattended and attended outbound message dialing can only function if telephone numbers to be called are dialed *en masse* from a stored electronic list of numbers; otherwise, the efficiencies of using an IVR system to initiate outbound calls cannot be realized.

47.    Furthermore, it is my understanding that in a previous case TWC's IVR system was determined to be an ATDS within the meaning of the TCPA. (Exhibit C.) In a deposition

transcript from that case, a corporate fact witness clearly described how TWC's IVR system functioned—identical to the unattended message dialing function. (Exhibit D.) Nothing in the IVR record produced by TWC indicates that the IVR system in this case is different than the IVR system in the King case.

48.     Therefore, it is my opinion, based on my knowledge, education, experience, expertise, training, my review of the relevant documents and the facts described above that

**ECLERX'S DIALING SYSTEM**

52.     I understand that eClerx is a professional outsourcing company that offers call center services. EClerx provides outsourced technical support and troubleshooting call center services to TWC. I understand that fact discovery in this case is ongoing and I also understand that there may be documents and/or evidence that have yet to be produced regarding the dialing

system employed by eClerx when providing their call center services. When the appropriate and detailed technical documentation and evidence is made available, I will provide my conclusions and opinions on whether or not eClerx employed and utilized an ATDS as defined in the TCPA.

### THE NOBELBIZ DIALING SYSTEM

53.     I understand that NobelBiz provides hosted cloud-based software dialing services. I understand that fact discovery in this case is ongoing and I also understand that there may be documents and/or evidence that have yet to be produced regarding the NobelBiz dialing system. When the appropriate and detailed technical documentation and evidence is made available, I will provide my conclusions and opinions on whether or not the NobelBiz dialing system qualifies as an ATDS as defined in the TCPA.

### INFOCISION

54.     I understand that InfoCision Management Corporation ("InfoCision") provides direct marketing services to its clients. Evidence has been produced that InfoCision employs at least the NobelBiz dialing system.

55.     I understand that fact discovery in this case is ongoing and I also understand that there may be documents and/or evidence that have yet to be produced regarding the dialing systems employed by InfoCision. When the appropriate and detailed technical documentation and evidence is made available, I will provide my conclusions and opinions on whether or not the dialing systems employed by InfoCision qualify as an ATDS as defined in the TCPA.

### THE MERIDIAN AND GOOGLE VOICE DIALING SYSTEM

56.     I understand that Meridian Cable Strategies Inc. ("Meridian") provides outsourced call center services for delinquent accounts to cable companies. Meridian, using Google Voice, provides outsourced account management services to TWC. I understand that fact discovery in this case is ongoing and I also understand that there may be documents and/or evidence that have yet to be produced regarding the Meridian and Google combined dialing system. When the appropriate and detailed technical documentation and evidence is made available, I will provide my conclusions and opinions on whether or not the Meridian and Google dialing system qualifies as an ATDS as defined in the TCPA.

**DETERMINING LANDLINE AND CELLULAR TELEPHONE NUMBERS**

57.     Nearly 50% of all households in the U.S. today exclusively use cell phones. Cellular telephone numbers are often used as home, residential, business or other numbers and are subsequently designated as such on forms and other records. Due to the inherent unreliability of these forms and records as the guiding information for making automated outbound telephone calls, most telemarketers use a highly reliable and inexpensive technology solution that has been available to them for well over a decade.

58.     In November, 2003, the FCC mandated the implementation of a service known as "number portability" to be offered by both landline and cellular common carriers to all landline and cellular subscribers. Specifically, the service is characterized by two features: Local Number Portability ("LNP") and Wireless Local Number Portability ("WLNP"). LNP enables cellular subscribers to "port," or transfer, their cellular telephone numbers from a cellular carrier to a landline carrier within a defined geographic local area to essentially become home landline telephone numbers and vice versa. WLNP enables cellular subscribers to "port," or transfer, their cellular telephone numbers from one cellular carrier to another, allowing them to essentially own their telephone number regardless of which cellular carrier they wish to subscribe to.

