**EXHIBIT D**

**Part 1 of 2**

to

**Declaration of Andrew Prins**



**Planet Depos®**
We Make It *Happen*™

## Confidential - Attorneys' Eyes Only

# Transcript of Randall Snyder

**Date:** December 18, 2018
**Case:** Hunter, et al. -v- Time Warner Cable Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
1                  UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    LEONA HUNTER and ANNE MARIE        )
     VILLA, on behalf of themselves     )
5    and all others similarly          )
     situated,                          )
6                                       )
             Plaintiffs,                )
7                                       )
       vs.                              ) Case No. 1:15-cv-
8                                       ) 06445-JPO-JLC
     TIME WARNER CABLE, INC.,           )
9                                       )
             Defendant.                 )
10                                      )

11

12           CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15        VIDEOTAPED DEPOSITION OF RANDALL SNYDER

16

17

18
          Taken at the Offices of Depo International
19                 703 South 8th Street
                   Las Vegas, Nevada
20
              On Tuesday, December 18, 2018
21                   At 9:09 a.m.

22

23

24
          Reported by:  Jane V. Efaw, CCR #601, RPR
25
```

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                                    22

1    after the duration of a call, and then the system

2    records the call and the data about the call and the

3    call logs.  He indicated that that's exactly what

4    these call logs represent.  But he didn't -- I have

5    no evidence that it was somehow inaccurate or just

6    suggestive of that occurring.

7    BY MR. PRINS:

8        Q.   So, Mr. Snyder, I'm going to ask you again

9    because you didn't really answer my question.  Is it

10   your testimony that when you see an attempt status

11   equal to live voice in the call log, that you can

12   definitively determine that a prerecorded voice

13   played on that call?

14       A.   Based on the evidence that I have, not that

15   it played but that a call was initiated using a

16   prerecorded voice.  But most likely it played.  And

17   there are -- we can come up with certain outlying and

18   hypothetical circumstances where it didn't.  But for

19   the most part, that's exactly what occurred.

20       Q.   So your answer is, no, you can't tell

21   definitively that a prerecorded voice played; is that

22   correct?

23           MR. ARISOHN:  Objection.  Mischaracterizes

24   the witness's testimony.

25           THE WITNESS:  Yeah, exactly.  No, I think

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                    23

1   you can tell definitively, but nothing is 100

2   percent.  So I resist being absolutist about this.

3   However, in my experience, this type of data is

4   extremely reliable and accurate.

5           And in some cases, we can, again, come up

6   with a hypothetical situation where in one call or

7   another something may have occurred.  But for the

8   most part, it is my opinion that when attempt status

9   field says live voice, based on the evidence I

10  reviewed, that prerecorded voice message was played

11  when that call was initiated.

12  BY MR. PRINS:

13      Q.   But there are circumstances where the

14  attempt status field could -- or would state live

15  voice and the prerecorded voice would not have

16  played; is that correct?

17      A.   Yeah, I can come up with all kinds of crazy

18  things.  Like somebody dropped their cell phone or

19  something, and it broke just as the call was

20  answered, you know.  All kinds of, you know, weird

21  hypotheticals we can come up with.  But in my

22  experience, that's a tiny, tiny percentage of what

23  these call logs represent.

24      Q.   And is it your testimony that when attempt

25  status is equal to answering machine, that a

```
1    prerecorded voice would have played on that call?

2         A.   Yes, essentially the same answer as I gave

3    before.  We can always come up with some wild

4    scenario that something occurred, but for the vast

5    majority of these calls, that must be accurate, in my

6    experience and based on the evidence that I reviewed.

7         Q.   ████████████████████████████████████

8    ██████████████████████████████████████████████████

9    ██████████████████████████████████████████████

10        A.   ████

11        Q.   Mr. Snyder, what is your current cellular

12   phone number?

13        A.   ███████████████

14        Q.   And other than the Number ███████████, do

15   you have any other cellular phone numbers?

16        A.   No.

17        Q.   How long have you had the cellular phone

18   Number ███ -- is it ████████████?

19        A.   ███████████████.

20        Q.   ███████████?

21        A.   Correct.

22        Q.   And I'm sorry.  Just to be clear.  How long

23   have you used this cellular phone number,

24   ███████████████?

