**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LEONA HUNTER and ANNE MARIE VILLA,
on behalf of themselves and all others similarly
situated,

                               Plaintiffs,

     v.                                 Case No. 1:15-cv-06445-JPO

TIME WARNER CABLE, INC.,

                            Defendant.

---

## DEFENDANT TIME WARNER CABLE INC.'S MOTION TO STRIKE THE DECLARATION OF COLIN WEIR

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................3

I. MR. WEIR'S OPINIONS CONCERNING A CLASS METHODOLOGY FOR IDENTIFYING "MISMATCHED" CALLS TO AN UNINTENDED "CUSTOMARY USER" ARE NOT PREMISED ON SUFFICIENT FACTS OR DATA ...................................................................................................................4

    A.      Mr. Weir Lacks Knowledge Concerning the LexisNexis Input Data that Forms the Foundation for His Entire Methodology.................................6

    B.      Mr. Weir Failed To Recognize that the LexisNexis Input Data that Forms the Entire Foundation for His Methodology Is Demonstrably Incomplete and Inaccurate ......................................................................................9

II. MR. WEIR'S OPINIONS CONCERNING A CLASS METHODOLOGY FOR IDENTIFYING "MISMATCHED" CALLS TO AN UNINTENDED "CUSTOMARY USER" ARE NOT THE PRODUCT OF RELIABLE METHODS ........................................................................................................12

    A.      Mr. Weir's Methodology Depends on Unreliable Assumptions and Procedural Steps.......................................................................................13

    B.      Mr. Weir Did Nothing To Verify His Results or Determine the Error Rate of His Methodology ...............................................................................17

    C.      Mr. Weir's Methodology Produces Demonstrably Wrong Results .................18

CONCLUSION....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).................................................................................4, 5, 13, 17

*Bruno v. Bozzuto's, Inc*.,
    311 F.R.D. 124 (M.D. Pa. 2015)....................................................................................7, 8, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................................1, 3, 4

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
    367 F. Supp. 2d 413 (W.D.N.Y. 2005)......................................................................7, 8, 9, 12

*Gazzara v. Pulte Home Corp.*,
    No. 6:16-CV-657-ORL-31-TBS, 2017 WL 840953 (M.D. Fla. Mar. 3, 2017).....................20

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)............................................................................................................3, 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).................................................................3, 13, 18, 20

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014) (Oetken, J.), *aff'd*, 638 F. App'x 43 (2d
    Cir. 2016) ......................................................................................................................15, 17

*Ruggiero v. Warner-Lambert Co*.,
    424 F.3d 249 (2d Cir. 2005)...............................................................................................4, 9, 13

*SLSJ, LLC v. Kleban*,
    277 F. Supp. 3d 258 (D. Conn. 2017)....................................................................................12

*U.S. v. Tuzman*,
    No. 15 Cr. 536 (PGG), 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017)............................17, 18

*United States v. Romano*,
    794 F.3d 317 (2d Cir. 2015)..................................................................................................18

*Valente v. Textron, Inc.*,
    931 F. Supp. 2d 409 (E.D.N.Y. 2013) .............................................................................17, 18

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004).....................................................................................................17

**RULES**

F.R.E. 702 ................................................................................................................... *passim*

# INTRODUCTION

Plaintiffs offer a written report from their expert, Colin B. Weir, in which he opines on a methodology that he claims can identify calls from TWC's interactive voice response ("IVR") platform that reached an unintended recipient. Weir Decl., ECF No. 213, ¶ 7. According to Mr. Weir, the only discovery Plaintiffs need from TWC to make this determination is a list of outbound calls it placed, reflecting the numbers that TWC dialed, and the names of the account holders TWC intended to reach. *Id.* ¶ 11, 18, 24. Next, he says that Plaintiffs can obtain third-party "reverse lookup" data from LexisNexis for each telephone number at issue, which allegedly reflects the historical "customary user" of each telephone number. *Id.* ¶ 18. Finally, Mr. Weir says that Plaintiffs can compare the name of the "customary user" identified by LexisNexis against the name of the TWC customer that TWC intended to call at each point in time: Where there is a "mismatch" between these two names, the individual listed in the LexisNexis data is deemed to be the true "customary user" of that telephone number, and a member of the putative class. *Id.* ¶¶ 24, 27.