59.     Because of number portability, there is no distinguishing characteristic within the telephone number format and the value of the digits themselves to determine which carrier services a particular telephone number and whether the number is even a landline or cellular number. The standard numbering plan in the United States for both landline and cellular telephone numbers is the ten-digit number format: "NPA-NXX-XXXX." "NPA" refers to the Numbering Plan Area, more commonly known as the three-digit "area code." The NPA is also of the format "NXX." The entire format of the number, "NXX-NXX-XXXX" refers to a numbering plan where the digit "N" can be any number from 2 through 9 and the digit "X" can be any number from 0 through 9.

60.     If a subscriber wishes to port his or her landline telephone number to a cellular telephone number, or vice versa, or their telephone number to another competing landline or cellular carrier, the carrier is required to do so within a few hours or less. To do this, all of the

landline and cellular carriers are connected to a nationwide real-time number portability database. The primary number portability database is owned, operated and maintained by an independent company known as ©Telcordia Technologies, Inc. dba "iconnectiv."[1] Because of the FCC mandate for number portability among all common carriers, a centralized real-time telephone number portability database needs to be employed for any and all telephone calls to be completed to the appropriate carrier network.

61.     The number portability database essentially associates each and every telephone number with a landline or cellular carrier network identifier, enabling calls to be made to the proper landline or cellular carrier network. During the course of establishing each and every telephone call and to deliver those calls to the proper network servicing the called party numbers, the number portability database is queried in real-time so that calls can terminate in the proper carrier network and properly delivered to the called party. Due to the critical nature of this service, reliability of iconnectiv's database is among the highest in the telecommunications industry.

62.     Iconnectiv, as well as other information services companies that provide wholesale access to iconnectiv's database, is commonly employed by telemarketing companies to analyze databases or lists of telephone numbers prior to calling them using an automatic telephone dialing system. Iconnectiv and its client wholesalers lease and maintain access to the number portability database enabling organizations to definitively know whether any telephone numbers in a list of numbers are cellular or not. I have personally been involved with contracting these organizations to obtain this telephone number data, both for wireless network products I have designed and in many TCPA cases.

63.     Telephone numbers included in account records being serviced by telemarketers are typically "scrubbed" by either iconnectiv or its client wholesalers to determine which ones are cellular telephone numbers prior to being added to a campaign of numbers to be called by an automatic telephone dialing system. "Scrubbing" is a term used to describe a process by which a list of telephone numbers is compared against another list of telephone numbers having

---

[1] *See* http://www.iconectiv.com/numbering/number-portability-administration-center-npac.

additional parameters associated with those numbers. If a telephone number is determined to be a cellular telephone number by this "scrubbing" process, it can be treated appropriately and in accordance with all local, state and federal statutes and regulations. For example, organizations need to recognize whether a telephone number is a landline or cellular number, and treat them appropriately so that they do not initiate automatic calls in potential violation of the TCPA.

64.     Based on my knowledge, education, experience, expertise and training, it is my opinion that consumers' telephone numbers can be definitively and clearly determined to be either cellular or landline numbers. Furthermore, the ability to do so is an inexpensive and straightforward administrative process commonly used in the telemarketing industry. Therefore, the Defendant certainly has the ability to subscribe to iconnectiv's number portability database to avoid calling cellular telephone numbers using an automatic telephone dialing system.

## DETERMINING REASSIGNED NUMBERS

65.     Telephone number recycling is a common occurrence in the cellular telecommunications industry. It results when a unique telephone number previously used for telephone services is relinquished from one party and *reassigned* to another party. Telephone numbers are a finite resource. As such, carriers commonly take telephone numbers that were previously used and assign them to new subscriptions. This is partly due to the large number of prepaid subscribers that have a high rate of transience as well as aggressive competition among the cellular carriers for both prepaid and postpaid subscribers that no longer wish to keep their numbers. Numbers that were previously used as either landline or cellular telephone numbers can be assigned to new cellular telephone subscriptions.

66.     Telephone number recycling takes place, for example, when a person stops using telephone services and discontinues payment to the carrier; when a person obtains a new telephone subscription with a new number replacing the old one; when a person using a number is delinquent in paying for telephone services and is subsequently shut off, and; various other circumstances whereby a telephone number is taken out of service and reassigned to a new service. Thus, it is incumbent upon telemarketers and debt collection servicers using automated telephone dialing systems to ensure that they are calling the proper individuals, especially in the

event the numbers on file for those individuals were reassigned to other people.