25        A.   A very long time.  Probably more than 12 or
```

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                    25

1    13 years.

2        Q.    And who is your cellular carrier?

3        A.    ████████████

4        Q.    And for the entire time that you have used

5    the ███████████ number has your carrier been ████

6    ██████?

7        A.    Yes.

8        Q.    And other than that ████████████ number, do

9    you use any other cell phones?

10       A.    I think you already asked me that.

11       Q.    I did, but I messed up the number.

12       A.    Okay.  So the answer is no.

13       Q.    No?

14       A.    Yeah.

15       Q.    And is the ██████████ number connected to

16   a family plan at ████?

17       A.    No.

18       Q.    Does anyone other than you ever use your

19   cell phone with the number ████████████?

20       A.    That's a broad question.  I mean, there have

21   been individual times over many, many years where

22   somebody can say, "Can I borrow your cell phone," and

23   made a call or something.  But I'm basically the user

24   of that number and that cell phone.

25       Q.    Is there a spouse or a roommate that

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                    35

1   whole commercial business is predicated upon

2   collection of mass data.  And the idea, anyone that

3   is -- I guess how you would say, is the customer user

4   of a given telephone number, fills out any form that

5   could be accessed by Lexus Nexus, whether you're

6   applying for insurance or credit card or if you give

7   your phone number to the DMV or if you get arrested,

8   or any number of places where your phone number is

9   recorded by some entity, commerce or noncommercial.

10  And Lexus Nexus access to that.  They collect that

11  mass data.  So when you query on a certain piece of

12  information, they can respond with the data they've

13  collected in an organized format.

14       Q.   So again, what role is the National Change

15  of Address database playing in your methodology if

16  Lexus is returning an address associated with what I

17  think you have called the customer or user of the

18  phone?

19       A.   Yes.  The idea is that if the address and

20  contact information data received, you get dates with

21  all the stuff, too, of when the data was collected

22  and when Lexus Nexus is essentially assuring that

23  this was the correct data on a given date.  You can

24  further, if it's far enough back, if need be, you can

25  run that data through the National Change of Address

1    his methodology is reliable and accurate."

2         Did I read that correctly?

3    A.   Yes.

4    Q.   And you still agree with that today;

5    correct?

6    A.   Yes.

7    Q.   You testified earlier that you have not

8    spoken to Mr. Weir in connection with this case;

9    correct?

10   A.   Correct.

11   Q.   How much time did you spend reviewing

12   Mr. Weir's methodology?

13   A.   I don't recall.  His report was concise and

14   clear and very straightforward.  It wasn't -- it's

15   not an overly complex analysis.  So I was able to go

16   through his report a couple times very quickly and

17   understand which call log records he was looking at,

18   how he filtered them, calling out unique telephone

19   numbers, number of calls, and his methodology for

20   obtaining contact information.  So it was very

21   straightforward, from my perspective, so it didn't

22   take very long.

23   Q.   Would you say you spent more than one hour

24   or less than one hour?

25   A.   Probably between one and two hours, just

1   looking at it, reviewing it and making sure that I
2   thought it was correct and accurate and just reading
3   through it a little more carefully.  But again, it
4   was very straightforward, in my opinion.
5        Q.   Other than looking through it to make sure
6   it was correct and accurate, did you take any other
7   steps to assess the methodology?
8        A.   No.  I have a lot of experience in this area
9   with this precise methodology that's been deemed by
10   the courts to be reliable and accurate in other
11   cases.  So I just wanted to ensure that -- that he
12   was looking at the right records.  And certainly, he
13   could have used other data processors besides Lexus
14   Nexus as well.  He chose Lexus Nexus.  That's okay.
15   But I just wanted to make sure that it was correct in
16   my mind.
17        Q.   And you agree with his choice to use Lexus
18   Nexus?
19        A.   Yes.  I think he could have easily used the
20   TransUnion service.  They're very competitive, these
21   data processing companies.  They charge a lot of
22   money.  You have access to a lot of data.  They're
23   used by all kinds of industries and organizations to
24   get correct data.  So I have no issue with his choice
25   of using one over another.

1      Q.   And let's just jump back to page 3 of your

2    report and the documents reviewed and considered.   At

3    the bottom of page 3, we talked about this earlier.