Mr. Weir's opinions are wholly unsubstantiated and unreliable, and thus should be excluded. *See* F.R.E. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Although Mr. Weir claims that he can identify a "mismatch" where the "customary user" of a telephone number does not "match" with TWC's customer based on LexisNexis data, Weir Decl. ¶¶ 13, 18, Mr. Weir admits that he has no idea what specific data sources LexisNexis draws from to identify these purported "customary users," nor LexisNexis's error rate in *accurately* identifying the "customary user" of a telephone number at a given point in time. Because he knows so little about LexisNexis, he also failed to appreciate that ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

To try to work around these and similar gaps in the LexisNexis data, Mr. Weir adopted a number of baseless assumptions as part of his purported methodology, which resulted (among other things) in his *discarding* thousands of consumer identities reported by LexisNexis, including identities of TWC's own customers that could have established right-party contact but lacked the "date" of the reported association. Moreover, Mr. Weir did nothing to verify that his methodology *actually* succeeds in correctly identifying calls in which the "customary user" of the telephone differs from TWC's own customer, and Mr. Weir testified that he could not identify the error rate of his methodology in accurately doing so. Had Mr. Weir actually conducted any analysis of the output of his methodology in order to ascertain its error rate, he almost certainly would have

---

[1] In this Motion, TWC references certain depositions and declarations, including the Declaration of Marc Bacon, the Declaration of David Zitko, the Declaration of John Taylor, the Declaration of Robert Fuite, and the Declaration of Kenneth Sponsler, the Deposition of Randall Snyder (attached as Ex. D to the Declaration of Andrew Prins), and the Deposition of David Zitko (attached as Ex. F to the Declaration of Andrew Prins). These documents will be filed contemporaneously as exhibits and attachments in support of TWC's Brief in Opposition to Class Certification, and may be located in the docket entry for that Brief.

discovered that his results are completely unreliable in identifying "mismatched" calls where the "customary user" of a phone differs from TWC's customer, with a demonstrable error rate **of at least 86%**. *See* Declaration of John Taylor ¶¶ 22-23.

Mr. Weir's opinions on the purported "reliability" of the LexisNexis data in identifying the historical "customary users" of a telephone, and on his methodology's ability to identify a "mismatch" between TWC's customer and the true "customary user" of the telephone number at the time of the call are not premised on sufficient facts or data, are not the product of reliable methods, and would therefore be unhelpful (and entirely misleading) to the trier of fact. Accordingly, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert*, TWC moves to strike Colin Weir's expert report submitted in support of Plaintiffs' motion for class certification (ECF No. 213).

## ARGUMENT

Federal Rule of Evidence 702 provides that an expert may provide testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to determine whether the expert's specialized knowledge will assist the trier of fact, *i.e.*, will be not only relevant, but reliable. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert*, 509 U.S. at 589. Expert testimony at the class certification stage is subject to the *Daubert* standard. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018).

*Daubert*, which dealt with a scientific method, stated that the district court could consider the method's testability, the extent to which it "has been subjected to peer review and publication,"

3

the extent to which a technique is subject to "standards controlling the technique's operation," the "known or potential rate of error," and the "degree of acceptance" within the "relevant scientific community." 509 U.S. at 593-94. But "the Rule 702 inquiry [i]s 'a flexible one,'" and "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (internal citations omitted). And because "it is critical that an expert's analysis be reliable at every step, … '*any* step that renders the analysis unreliable … renders the expert's testimony inadmissible.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis in original).

Here, Mr. Weir's opinions concerning the reliability of LexisNexis's reverse lookup data and the accuracy of his methodology in identifying "mismatched" telephone calls to a "customary user" that is not TWC's customer should be excluded because those opinions are not premised on "sufficient facts or data," are not the "product of reliable … methods," and will not "help the trier of fact to understand the evidence" or any issue in this case. F.R.E. 702; *see also Ruggiero*, 424 F.3d at 253; *Amorgianos*, 303 F.3d at 267.

## I. MR. WEIR'S OPINIONS CONCERNING A CLASS METHODOLOGY FOR IDENTIFYING "MISMATCHED" CALLS TO AN UNINTENDED "CUSTOMARY USER" ARE NOT PREMISED ON SUFFICIENT FACTS OR DATA

In his report, Mr. Weir explained that he was "asked by Counsel for Plaintiffs to examine Defendant's call detail records for calls made from its IVR platform, and to identify wrong number calls placed from that platform." Weir Decl. ¶ 2; *accord*, Weir Depo. 11:25-12:5 ("I processed that data in the manner in which I was instructed to identify what plaintiff believes are wrong

4

number calls.").  In particular, Mr. Weir evaluated whether "it is possible to match the name of the intended recipient [*i.e.* TWC's customer] with the name of the customary user of the telephone number at the time of the call."  Weir Decl. ¶ 13.  To do so, Mr. Weir identified █████ unique telephone numbers that TWC's IVR platform called and sent those telephone numbers to LexisNexis; LexisNexis returned to him a data set allegedly identifying "the historic and current customary users of the telephone number."  *Id.* ¶¶ 10-18.  Mr. Weir further opined that LexisNexis provides "reliable information" concerning such customary users.  *Id.* ¶ 17; Weir Depo. 31:5-11; 32:16-23; 33:14-22 ("Again, what I would say is in the vast majority of instances, LexisNexis is returning reliable information about the customary user of a phone.").