67.     There exist commercially available third-party information service companies that maintain telephone number recycling data. One such company, Early Warning Services, LLC[2] ("Early Warning"), maintains proprietary connectivity to the telecommunications carriers in order to provide its Mobile Number Verification service. To support this service, Early Warning maintains a database that is populated daily with telephone numbers that have been relinquished that day. (Exhibit F.)

68.     The Mobile Number Verification service enables organizations to query the database in real-time or in batch mode prior to calling individuals. The service returns a number match or mismatch indicator based on changes to the telephone subscription since the last date the organization called the individual and the network status of the number, if deactivated or suspended. If the response returned is a "number match," then the organization can call that number and be assured that they are calling the proper party. If the response returned is a "number mismatch," then the organization can refrain from making an outbound call to an outdated number or one that is out of service. This solution was also presented in testimony to the Senate Committee on Commerce, Science & Transportation in May, 2016. (Exhibit G, pp. 23-25.)

69.     Based on my knowledge, education, experience, expertise and training, it is my opinion that telephone numbers can be definitively and clearly determined to have been reassigned since the last time those numbers were called. Furthermore, the ability to do so is a straightforward administrative process commonly used in the telemarketing industry to prevent automatic dialing of reassigned numbers. I have not seen any evidence that TWC subscribed to such a service.

## ASCERTAINABILITY

70.     I understand that TWC has recorded account information associated with the telephone numbers of consumers who were called for technical support, account delinquency or other reasons. Typically, this account information includes the person's name, address and

---

[2] *See* https://www.earlywarning.com/mobile-number-verification.html.

possibly email address.

71.    In the case where this information is non-existent, reliable contact information can be ascertained based solely on the telephone number called. There exist commercially available third-party information service companies that collect, maintain and analyze telephone number data for various commercial information purposes. Beside analyzing whether telephone numbers are cellular numbers or landline numbers, these information service companies also provide various class action administration and litigation support services.

72.    I have personal and technical experience with some of these third-party information service companies such as A.B. Data, Ltd.[3] ("A.B. Data"), Alexander Reus, P.A. dba DRRT, a limited partner of Diaz Reus & Targ LLP[4] ("DRRT"), CompliancePoint[5] and Contact Center Compliance Corporation.[6] These organizations either maintain or have access to extensive databases and also provide data analysis services for litigation support. These companies have the ability to identify and provide current contact information for individuals based on telephone numbers as well as other provided account data, if provided.

73.    These companies have access to a complete and accurate database, updated daily, of all telephone numbers and related information used in the United States. For each telephone number in the United States, they access the associated telecommunications carrier, whether the number is a landline number or cellular number, and the porting history of the telephone number. In fact, they typically can access this information for any given date or timeframe in the past, regardless of whether the number was ever ported before or after that date. I have been personally involved in contracting with these companies to provide telephone number data analysis in several TCPA class action lawsuits.

74.    Additionally, these companies partner with several reputable data processors and vendors such as LexisNexis, Experian Information Solutions, Inc., Nexxa Group Inc., as well as many others. Using additional information from these data processors, these companies have the

---

[3] *See* http://www.ABDataClassAction.com/services/notice-administration.
[4] *See* http://DRRT.com/litigation-support.
[5] *See* http://www.CompliancePoint.com.
[6] *See* http://www.DNC.com.

ability to obtain the owner's name of the telephone subscription associated with the telephone number and the owner's address during the timeframe the subscription was in service. Furthermore, they can obtain the latest contact information for the owner of the telephone subscription at some time in the past by using databases provided by the United States Postal Service ("USPS"). The USPS maintains the National Change of Address database ("NCOALink"), which is updated daily and contains approximately 160 million change of address records for the past four years.[7] If current address information is unavailable via the USPS, A.B. Data can access credit reporting agencies' information or other data to obtain address information.

75.   Hence, these companies have the ability to cross-reference individual telephone number data from various data resources with telephone subscriber data obtained from their partners, thus revealing names, addresses and current contact information for individuals who used a particular telephone number during a particular timeframe in the past.