4    Documents reviewed and considered.   We have the

5    Second Amended Class Action Complaint, the call log

6    data, the deposition transcript of David Zitko, the

7    declaration of Colin Weir and the Telephone Consumer

8    Protection Act and regulations.

9           And I believe you testified earlier that

10   this is, in fact, an accurate list of the documents

11   you considered in connection with this case; is that

12   correct?

13     A.   In connection with this report, yes.

14     Q.   And this report was submitted under penalty

15   of perjury; correct?

16     A.   Yes.

17     Q.   And so because this is an exclusive list of

18   documents you considered, is it correct that you did

19   not look at the file that Mr. Weir sent to Lexus

20   Nexus?

21     A.   No.   I didn't look at the actual individual,

22   analytical steps he took in performing his job.

23   However, I'm opining on the methodology overall.

24     Q.   And just so I understand.   So you did not

25   review the source code that Mr. Weir used in

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                    42

1   connection with running your methodology; is that

2   correct?

3       A.   That's correct.  I have worked with him in

4   other cases where I did.  This was extremely

5   straightforward.  So I have seen his scripts before

6   that he uses as input, and I have no reason to

7   believe that what he did was incorrect.

8       Q.   What programming tool did he use to execute

9   the methodology?

10      A.   He uses several.  And this is really his

11  area of expertise, I understand the methodology, but

12  he's an expert in the nuts and bolts details of doing

13  the actual numerical data analysis.  But he uses some

14  statistical software.  He uses other software that

15  comes up with similarity scores of data, of comparing

16  data.  So you can -- like I said before, if a name

17  comes back Bill or William, you can be very sure that

18  it's probably the same person.

19           So I'm not -- I don't use those tools.  He

20  does.  But I know that he does, and he's opined on

21  those issues before.  I think in his report he lists

22  some of the software he uses.

23      Q.   My question, sir, is, what software did he

24  use in this case?

25      A.   I'd have to look at his report.

1      Q.    Is it fair to say you do not know what

2    software he used in this case?

3      A.    Right.  I have to reference it.  I didn't

4    use the software, he did.  So it's not based on my

5    direct knowledge of use of the software.

6      Q.    But sitting here right now, you can't tell

7    me what software he used?

8      A.    I didn't memorize his report.

9      Q.    Did you review the information that he

10   received back from Lexus Nexus?

11     A.    No, I am reviewed his results and summary

12   information in his report.  So his report is his

13   testimony, that's all I reviewed.

14     Q.    What do you mean when you said you reviewed

15   his results?

16     A.    In his report he has tables and numbers and

17   information that he's testifying to as an expert in

18   this case.

19     Q.    But you did not review the output of his

20   program after he had done -- applied the methodology;

21   is that correct?

22     A.    No, I did not.

23     Q.    And you said you've seen his source code in

24   other matters; is that correct?

25     A.    Yeah, the scripts he writes in order to do

1    the database analysis and the information he inputs

2    for these commercial databases.  I did not review

3    that specifically in this case.

4        Q.   And do you know whether he has modified any

5    of -- do you know whether he even used those scripts

6    in connection with this case?

7        A.   No, I don't know.

8        Q.   Do you have any personal experience using

9    Lexus Nexus?

10       A.   No.

11       Q.   Do you know what Lexus Nexus product

12   Mr. Weir used?

13       A.   They have certain specific services for

14   contact information, as does TransUnion and some of

15   the others.  I only know, based on my experience and

16   knowledge, of the data it can produce and the

17   reliability over many years of experience.

18       Q.   So is that to say you do not know what

19   specific Lexus Nexus products he used?

20       A.   No, but it may be listed in his declaration.

21       Q.   But you don't know?

22       A.   Again, I didn't memorize his declaration.

23       Q.   And if you did know it -- strike that.

24           You have not used any Lexus Nexus product in

25   connection with phone information; is that correct?

1       A.    Right.   That's why -- that's why Colin Weir

2   is involved in this case.   That's his task.

3       Q.    Do you know why Mr. Weir chose Lexus Nexus

4   over TransUnion?

5       A.    I don't.

6       Q.    Do you know what data sources Lexus Nexus

7   pulls from to generate its results?

8       A.    Generally, but there must be hundreds and

9   thousands more than I can name off the top of my

10  head.   They certainly have case studies that they