Mr. Weir opined that he is able to take TWC's outbound calling records for the IVR platform, compare them to LexisNexis "reverse lookup" data, and identify all calls in which a name "mismatch" occurs between those data sources.  Weir Decl. ¶¶ 19-24.  Executing complex computer code to perform that "matching" process, Mr. Weir produced a list of "██████ mismatched calls to ████ unique telephone numbers," *id.*, which Plaintiffs and their expert Randall Snyder contend are equivalent to "wrong number" calls that TWC placed without "prior express consent."  *See* Motion for Class Certification, ECF No. 211 at 18-19; Declaration of Randall Snyder, ECF No. 214, ¶ 25.

Mr. Weir's opinions should be excluded because his opinion that LexisNexis reliably returns the "customary user" of a number at a specific point in time is not supported by sufficient facts and data ████████████████████████████████████████████ and accordingly his opinion that his methodology can reliably identify "mismatches" between the "customary user" and TWC's own customer is likewise not based on sufficient facts or data and will not assist the trier of fact.  *See Amorgianos*, 303 F.3d at 265.

## A.      Mr. Weir Lacks Knowledge Concerning the LexisNexis Input Data that Forms the Foundation for His Entire Methodology

Mr. Weir opined that customer names identified in TWC's call records could be compared to consumer identity information purchased from LexisNexis to identify "mismatches" where the "customary user" at the time of a call (identified by LexisNexis) does not "match" TWC's customer.   Weir Decl. ¶¶ 16-24.   Mr. Weir's reliance on LexisNexis for this purpose is fundamentally flawed for numerous reasons, including that he has not examined LexisNexis's underlying data, could not identify a single source of data that LexisNexis relies on, and does not know the error rate in LexisNexis's compiled data in accurately identifying the "customary user" of a telephone—unsurprisingly, because LexisNexis is a proprietary "black box" product that does not allow access to such information.  *See, e.g.*, Declaration of Ken Sponsler, at 25 ("None of the reverse look-up data providers, including LexisNexis, identify their source material, the accuracy of that material, or what they do (if anything) to reconcile inaccuracies in the source data."). Specifically:

•        Mr. Weir did not identify in his report—and could not identify in his deposition— what specific "reverse lookup" product LexisNexis had used to return to him information concerning the purported "customary users" of telephones.  Weir Depo. 22:20-23:6 ("Q.  But you don't remember the name of that service?  A.  I don't remember precisely.").

•        Mr. Weir could not identify a *single* source from which LexisNexis gathers its source data concerning the identities of purported "customary users" of telephone numbers.  *See, e.g.*, *id.* 39:3-9 ("[B]ecause LexisNexis keeps its precise sources proprietary, I understand the general nature of where the data comes from, but not the names of the entities that Lexis uses to obtain that data."); *id.* 38:17-21; 38:24-39:2; 40:23-25.

- Mr. Weir did not request that LexisNexis produce to him any of its underlying data sources. *Id.* 41:21-42:5 ("Q.  Have you asked LexisNexis for its underlying data?  A.  I haven't made a specific request" because "[t]hey were not going to provide it to me.").

- Mr. Weir had no knowledge of whether or how LexisNexis *reconciles* data from various competing data source entities to generate the final report of historical name-number associations.  *See id.* 41:16-20 ("Q.  Does LexisNexis do anything to reconcile that [source] information that you're familiar with?  A.  Again, how they handle the particular inbound information is subject to their proprietary structure, so I can't speak to that.").

- Mr. Weir performed no analysis of, and has no knowledge of, LexisNexis's error rate in *accurately* linking consumers with associated telephone numbers.  *Id.* 190:3-17 ("Q.  Do you know what the error rate in Lexis's data is?  A.  I don't know that they even would disclose that information, again, given that their methods are proprietary.").

But expert testimony is inadmissible under *Daubert* when it is not based on "sufficient facts or data," F.R.E. 702, which requires, at a bare minimum, that the expert must have verified the accuracy of the underlying data upon which the expert relies.  *See, e.g.*, *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y. 2005) ("Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under *Daubert*."); *Bruno v. Bozzuto's, Inc*., 311 F.R.D. 124, 125 (M.D. Pa. 2015) ("Because Plaintiffs' experts have relied on unverified secondhand data, their reports and testimony exhibit neither sufficient reliability nor the requisite fit required for admission in federal practice.").  Mr. Weir's opinions fail that threshold requirement.