76.   Furthermore, because of these extensive data analysis capabilities, purported issues concerning number portability, the recycling of telephone numbers, family plans, business plans and pre-paid telephone plans are unlikely to affect the ability of companies of this sort to identify the subscriber of a telephone number within the last four years.

## CELLULAR SUBSCRIBERS ALWAYS INCUR CHARGES FOR EACH CALL

77.   It is very common in today's cellular market for subscribers to obtain cellular features and services that are bundled into a variety of single-price rate plans. Where this is the case, it may be difficult to determine precisely the actual monetary charges to subscribers for individual cellular telephone calls. This is because these single-priced rate plans may include unlimited call-time for a single bulk price. Where this is not the case, a cellular subscriber's phone bill will include an itemized fee for each telephone call both made and received.

78.   Cellular network operators typically charge for services using rate-plans that provide subscribers calls in predefined amounts. Call features and services are often times bundled together and sometimes provided a la carte. In these cases, it is difficult to derive an

---

[7] *See* http://www.peachtreedata.com/ncoa/.

itemized single fee for sending or receiving a telephone call based on an individual subscriber's rate-plan. However, cellular subscribers, as the called party, are always charged by the cellular network operator for receiving calls. A portion of what subscribers pay for their entire cellular telephone service each month goes toward this service as it does for many "included" features and services, such as voice-mail, three-way calling and call-forwarding. Cellular network operators always consider the actual and precise operating cost for carrying calls across their networks as well as the marketing costs incurred to acquire new subscribers, the cost of *churn* (*i.e.* the cost of losing subscribers to competing operators and the cost to remove their access to the network) and the cost for any included features and service calls. The cellular network operators maintain detailed statistics on subscriber behavior and demographics and can accurately predict usage of their networks by subscribers of any given rate-plan. The charges always cover all of a subscriber's features and services regardless of whether these charges are itemized or not. Although there may not be a direct itemized fee associated for each individual telephone call, the bundled fees charged to subscribers truly account for the itemized fees that may otherwise be individually charged. When telephone call traffic increases to the point where a cellular operator's profit margins decrease for unlimited single-rate bundled pricing plans, the operator raises the price of these bundled plans and offers alternative plans to account for the loss in revenue. The revenue obtained by the cellular operators always originates with the cellular subscriber consumers and the fees charged are always based on the number of telephone calls subscribers make and receive, regardless of whether these fees are plainly discernable or not in an itemized list.

## **CONCLUSIONS**



81.     In a previous case (King), TWC's IVR system had been determined to be an ATDS. Nothing in the record produced by TWC indicates that the IVR system in this case is different than the IVR system in the King case.

86.     Telephone numbers can be determined to be either cellular or landline numbers using a straightforward administrative process.

87.     Telephone numbers can be determined to have been reassigned since the last time they were called using a straightforward administrative process.

88.     Current contact information can be definitively ascertained based on the account record information stored by TWC.

**SUMMARY OF OPINIONS**

89.     It is my opinion, based on my knowledge, education, experience, expertise, training, my review of the relevant documents and the facts described above, that ██████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████

90.     It is my opinion, based on my knowledge, education, experience, expertise, training, my review of the relevant documents and the facts described above, that ████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████

91.     It is my opinion, based on my knowledge, education, experience, expertise, training and the facts described above that telephone numbers can be determined to be either cellular or landline telephone numbers. Furthermore, the ability to do so is a commonly-practiced and straightforward administrative process to prevent automatic dialing of cellular numbers.

92.     It is my opinion, based on my knowledge, education, experience, expertise, training and the facts described above that TWC could have determined reassigned customer telephone numbers since the last time they were called. Furthermore, the ability to do so is a commonly-practiced and straightforward administrative process to prevent automatic dialing of reassigned numbers.

93.     It is my opinion, based on my knowledge, education, experience, expertise, training and the facts described above that individuals' current contact information can be definitively and clearly ascertained based on the account record information stored by TWC or by other means.

94.     It is my opinion, based on my knowledge, education, experience, expertise, training and the facts described above that cellular subscribers always incur charges for each call regardless of the way the subscription service is bundled and even if there are no explicit itemized subscription fees.

95.    My opinions in this Declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems and a detailed understanding of automatic telephone dialing systems. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 20th day of January, 2017.

_Randall A. Snyder_
_____
Randall A. Snyder