11  publish and information that they publish as to where

12  they obtain the raw source data from public and

13  private sources.

14          Some of it is anonymized; some of it is

15  associated with individuals that they can obtain,

16  such as credit reports and loan applications, those

17  types of things.   But it's a very large list that I

18  can't tell you, off the top of my head, all the

19  items.

20      Q.    But you haven't reviewed any Lexus Nexus

21  case studies in connection with your report here;

22  correct?

23      A.    No.   And they serve to show the reliability

24  and the usage of their product, and they've been

25  successful for many years.   It's commercially used by

Confidential - Attorneys' Eyes Only

Transcript of Randall Snyder
Conducted on December 18, 2018                                      47

1    be associated with an official document.

2         Q.   What specific credit reporting agencies does

3    Lexus purchase data from?

4         A.   I can't say.  I know for sure, but I would

5    be surprised if it wasn't from the main three ones.

6    It's Experian, TransUnion -- there's another one, I

7    think.  I just can't recall off the top of my head.

8         Q.   But you have no knowledge and fact of which,

9    if any, credit reporting bureaus Lexus purchases its

10   data from; correct?

11        A.   I -- again, I would be surprised if they

12   didn't obtain data from all the sources they could

13   get data from.  I have no reason to believe that for

14   some reason, one of these credit reporting agencies

15   did not want to sell them data.  That's the business

16   they're in.

17        Q.   But you don't know one way or another

18   whether Lexus actually purchases data from any credit

19   reporting agencies; correct?

20        A.   Well, they advertise they obtain date from

21   credit reporting agencies.  I guess if they're

22   misleading the public in their products and services,

23   but that's one of the main sources of information.

24        Q.   So your testimony is that Lexus advertises

25   in connection with its adverse look-up product, that

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                    48

1    it obtains data from credit reporting agencies?

2         A.    Yes.

3         Q.    Where have you seen that advertisement?

4         A.    In many places.  I have just been -- I have

5    looked at their website dozens of times or -- and I

6    get it that that's kind of marketing material, but I

7    don't have a reason to believe that they would be

8    misleading about where their data sources are.

9              They have case studies.  They have white

10   papers on their website, so, in many, many places.  I

11   just didn't feel it.  I mean, I could have pulled up

12   all that data, but it's publically available to

13   anybody that wants to look it up.

14        Q.    Sitting here today, do you know whether

15   Lexus purchases data from Experian, yes or no?

16        A.    Not for sure, but I would be very surprised

17   if they didn't.

18        Q.    Sitting here today, do you know whether

19   Lexus purchases data from TransUnion, yes or no?

20        A.    Same answer.  I would be very surprised if

21   they didn't.

22        Q.    So that's a no; correct?

23        A.    Yes.  And absolute knowledge?  No.

24        Q.    And I think you mentioned that Lexus might

25   purchase data from insurance companies; is that

1    witness's prior testimony.

2           THE WITNESS:  Yes.  I wouldn't have used the

3    terminology in such a pejorative way as you did by

4    repeating back my answer.  However, again, this is a

5    commonly and very popularly used commercial product

6    that's considered reliable by all the industries that

7    use it.  And if it were not, I don't see how they

8    would be in business.

9    BY MR. PRINS:

10      Q.   Just to clarify the record, are there any

11   other bases for your opinion that Lexus Nexus is

12   reliable that you would like to offer right now?

13      A.   No.

14      Q.   Can you tell me the name of any single

15   insurance company that Lexus Nexus buys data from?

16      A.   They -- they market and advertise that they

17   get data from the insurance industry.  It may -- and

18   there's many reasons for that.  I don't know if they

19   have confidentiality agreements or they don't want to

20   list every -- the thousands of companies that they

21   collect data from.  But, no, I don't have absolute

22   epistemological knowledge of an individual company

23   that they collect data from.

24      Q.   So you do not know a single insurance

25   company by name that Lexus Nexus purchases data from;

Confidential - Attorneys' Eyes Only
Transcript of Randall Snyder
Conducted on December 18, 2018                                    54

1    correct?

2        A.   By name?  No.

3        Q.   You mentioned local governments.  Do you

4    know a single local government by name that Lexus

5    Nexus purchases data from?

6        A.   No.  They advertise industries.  So they