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ The

relevant LexisNexis user agreement governing Mr. Weir's use of LexisNexis expressly states that

its "[s]ource data is sometimes reported or entered inaccurately, processed poorly or incorrectly,

and is generally not free from defect" and that "[b]efore relying on any data, it should be

independently verified." LEXISNEXIS TERMS OF USE, https://risk.lexisnexis.com/masterterms (last

visited Jan. 22, 2019); ██████████████████████ Despite contracting with LexisNexis for

its services, Mr. Weir was *unaware* that LexisNexis does not warrant the accuracy of its own data,

or that it has an independent verification requirement.  Weir Depo. 190:18-21 ("Q.  Does Lexis

provide any warranty about the accuracy of its data?  A.  I don't have a recollection of that one

way or the other.").  Yet Mr. Weir did nothing to try to identify the error rate internal to the

LexisNexis data, or to verify the accuracy of its data—as LexisNexis itself says is necessary.  *Id.*

190:3-17.  This completely unknown "rate of error" in *accurately* identifying the "customary

users" of specific telephone numbers over time, coupled with Mr. Weir's failure to verify the

results reported from LexisNexis, forecloses Mr. Weir from rendering expert opinions concerning

or based upon that data source consistent with *Daubert*.  *See, e.g.*, *Dreyer*, 367 F. Supp. 2d at 446;

*Bruno*, 311 F.R.D. at 125.

One reason it is important for an expert to test the facts or data supporting his opinion is so that the Court can evaluate whether those "data … [are] []adequate to support the conclusions reached" by the expert.  *Ruggiero*, 424 F.3d at 253.  Here, the LexisNexis data are inadequate to support Mr. Weir's conclusions—*i.e.*, his identification of purported calls to "customary users" of telephone numbers that do not "match" TWC's own customers— ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██  Thus, LexisNexis, the data source on which Mr. Weir bases all of his conclusions, h██████

████████████████  is not "adequate to support the conclusions reached" by Mr. Weir concerning the historical "users" of telephone numbers, *i.e.* the putative class members.  *Ruggiero*, 424 F.3d at 253.  The LexisNexis data set therefore does not provide "sufficient facts or data" upon which Mr. Weir could opine as to whether a specific call to a telephone number resulted in a "mismatch" between the "customary user" and TWC's customer.  *Dreyer*, 367 F. Supp. 2d at 446.

**B.    Mr. Weir Failed To Recognize that the LexisNexis Input Data that Forms the Entire Foundation for His Methodology Is Demonstrably Incomplete and Inaccurate**

Had Mr. Weir actually done anything to verify whether LexisNexis *accurately* reports the historical "customary users" of telephone numbers, he would have quickly found that LexisNexis's data is both demonstrably incomplete and inaccurate in identifying such individuals.  To take just a few of the most obvious examples:

- LexisNexis does not identify many associations that certainly exist.  For example, in discovery Plaintiffs identified their *historical* telephone numbers (numbers other than the ones

9

at issue in this case) as ██████████ (Hunter) and ██████████ (Villa), ████████████████

████████████████████████████████████████████ ▪ █████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

- This "missing association" problem is pronounced: Based on the sample outbound calling data Mr. Weir analyzed, Mr. Weir claims that 9.8% of the phone numbers that TWC called (and of the unique telephone numbers that Mr. Weir claims are "mismatched" putative class members) are "straight mismatches," *i.e.* telephone numbers that were *never* associated with TWC's customer. Fuite Decl., ¶ 7; Weir Depo. 125:13-126:1. But it is implausible on its face that 9.8% of the time, TWC's customers provided TWC with a number with which they were *never associated* to be contacted on about their own accounts. *See* Zitko Decl. ¶¶ 23-28 (explaining the process by which TWC subscribers supply contact information to TWC).

- LexisNexis does not capture the *dates* of many associations. For example, for 17.7% of the rows of identity data that LexisNexis returned to Mr. Weir, LexisNexis provided a consumer identity *without the date* that individual was allegedly first associated with that telephone number, *i.e.* a "First Seen" date. *See* Weir Depo. 46:16-51:7; Fuite Decl., ¶ 29. Mr. Weir's methodology simply *ignored* those identities, Weir Depo. 94:6-9; Fuite Decl., ¶ 29,

████████████████████████████████████████████████████████████

████████████████████████████████████ In fact, in 3.7% of the "mismatched" calls Plaintiffs

---

2 *See* Fuite Decl., ¶ 32; Plaintiffs' Objections and Answers to Defendant's Fifth Set of Interrogatories, attached as Ex. A to Prins Decl., Response to Interrogatory No. 10; Hunter Depo. 32:24-34:03; *see also* Hunter Depo. 13:18-14:5; ████████████████████████████████████
████████████████

3 Weir Depo. 18:8-10; 173:16-174:12; Fuite Decl., ¶ 33; ████████████████████████
████████████████

identified, LexisNexis *did* report TWC's customer's name as associated with the phone number, but Mr. Weir just *dropped* TWC's customer's name from his analysis because there was no "date" data available for that individual identity.  Fuite Decl., ¶ 28.