7    advertise state and local municipal records, arrest

8    records, DMV records, which is likely across all 50

9    states.  But, again, I doubt that they would attest

10   to that if it were not true.  I have no reason to

11   believe that their assertions are not true.

12       Q.   Is it your testimony, based on what you just

13   said, that Lexus -- strike that.

14            Is it your testimony that the Lexus Nexus

15   phone product at issue here, as used by Mr. Weir,

16   relies on arrest records.

17       A.   It doesn't rely on.  I understand that the

18   mass data that Lexus Nexus connects -- collects goes

19   into its product and you simply request information

20   and provide you a result.  There's no way to

21   determine the source, necessarily, of that result

22   based on the product you purchase from Lexus Nexus.

23   So you get a result of address and names, but it

24   doesn't say we got this name here, we got this name

25   there, we got this name there, we got this address

1    there.  That's not a service they offer.

2        Q.   Can you tell me a single county or city that

3    Lexus uses arrest records from in connection with its

4    phone reverse look-up product?

5        A.   No.  And actually, it's a misnomer, I think,

6    to call it a phone reverse look-up product.  If you

7    -- many people commonly do get on the web and type in

8    reverse look up and there's hundreds, if not

9    thousands of very unreliable bad data services called

10   reverse look-up phone services.  That's surely not

11   what this is.

12           It may be a similar product name.  However,

13   the idea is that this is mass data collected from

14   reliable sources over many years and over a lot of

15   time.  And my experience has been it's very reliable.

16           And again, in the industry, in the

17   telecommunications industry -- and I use these in

18   other products outside of the legal realm, where we

19   needed to look up or look at reverse phone

20   directories that were available commercially.

21           They're generally highly unreliable because

22   they're not based on collecting mass data from

23   hundreds of thousands of sources.  It's based on old

24   data that can be gleaned from old Yellow Pages or old

25   White Pages in certain cities and municipalities.

1          So I look at this as not as just a simple

2     reverse phone lookup.  This is an actual programmatic

3     operation, where Lexus Nexus, as a data processing

4     company, provides very valuable data.  It's very

5     reliable from data sources, unlike the commonly known

6     average reverse lookup that you could type into a

7     Google search and obtain potentially information for

8     1995, and a number or something like that.  Those are

9     all very unreliable.

10         Q.   So it's a fair point, Mr. Snyder, and I just

11    want to make sure we have a common terminology,

12    because I'm not trying to trip you up by sneaking in

13    a reverse lookup or anything like that.  So going

14    forward, I'm going to refer to the Lexus Nexus

15    product used by Mr. Weir, and we would have a common

16    understanding about what that project -- what I'm

17    referring to; correct?

18         A.   Yes, thank you.

19         Q.   And your answers before about the Lexus

20    Nexus phone product, as I was calling it, you were

21    referring to the Lexus Nexus product used by

22    Mr. Weir; correct?

23         A.   Yes.

24         Q.   So circling back to the arrest records, can

25    you tell me, sitting here today, a single

1   municipality or other government entity that the

2   Lexus Nexus product used by Mr. Weir pulls from or

3   has access to.

4       A.   Sitting here today, no.

5       Q.   Other than credit reporting agencies,

6   insurance companies, local governments, is there any

7   other group or industry that, sitting here today, you

8   know for a fact that the Lexus Nexus -- the Lexus

9   Nexus product used by Mr. Weir relied upon?

10      A.   No.  Again, I'm not an expert in the Lexus

11  Nexus data collection side of their business.

12  They're B to B business that they don't sell

13  commercially, but where they obtain the data from.

14  My opinions are purely based on the usage of their

15  services and the data they can provide commercially

16  for the information that someone like Mr. Weir is

17  trying to obtain.

18      Q.   So your answer is that you cannot provide

19  another industry or general group of entities that --

20      A.   That's right.  But, you know, on my next

21  break, I can certainly do the research and give you

22  names of dozens.

23      Q.   But you didn't do that research in

24  connection with your report, correct, because I don't

25  see any Lexus website listed on your document.

Confidential - Attorneys' Eyes Only

Transcript of Randall Snyder
Conducted on December 18, 2018                          62

1    there, for some reason, is a lack of confidence in

2    using one of these date processors, you can use