- The LexisNexis "First Seen" date does not reliably report when an individual began using a telephone number—as Mr. Weir himself now admits.  Weir Depo. 60:5-23; 160:12-162:4;

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████  For example, according to LexisNexis's data, all calls that TWC placed to Plaintiff Villa occurred *before* LexisNexis identifies that her number was "first seen" associated with her.  Fuite Decl., ¶ 47.  At the time of TWC's calls, LexisNexis reported that her number remained associated with *TWC's customer*, ████████████.  Fuite Decl., ¶ 47; Hillis Decl., Ex. A, LEXISNEXIS_00000052.  As a result, under Plaintiffs' methodology, *Plaintiff Villa is not a member of the proposed class*.  Fuite Decl., ¶ 47.

- Among the 10,000 unique phone numbers Mr. Weir evaluated, for 541 of them, LexisNexis identified a "First Seen" date associating TWC's customer with his or her own phone number **after** *TWC had already started placing calls to reach that named individual*.  Fuite Decl., ¶ 36.  In such cases, TWC started calling the customer an average of 554 days *before* that customer name was "first seen" associated with that number in LexisNexis's data (median, 435 days).  *Id.* And Plaintiff Hunter's telephone number on which she brings her claims ████████████ illustrates just the opposite problem: although she testified she obtained her number in 2015, Hunter Depo. 30:21-31:7, ████████████████████████████

████████████████████████████████████████████████████

- LexisNexis returned to Mr. Weir *no information at all* for 239 of the 8,549 numbers (3%) that TWC called and Mr. Weir considered.  Fuite Decl., ¶ 28. ███████████████

████████████████████████████████████████████████ Rather than perform further analysis on those numbers, Mr. Weir deemed them "matches," removing them from his analysis.  Weir Depo. 107:2-9.

Thus, LexisNexis does not and cannot accurately identify historical name-number associations, or the "customary users" of a given telephone number over the historical time period. The viability of Mr. Weir's putative class methodology turns on the accuracy of the LexisNexis data in reporting historical name-phone number associations.  But the LexisNexis data is demonstrably incomplete and inaccurate for the purpose for which Weir used it, and therefore cannot yield accurate "mismatch" results. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Mr. Weir's conclusions regarding any "mismatch" between TWC's customer and the LexisNexis "customary user" are not based on "sufficient facts and data," F.R.E. 702, and should be excluded.  *See, e.g.*, *Dreyer*, 367 F. Supp. 2d at 446; *Bruno*, 311 F.R.D. at 125.

## II. MR. WEIR'S OPINIONS CONCERNING A CLASS METHODOLOGY FOR IDENTIFYING "MISMATCHED" CALLS TO AN UNINTENDED "CUSTOMARY USER" ARE NOT THE PRODUCT OF RELIABLE METHODS

Even if the LexisNexis data could be interpreted as reporting historical "customary users" of telephones (it cannot), and even if LexisNexis data could be assumed to be complete and

12

accurate in reporting such historical "customary users" (it is not), Mr. Weir has applied an unreliable methodology that cannot accurately identify whether the "customary user" reported by LexisNexis *actually* "matches" with TWC's customer.  *See In re LIBOR*, 299 F. Supp. 3d at 467 ("The expert's methodology is to be assessed step-by-step, and 'it is critical that an expert's analysis be reliable at every step.'").  In particular, Mr. Weir's methodology addresses the data problems above using indefensible assumptions, and uses an inaccurate "name matching" algorithm that cannot *actually* determine whether TWC's customer and the LexisNexis "customary user"/putative class member are the same person, as Mr. Weir himself admits.  Besides those basic missteps, Mr. Weir has no idea what the error rate of his methodology might be, and in fact, his method demonstrably *misidentifies* "mismatched" calls to wrong numbers **at least 86% of the time**, including in the case of his two *lead* examples of "mismatched" numbers.  Taylor Decl., ¶¶ 22-23, 30-33.  Accordingly, Mr. Weir's opinions are not based on a reliable methodology and are inadmissible.  *See Ruggiero*, 424 F.3d at 253; *Amorgianos*, 303 F.3d at 267.