3    another or use several and cross-reference the data

4    you get from that to get a reliable result.

5              So my opinion really is that this can be

6    done and this is the overall methodology and here's

7    how it works.  The fact of whether one data processor

8    we use, or more, has to do with the results we get.

9    And if the results look spurious, for some reason,

10   over a large mass of data, you might run it again

11   through another data processer.

12        Q.   But you've already testified earlier that

13   you have no reason to question results already

14   obtained in this case; correct?

15        A.   That's right.  That's right.  Because I saw

16   Colin Weir's report and he indicated there wasn't

17   much of a problem and -- or a problem at all.  And

18   I'm just -- I'm opining again on the methodology

19   that, in my experience, is reliable.

20        Q.   And the methodology as used by Colin Weir

21   that you are opining on, is that Lexus is reliable

22   for this --

23        A.   Right.  And that's a subset of the overall

24   opinion I'm providing in this case.

25        Q.   Uh-huh.

1   majority of the data was not reliable, I would

2   certainly -- I believe I certainly would know about

3   it, especially in cases like the one we're here

4   talking about today.

5       Q.   But you've done no analysis yourself to

6   determine the error rate of the Lexus data; correct?

7       A.   No.  And it's just like, you know, if you

8   buy a car, maybe J.D. Power tells you, you know, how

9   many complaints there have been in the first month of

10  each model of car.  You know, people believe that.

11  They trust it.  I believe that J.D. Power is not

12  lying.  But I don't believe I have to perform an

13  independent analysis of that, unless it's required,

14  and if plaintiff's counsel asks to do the research.

15  Certainly, I could probably could do it or someone

16  else could do the research and determine the range of

17  numbers of reliability of that data.

18      Q.   But you haven't done that analysis today?

19      A.   I haven't done that, no.

20      Q.   I think you mentioned J.D. Power &

21  Associates, and I believe you were trying to draw an

22  analogy to a third-party authoritative source from

23  which you could rely on, their opinion of

24  reliability.  Was that the analogy --

25      A.   Yes.

Confidential - Attorneys' Eyes Only

Transcript of Randall Snyder
Conducted on December 18, 2018                              70

1    and number crunching and can testify to that

2    reliability as well.

3        Q.   What is your understanding of the term

4    "customary user" as used in your report?

5        A.   The -- I'm not trying to -- I know there's

6    an issue that's been a going around TCPA industry for

7    years of what the called party is and what that

8    means.  We're talking about the person generally

9    associated with the telephone number.  When you call

10   that number, that's the person you're intending to

11   call.  So it's the person that uses that number.  The

12   subscription may not be in their name, but it's

13   basically the person that uses that number, just as

14   we all here today can provide our phone numbers as

15   our phone numbers.  So we're associated with that

16   number.

17       Q.   So would it be fair to say -- and I want you

18   to tell me if it's not -- that when you use the

19   phrase "customary user" in your report, you're

20   referring to the primary user of a phone number?

21       A.   Yes, and I'll be candid.  I've been in lots

22   of depositions and lots of rebuttal reports over this

23   issue, and, you know, the opposing counsel or the

24   opposing side makes an argument that, well, how do

25   you know if you let somebody borrow your phone to

1    you, that's how they would do it.  I'm not talking

2    about any business relationships or legal

3    relationships or anything like that.  It's the person

4    that publicly and privately associates themselves

5    with that phone number.

6        Q.   And based upon your years of experience in

7    TCPA cases and in the telecom industry, are there

8    situations in where there are multiple customary

9    users of a phone number, as you are using that term

10   in your report?

11       A.   Not that are not exceptions.  There are

12   great exceptions.  I just have never seen that.  I

13   can think of hypotheticals where a parent gives two

14   12 years olds one phone to share or something like

15   that.  But then there's always confusion.  And that's

16   just a hypothetical.

17            In my experience, telephone numbers are

18   widely used to associate with individuals.  In fact,

19   it's used in authentication all the time, you know,

20   when you try and log in to your website at your bank

21   and they want to send you a text message, and you put

22   the code in, right?  They are sending that number to

23   the user that put his number down when they got the

24   account.  So that's the user.  Right?

25            Those services wouldn't work if there were