A.     **Mr. Weir's Methodology Depends on Unreliable Assumptions and Procedural Steps**

As discussed above, Mr. Weir's name-matching methodology addressed the yawning gaps in the LexisNexis data by applying demonstrably false assumptions.  For example, when LexisNexis reported a consumer identity without a "First Seen" date, Mr. Weir simply dropped that identity from his analysis, even if that identity was TWC's *own customer*; and if LexisNexis reported a telephone number without *any* consumer identity, he simply assumed that all calls to such numbers were a "match."  *See supra* at section I(B).  Likewise, Mr. Weir's methodology simply *assumes* that the LexisNexis "First Seen" date is a reliable indicator of the date that the individual became associated with a number, even though ███████████████████████████████

████████████████████████████████████████████████████████

███████   And Mr. Weir's methodology treats a reported name-number association as evidence that a person is a "customary user" of a phone, even though ████████████████████████ ████████████████████████

There is still another basic methodological flaw: Because TWC's call log data and LexisNexis reverse lookup data do not report unique consumer identifying information (like a date of birth or social security number) that might allow Mr. Weir to identify a true "match" between the TWC customer and LexisNexis "customary user," Fuite Decl., ¶ 27, Mr. Weir employs yet another shortcut: He utilizes a crude name-matching algorithm, and simply assumes that a call is a "match" if the TWC customer and LexisNexis identity have *either* the same first name *or* the same last name (or the *first* name of one is the same as the *last* name of the other). Weir Depo. 111:20-112:12; Fuite Decl., ¶ 39. And to identify whether names like █████████ and █████████ are a "match" or a "mismatch," Mr. Weir also used a "Jaccard score"—which purports to compare the similarity of two strings of text—and called names a "match" if their Jaccard score exceeded an arbitrary level of .5. Fuite Decl., ¶¶ 41-43; Weir Depo. 114:16-20.

But very small changes in Mr. Weir's arbitrary selection of the threshold score of .5 would bring individuals in and out of the class: for example, ████████████ and ███████████ are considered "mismatched" under Mr. Weir's existing methodology, but they would have been considered a "match" if a threshold value of .4 had been used instead. Fuite Decl., ¶ 43. Small changes in the Jaccard score will expand or contract the class by 7-10%. *Id.*, ¶ 43. Mr. Weir admitted that "there's no quote unquote correct [Jaccard] threshold that you could use." Weir Depo. 115:4-20; *see also* Weir Depo. 205:23-209:7 (explaining that altering the .5 threshold to .4 would result in a "mix of both" additional false negatives and reductions in false positives). He also admitted that the .5 threshold score he chose may result in some true matches being wrongly

classified as "mismatches," and some true mismatches being wrongly classified as "matches."  *See*

Weir Depo. 115:12-20; 116:16-117:23.  Mr. Weir's failure to offer any facts or data supporting

the reliability of his arbitrary choice of a .5 Jaccard Score renders his testimony unreliable.  *See*

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014)

(Oetken, J.), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("Scientific conclusions cannot depend upon

the arbitrary choice of parameters.").  Indeed, he admits that he did not even *test* another Jaccard

score until after Defendant's counsel probed Plaintiff's other expert, Mr. Snyder, about this issue.

Weir Depo. 27:17-29:4.

Nor can human review fix these problems, as such review is "not practical to do … on a

large scale."  *Id*. 209:25-213:18.  Even at a small scale, Mr. Weir was unable to opine whether

individuals that *his methodology* identified as "mismatched" *actually* represented the same person,

or different individuals, and disclaimed any opinion on that matter.  *Id*. 215:14-219:2.  Indeed, Mr.

Weir's name matching approach is flawed because it *admittedly* cannot determine whether TWC's

customer *actually is the same person* as the "customary user" identified by Mr. Weir in the

LexisNexis data:

> Q.   What additional information would you want in order to be able to render an
> opinion about whether these two names are in fact the same person? …
>
> A.   I'm not sure.  I was asked to do an exercise that compares the names of
> customary users.  I wasn't asked to definitively identify anybody in any of the
> records.

*Id*. 218:5-15; *see also id.* 218:17-219:2 ("Q.  Do you agree that if you were going to render an

opinion about whether those two names are associated with the same person, that it would be

helpful to speak to [the 'mismatched' individual]? … A.  I don't know. I'm not offering an opinion

about it.").

It is unsurprising that Mr. Weir admits that his methodology cannot *actually* identify whether TWC's customer and the "customary user" reported by LexisNexis are the same person or different people because it demonstrably fails to do so.  This is provable in at least two ways:

*False mismatches*: Mr. Weir's methodology for identifying "mismatched" calls generates obvious examples of alleged "mismatches" where TWC was plainly not calling a wrong number.  For example:[4]

| LexisNexis Identity | "Mismatched" TWC Customer Name | Reason For "Mismatch" |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Again, Mr. Weir could not opine on whether such "mismatched names" his methodology identified *actually* represented contact with the same person (*i.e.*, TWC's customer) or a different person, because his methodology *does not actually purport to identify* whether TWC's customer is the same person as the "customary user" identified by LexisNexis.  Weir Depo. 215:14-219:2.