1   multiple -- it was a common thing, that multiple

2   people gave out the same phone number for themselves

3   all the time.  In my experience, that's a very, very

4   tiny -- I'm sure it occurs, but a very tiny

5   percentage of the time.

6       Q.   Can you put an estimate on the percentage of

7   time that occurs?

8       A.   Very small.  I would be speculating.  All I

9   could say is very small.  And I think that most

10  people in this industry will give you a similar

11  answer.  These are not statistics that are kept.

12          But, again, if it was a common occurrence,

13  that multiple people were giving out the same phone

14  number and registering with websites and doing your

15  online banking and all the other things we use our

16  phone numbers for, we're giving out the same number,

17  it would be extremely problematic in the industry, no

18  companies would use i for authentication.

19          Nobody, when they were trying to reach you,

20  would know whether they were actually calling you or

21  not.  Whose voicemail do you have associated with it.

22  It's just a myriad of problems that people don't seem

23  to have today, and the reason they don't have them is

24  because that situation doesn't occur.

25      Q.   Would you say the situation of multiple

1    customary users being associated with a phone occurs

2    in less than 1 percent of instances?

3        A.   I'd be guessing.  But I'd be surprised if it

4    was more than that.  But it's just a guess.  I don't

5    have any authoritative source for that except

6    personal experience.

7        Q.   And in the situation of, let's say, a home

8    phone in a household, is it your opinion that there

9    would still be only a single customary user

10   associated with that home phone, or would there be

11   multiple customary users associated with that home

12   phone?

13       A.   There might be multiple.  But the idea is if

14   somebody that uses that phone number put their own

15   name and that phone number down on some -- somewhere,

16   that was information collected by the data processors

17   like Lexus Nexus, they have a reasonable means of

18   determining or providing to others that this

19   association exists between this phone number and this

20   person.

21            So the idea is that, oh, if I get a new

22   cable service or a new electronic service or I moved,

23   and I put my own phone number down, I put my cell

24   phone number down, I put my name down, those

25   utilities are also industries that provide data.

1            When you request that data back, you're

2       still reasonably assured that that person's

3       associated with that phone number.  Again, landline

4       numbers aren't used for authentication, you know, for

5       electronic communications, that kind of thing.

6       And landline --

7              MR. ARISOHN:  Ojbection.

8              THE WITNESS:  Yeah.

9              MR. ARISOHN:  Sorry.  Go ahead.

10             THE WITNESS:  And landline numbers are

11      becoming -- used less and less today, although

12      usually in cases like this, they are 50 percent or

13      more of the calls made when you analyze the numbers.

14      I'm not sure if that was done in this case.

15             MR. ARISOHN:  Can we take a quick break when

16      it's convenient?

17             THE WITNESS:  Yes.

18             MR. PRINS:  How much longer do we have on

19      the video?  We're going to run out of video in about

20      ten minutes, Josh.  Does that work for you?

21             MR. ARISOHN:  Okay.  Maybe five minutes?

22             MR. PRINS:  Sure.  Five minutes is fine.

23             THE WITNESS:  But my point is that -- the

24      idea is that a name that's associated with a phone

25      number doesn't -- is based on what people represent

1   you have with customers that sign up on the web, for

2   instance, for a service and they accidentally

3   transpose a digit or they're typing too fast.  And

4   now there's a wrong number -- I'm sorry -- associated

5   with that name.  And that's why systems like Early

6   Warning exist, so you can see if that phone is

7   disconnected or associated with a certain date or why

8   these Lexus Nexus services exist, so you can

9   cross-reference that data.  But it does happen, but

10  that's -- again, that's a small percentage.

11      Q.   And if a company was trying to avoid calling

12  reassigned numbers, for example, would relying on a

13  source of data that was tracking disconnects be sort

14  of a reasonable method to employ?

15      A.   Yes.

16      Q.   Do you know any other services other than --

17  I'm sorry, I don't remember the one you worked with,

18  something.com.

19      A.   Early Warning.

20      Q.   Other than earlywarning.com, do you know of

21  any other providers of information about disconnects?

22      A.   Yeah, there's one other.  I don't recall the

23  name off the top of my head.  I just know Early

24  Warning, because I've worked with them personally

25  over the last few years.