*False matches*: Plaintiffs' assumption that a call is a "match" if the TWC customer and LexisNexis identity have *either* the same first name *or* the same last name will generate a huge number of "false matches."  For example, Mr. Weir's methodology considered the following names to be *matches* because of a shared first name: "███████████" and "███████████;"

---

[4] Fuite Decl., ¶¶ 40-43 (collecting citations from Botello Decl.).

"██████████████" and "██████████████ "██████████████" and "██████████████." Fuite Decl., ¶ 39.  Confirmation of the relationship between these individuals and other individuals identified by his methodology would require detailed individualized factual inquiries, which Mr. Weir admits he did not undertake.  Weir Depo. 175:2-25 ("I've done additional spot-checks of the data.  And that would be as far as I've gone in terms of investigating relationships.").

Mr. Weir's opinions on his arbitrary name-matching methodology should be excluded, because that methodology cannot reliably determine whether the "customary user" of a telephone at a given point in time is the *same person* that is TWC's customer, and instead substitutes a completely arbitrary "Jaccard scoring" methodology in place of actually determining right-party or wrong-party contact.  *Amorgianos*, 303 F.3d at 265; *Reed Const. Data Inc.*, 49 F. Supp. 3d at 407.  Indeed, because liability under the TCPA turns on whether TWC *actually* had the "prior express consent" of the person it called (*i.e.*, its customer), a methodology that *cannot* identify whether the "customary user" is *actually* the same person as TWC's customer is positively misleading to the factfinder, and should be excluded on those grounds as well.  *See id.*

### B.    Mr. Weir Did Nothing To Verify His Results or Determine the Error Rate of His Methodology

An expert's inability to determine the error rate of his analysis renders it subject to exclusion.  *See, e.g., Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 425 (E.D.N.Y. 2013) ("The Court also finds that Seluga's simulation model is not reliable because its error rate is unknown and cannot be determined."); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 49 (2d Cir. 2004); *U.S. v. Tuzman*, No. 15 Cr. 536 (PGG), 2017 WL 6527261, at *17 (S.D.N.Y. Dec. 18, 2017).  Mr. Weir, however, could not identify the error rate of his methodology in *accurately* identifying instances where the "customary user" of a telephone differs from TWC's customer.  Weir Depo. 191:22-192:4 ("Q.  Do you know the error rate in your analysis?  A.  Again, there isn't a particular

17

measurement for the error rate … Q.  But you don't know the error rate, correct?  A.  I have not calculated an error rate.").  Nor has he taken steps to quantify the degree of false positives in his methodology.  *Id*. 196:7-13 ("Q.  And have you taken any steps to quantify the degree of false positives that currently result from your methodology?  A.  Again, I've done manual inspection of the data to understand that it is working well on a regular basis, but I have not calculated the quantity of false positives.").  Nor did he calculate the degree of false negatives.  *Id.* 196:14-16.  Because an opinion based on a methodology with an unknown rate of error fails *Daubert* scrutiny, Mr. Weir's opinion should be excluded.  *See Valente*, 931 F. Supp. 2d at 425.

Relatedly, Mr. Weir also refused to state a threshold error rate at which his methodology should be considered unreliable.  Weir Depo. 80:24-81:13 ("Q.  But you are not willing to disclose a threshold at which you would consider the matching to be unreliable versus reliable; is that correct?  A.  …  [T]his particular type of analysis doesn't have sort of a natural statistical measure, and I'm evaluating its reliability holistically rather than looking at any one particular statistic.");  *id*. 81:14-82:7 (refusing to say whether he would consider his methodology accurate if it had a 50% error rate); *id.* 82:25-85:4.  "In determining whether the expert's opinion is reliable, a trial court should consider, *inter alia*, 'the theory's testability.'"  *Tuzman*, 2017 WL 6527261, at *10 (quoting *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015)).  Because Mr. Weir's methodology not only lacks an identified error rate, but is admittedly *untestable and unverifiable*, it is subject to exclusion on those grounds as well.  *Id.*

### C.    Mr. Weir's Methodology Produces Demonstrably Wrong Results

Unsurprisingly, given its many design flaws, Mr. Weir's methodology produces demonstrably wrong results in this case.  *See In re LIBOR*, 299 F. Supp. 3d at 501 (excluding an expert's opinion where his methodology produced "nonsensical results" when applied to the underlying data).  For example, in Table 1 of his report, Mr. Weir identified "Illustrative Examples

18

of the Matching Process," *i.e.* two exemplars of individuals who allegedly received "mismatched" calls from TWC at "reassigned numbers," ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮. Weir Decl., ¶ 26. But highly individualized inquiries show that even after the dates of those purported reassignments to these "mismatched" customary users, the phone numbers at issue *continued to call in to TWC to make payments on and interact on the accounts at issue*, throughout the time period of the alleged "wrong number" calls to these individuals. Taylor Decl., ¶¶ 30-33. As to ▮▮▮▮▮▮▮ the TWC customer also identified herself to TWC on multiple recordings of calls originating from the alleged "mismatched" telephone number throughout that time period. *Id.*, ¶ 33. In other words, Mr. Weir's two *lead examples* of "mismatched" individuals identified by his methodology actually represent *right party contact* with individuals who continued to interact with TWC concerning the accounts at issue from the telephone numbers at issue. *Id.*, ¶¶ 30-33.

To ensure these results were not abnormal, TWC's expert analyzed a random, statistically significant sample of 75 alleged "mismatched" phone numbers identified by Mr. Weir. Taylor Decl., ¶ 17. A highly individualized, fact-intensive analysis concluded that 65 of the 75 sample phone numbers remained associated with the TWC customer or account during the time the alleged "mismatched" calls were placed. Taylor Decl., ¶¶ 22-23. In many of these cases, even after a purported "mismatch" occurred, individuals continued to call in from the "mismatched" numbers at issue to make payments on their TWC accounts, request technical support, and engage in other transactions with TWC; indeed, in many cases, the call *recordings* at issue capture *TWC's own customer calling in* from the purportedly "mismatched" number and *identifying him/herself* to TWC. *Id.* Thus, Mr. Weir's methodology produces demonstrably inaccurate results **a minimum of 86% of the time**. *Id.*

19

By contrast, Mr. Weir did nothing to test whether his methodology *actually* succeeds in identifying instances where the "customary user" of a telephone is someone other than TWC's customer. Weir Depo. 79:10-18; 80:23-82:7; 180:11-19; 181:4-11; 192:3-4 ("Q. But you don't know the error rate, correct? A. I have not calculated an error rate."); *id.* 196:7-19. But a methodology with an error rate exceeding 86% cannot sustain *Daubert* scrutiny. *See, e.g.*, *Gazzara v. Pulte Home Corp.*, No. 6:16-CV-657-ORL-31-TBS, 2017 WL 840953, at *8 (M.D. Fla. Mar. 3, 2017).[5] Accordingly, Mr. Weir's declaration would be not only unhelpful but misleading to the finder of fact, and is therefore subject to exclusion. *See In re LIBOR*, 299 F. Supp. 3d at 501.

## CONCLUSION

For the foregoing reasons, TWC respectfully requests that the Court strike the Declaration of Colin Weir and exclude his testimony from the case.

---

[5] In his deposition, Mr. Weir opined that the LexisNexis data at issue is accurate in identifying the historical "customary user" of a telephone, because 90% of the time, LexisNexis reported that TWC's customer had historically been associated with a telephone number, generating a "match." *See, e.g.*, Weir Depo. 194:11-16 ("I'm saying if I'm getting 90 percent correct based on the Lexis data for the calls that are matched, that gives me confidence that the Lexis data has a high degree of accuracy."). But a "B" student in Statistics 101 could recognize that this is a complete abuse of Mathematics: even assuming that LexisNexis identified a "customary user" correctly in 90% of cases (it does not), that tells the Court *nothing* about its accuracy in the remaining 10% of cases that Mr. Weir has identified as "mismatches," *i.e.* calls for which Plaintiffs seek to impose astronomical damages on TWC. It is entirely possible that in those 10% of cases that Mr. Weir identifies as "mismatches," *essentially all of them are actually true matches* in which TWC reached its own customer. If that is true, then within the population of "mismatches," Mr. Weir's identified "mismatches" would be **wrong** *approximately 100% of the time*. Indeed, in this very case, TWC has proven that Mr. Weir's methodology *falsely* identifies wrong number calls *a minimum of 86% of the time*. *See supra* at section I(C). Thus, that Mr. Weir's methodology generates "matches" in 90% of cases tells the Court *nothing* about whether the 10% of calls for which Plaintiffs *intend to impose liability* are actually right party contact or "wrong number" calls. Far from a 90% rate of "accuracy" as he claims, Weir Depo. 194:6-16, Mr. Weir's methodology is *wrong* about calls he has identified as "wrong number calls" *at least 86% of the time.*

Dated: January 23, 2019

By: /s  Andrew D. Prins
      Andrew D. Prins

Matthew A. Brill (Admitted *Pro Hac Vice*)
Andrew D. Prins (Admitted *Pro Hac Vice*)
Nicholas L. Schlossman (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Phone: (202)-637-2200
Fax: (202)-637-2201
matthew.brill@lw.com
andrew.prins@lw.com
nicholas.schlossman@lw.com

*Attorneys for Defendant Time Warner Cable Inc.*