UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEONA HUNTER and ANNE MARIE VILLA,<br><br>                         Plaintiffs,<br><br>          -v-<br><br>TIME WARNER CABLE INC.,<br>                         Defendant. | 15-CV-6445 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Plaintiffs Leona Hunter and Anne Marie Villa bring this action against Defendant Time Warner Cable Inc. ("Time Warner" or "TWC"), alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227. Now before the Court is Plaintiffs' motion to certify a class under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), along with several motions to strike expert reports and declarations submitted in support of or in opposition to class certification. For the reasons that follow, the pending motions are denied.

I.     **Background**

The Court presumes familiarity with the background of this case, as described in the Court's previous opinions. *See Mejia v. Time Warner Cable Inc.*, No. 15 Civ. 6445, 2017 WL 5513638, at *1 (S.D.N.Y. Nov. 17, 2017); *Mejia v. Time Warner Cable Inc.*, No. 15 Civ. 6445, 2017 WL 3278926, at *1–4 (S.D.N.Y. Aug. 1, 2017).

The Telephone Consumer Protection Act ("TCPA") was enacted to address the widespread nuisance and invasion of privacy resulting from the proliferation of automated and prerecorded telemarketing calls. The Act, in relevant part, makes it

> unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone

service, . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A)(iii).  Individuals may bring suit pursuant to the Act's private right of action, and can recover at least $500 in damages for each unlawful call or up to treble damages for each violation of the statute that was "willful[] or knowing[]."  *Id.* § 227(b)(3).

The crux of the current dispute in this case is whether Plaintiffs have satisfied their burden for certification of a class consisting of individuals who have received wrong-number phone calls from Time Warner featuring an artificial or prerecorded voice, in violation of the TCPA.

### A.    Factual Background

Plaintiffs Leona Hunter and Anne Marie Villa allege that they both received numerous calls from Time Warner to their cellphone numbers that used an artificial or prerecorded voice. (Dkt. No. 178 ("Compl.")) ¶¶ 19–20, 28, 34–36.)  Hunter and Villa represent that they did not provide advance consent to be called by Time Warner (Compl. ¶¶ 32, 45), and that the calls were "wrong-number calls"—*i.e.*, that the calls were intended for individuals who were unassociated with Hunter and Villa and thus not reachable at their cellphone numbers (Compl. ¶¶ 23, 36). Rather than being isolated incidents, Plaintiffs allege that the phone calls they received were part of a "wide scale . . . debt-collection campaign[]" conducted by Time Warner, in which the company "repeatedly made unsolicited calls to consumers' telephones without consent." (Compl. ¶ 2; *see id.* ¶ 47.)  After having conducted class discovery and enlisted the help of expert witnesses, Plaintiffs now assert that this alleged wrong-number calling campaign they have identified is susceptible to class-wide relief.

The calls at issue are placed by Time Warner through its "interactive voice response system" or "IVR Platform," a calling system that Time Warner uses to call customers in order to

seek collection of overdue account payments.  (Dkt. No. 212-1 at 14:3–21; *see also* Dkt. No. 211 at 1.)[1]  In trying to contact customers, the calling system dials a phone number that the customer has provided to Time Warner and that has been maintained in Time Warner's account records for the customer.  (*See* Dkt. No. 229 ¶ 39; Dkt. No. 212-1 at 70:1–14.)  When the IVR Platform places a call that connects to a live recipient or goes to an answering machine, the Platform plays a collections message using a prerecorded voice.  (Dkt. No. 212-1 at 19:1–9, 20:2–12, 23:2–19.)  If the IVR Platform recognizes that it has connected to a live recipient, it logs the call in its records as a "Live_Voice" call; if it registers that it has connected with a voicemail inbox, it logs the call as an "Answering_Machine" call.  (Dkt. No. 212-1 at 73:24–74:7, 90:8–16; Dkt. No. 229 ¶ 7.)

In the general course, when the IVR Platform dials a phone number provided by a TWC customer and the call reaches that individual or her voicemail, the TCPA permits the playing of a prerecorded voice message because the customer has provided advance consent to be contacted. A problem arises, however, when the phone number in Time Warner's account records has been subsequently *reassigned* to a new individual.

For example, Time Warner had a particular phone number ("the 5900 number") listed in the account records of customer AS.  (Dkt. No. 212-1 at 70:9–14.)  On November 23, 2015, the 5900 number was reassigned from AS to Anne Marie Villa.  (Dkt. No. 212-1 at 70:15–71:2.)  After the reassignment occurred, Time Warner placed six calls to the 5900 number from its IVR Platform (Dkt. No. 212-2), but in doing so it was now calling Villa—an individual who had not

---

[1]       Where the Court relies on documents that have been filed under seal, the Court has concluded that the parties' interests in continued sealing of the portions referenced in this Opinion and Order are insufficient to overcome the presumption of public access to judicial documents.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

consented to being contacted by Time Warner. Similarly, Time Warner had another phone number ("the 1089 number") listed in the account records of customer AF. (Dkt. No. 212-1 at 80:22–81:10.) However, on May 18, 2015, the 1089 number was reassigned from AF to Leona Hunter. (Dkt. No. 212-1 at 81:12–24.) After that date, the IVR Platform called the 1089 number thirty-eight times (Dkt. No. 212-5), but it was now calling Hunter—who had not consented to be called at this number.

Under those circumstances, when the IVR Platform dials a number and reaches a new individual who has not consented to being called, or her voicemail, Time Warner's use of a prerecorded voice message on the call violates the TCPA.[2] Hunter and Villa seek to certify a class of such individuals who have received these wrong-number calls from Time Warner through its IVR Platform.

In order to determine the contours of their proposed class, Plaintiffs enlisted the assistance of Colin Weir, the vice president at a "research and consulting firm specializing in economics, statistics, regulation and public policy." (Dkt. No. 213 ("Weir") at 2.) Weir was asked to examine the "call detail records for calls made from [Time Warner's] IVR platform, and to identify wrong number calls placed from that platform." (Weir ¶ 2.) Time Warner provided Weir with call records for a sample of ten thousand telephone numbers called by its IVR Platform. (Weir ¶ 12.) Weir limited the sample to only those calls with which the IVR Platform

---

[2]      Liability under the TCPA for this particular reassigned-number scenario would attach only if the Court interprets the term "called party" in 47 U.S.C. § 227(b)(1)(A) to denote the new subscriber or customary user of the phone number after reassignment, rather than to denote the intended recipient of the phone call. Because the proper interpretation of "called party" is in flux in the wake of wake of *ACA International v. FCC*, 885 F.3d 687, 705–09 (D.C. Cir. 2018), Time Warner "assumes for the limited purpose of this [class certification] motion that it was required to obtain consent from the subscriber or customary user of any reassigned cell phone number" (Dkt. No. 224 at 9 n.3).

had made "Live_Voice" or "Answering_Machine" contact. (Weir ¶¶ 15–16.) Weir then sent the numbers that had received such calls "to LexisNexis for analysis through their historic lookup batch process," which "returns information about each telephone number, including the historic and current customary users of the telephone number." (Weir ¶ 18.)[3] Weir then compared the reverse-lookup data from LexisNexis to the call records from Time Warner to determine whether calls were "mismatched"—*i.e.*, whether the IVR Platform placed a call to a phone number when the LexisNexis data identified the name of the customary user of the number to be different from the name of the TWC accountholder that the IVR Platform was trying to contact. (Weir ¶¶ 19– 24.)

Through this process, Weir concluded that approximately 66,000 mismatched calls had been made to roughly 2,000 phone numbers, meaning that approximately twenty percent of the sample of numbers may have received wrong-number calls. (Weir ¶ 24.) Assuming this same percentage of mismatching occurs across the entire universe of calls made by the IVR Platform, Weir estimated that Time Warner has placed almost 150 million wrong-number calls to over 4 million phone numbers. (Weir ¶ 27.)

To corroborate Weir's expert report, Plaintiffs also enlisted the help of expert Randall Snyder, an "independent telecommunications technology consultant," who opined that Weir's methodology was "reliable and accurate." (Dkt. No. 214 ¶¶ 2, 24.) Time Warner, in turn, produced its own expert witnesses—John Taylor and Ken Sponsler—who submitted reports challenging Weir's methodology and disputing the ability of reverse-lookup databases, or any

---

[3]      The "customary user" of a phone number refers to the individual who regularly uses the number. The customary user sometimes differs from the "subscriber" of a phone number, which refers to the individual who officially pays for the phone line and whose name appears in the records of the telephone service providers. (*See* Dkt. Nos. 228-4 through 228-5 at 70:3–16, 184:15–22.)

other data source, to reliably determine the customary user of a specific phone number at a past point in time.  (*See* Dkt. Nos. 226–227.)

**B.     Procedural History**

Plaintiff Raquel Mejia initiated this case with the filing of the original complaint on August 14, 2015.  (Dkt. No. 1.)  An amended complaint was filed on March 28, 2016, removing Mejia and adding Hunter and Villa as Plaintiffs.  (Dkt. No. 45.)

On December 15, 2016, the Court appointed interim class counsel but denied without prejudice Plaintiffs' request for class-wide discovery.  (Dkt. No. 110.)  By around that time, Plaintiffs and Time Warner had both moved for summary judgment (Dkt. Nos. 75, 105), and Time Warner also moved for judgment on the pleadings, challenging the constitutionality of the TCPA under the First Amendment (Dkt. No. 82).  In an Opinion and Order dated August 1, 2017, the Court denied Plaintiffs' motion for summary judgment and Time Warner's motion for judgment on the pleadings, but granted in part Time Warner's motion for summary judgment. (Dkt. No. 154.)

Time Warner subsequently moved for a certificate of appealability regarding its constitutional challenge, and sought to stay the action pending the disposition of *ACA International v. FCC*, a case in the D.C. Circuit involving a Federal Communication Commission ("FCC") interpretation of relevant terms under the TCPA.  (Dkt. No. 155.)  In an Opinion and Order of November 17, 2017, the Court denied the request for a certificate of appealability but granted the stay.  (Dkt. No. 172.)  The stay was lifted on April 27, 2018.  (Dkt. No. 176.)  Plaintiffs then filed the operative amended complaint (Dkt. No. 178), and the parties proceeded to class discovery.

Plaintiffs filed the instant motion for class certification on November 30, 2018, seeking to certify a class of individuals who received a "Live_Voice" or "Answering_Machine"

wrong-number call using a pre-recorded voice from Time Warner's IVR Platform from October 16, 2013, until the time a class notice is disseminated.  (Dkt. No. 210.)  Time Warner subsequently moved to strike four of the expert reports submitted by Plaintiffs in support of their motion for class certification.  (Dkt. Nos. 246, 248, 285.)  Not to be outdone, Plaintiffs moved to strike several of the declarations (Dkt. No. 252) and two of the expert reports submitted by Time Warner in opposition to class certification (Dkt. Nos. 269, 271).

The motions are now fully briefed and ready for resolution, and the Court has taken into consideration the various notices of supplemental authority and responses filed by the parties.  (Dkt. Nos. 299–300, 303–06.)

## II.    Motions to Strike

In connection with the submissions on class certification, the parties have also filed six motions to strike.  (Dkt. Nos. 246, 248, 252, 269, 271, 285.)  Plaintiffs move to strike Defendants' two expert reports under Federal Rule of Evidence 702, and to strike eleven declarations for lack of proper disclosures.  (Dkt. Nos. 252, 269, 271.)  The Court discusses these three motions below.[4]

### A.    Motions to Strike Expert Reports

Plaintiffs seek to strike the reports of two of Time Warner's experts—John Taylor and Ken Sponsler—under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Dkt. Nos. 269, 271.)

---

[4]    The Court need not definitively resolve the three motions to strike filed by Time Warner.  Even affording full consideration to Plaintiffs' expert reports, the Court determines that the motion for class certification should be denied.  Accordingly, Time Warner's motions to strike are denied as moot.

The admissibility of expert testimony is governed by Rule 702, which provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data," and is "the product of reliable principles and methods," reliably applied to the facts of the case. Fed. R. Evid. 702. And these factors, in turn, largely have their origins in *Daubert*, in which the Supreme Court held that the district court bears a critical gatekeeping function in assessing the admissibility of expert testimony. *Daubert*, 509 U.S. at 589–95.

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (brackets and internal quotation marks omitted).

Although Rule 702 requires courts to serve an initial gatekeeping function to keep out "junk science," *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013), it is nonetheless "a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The first question a court poses in conducting the *Daubert* inquiry is "whether the expert has sufficient qualifications to testify." *Davis*, 937 F. Supp. 2d at 412 (citation omitted). If so, the "next question is 'whether the proffered testimony has a sufficiently reliable foundation.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). "The ultimate determination the Court must make on a *Daubert* motion is that the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 127 (S.D.N.Y. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

### 1.    Expert Report of John Taylor

John Taylor specializes in "analyzing data related to call records and facsimile ('fax') records in cases involving the [TCPA]" and has been engaged in that work for fourteen years. (Dkt. No. 226 ("Taylor") ¶ 4.) Taylor has provided expert testimony in numerous TCPA cases (Taylor ¶¶ 4, 7), and he submitted an expert report accompanying Time Warner's opposition to class certification in this case.

In his expert report, Taylor describes how he took a sample of 75 individuals whom Plaintiffs' expert Colin Weir identified as having received wrong-number calls and investigated whether each individual had indeed been wrongly contacted. (Taylor ¶¶ 17–18.) As part of this individualized investigation, Taylor looked at records from Time Warner that indicated whether a supposedly wrongly called number had subsequently initiated any calls to Time Warner to conduct account-related business, recordings of some such calls, and Caller ID Name ("CNAM") data (which uses telephone carriers' data to display names for caller ID functions). (Taylor ¶¶ 14, 18–19.) According to Taylor, through these methods he was able to determine that in 65 of the sample of 75 of those cases that Weir had identified as "mismatches"—or 86% of numbers—the phone number was associated with a TWC customer. (Taylor ¶¶ 22–23.)

Plaintiffs move to strike the expert report of John Taylor in its entirety under Rule 702 and *Daubert*. (Dkt. No. 269.) Plaintiffs' arguments in support of this motion fall into two categories: first, that Taylor's opinion about the error rate of Weir's analysis ignores the extent to which the LexisNexis data upon which Weir relied to identify the current users of the phone numbers he analyzed is demonstrably reliable; and second, that Taylor made mistakes in concluding that 65 of the sample of 75 phone numbers that allegedly received wrong-number calls are actually associated with the intended TWC customer.

As to the former, Plaintiffs contend that Taylor's 86% error rate is incorrect, because the LexisNexis data upon which Plaintiffs relied in identifying wrong-number calls matches Time Warner's own records—and is thus accurate—approximately 90% of the time. (Dkt. No. 270 at 3.) But this argument is based on a misunderstanding of the scope of Taylor's opinion. As Time Warner explains in response, Taylor's opinion is about the ability of Weir's methodology to produce false positives—*i.e.*, to identify calls as "mismatched" when they actually went to a number associated with the customer Time Warner intended to reach. (Dkt. No. 279 at 5–6.) And Taylor's analysis makes clear his conclusion that 86% of the cases that "Weir characterized as 'mismatches'" were actually not mismatched. (Taylor ¶ 22.) The two parties are simply focusing on different error rates, and there is nothing about Taylor's analysis on this point that is unreliable or fails to take account of contrary evidence.

Beyond the dueling error rates, Plaintiffs take issue with how Taylor viewed—or ignored—specific information in conducting his individualized investigation, in three ways. (Dkt. No. 270 at 4–8.)[5]

---

[5]     As Time Warner points out—and Plaintiffs do not refute—the three critiques of Taylor's individualized investigation do not apply to 40 of the mismatches disproven by Taylor, resulting in an undisputed false positive rate of 53% for Weir's methodology. (Dkt. No. 279 at

First, Plaintiffs contend that Taylor interpreted all inbound calls from the supposedly wrongly dialed numbers to Time Warner as evidence of no mismatch, when in fact the more natural reason for those numbers to call in would be to complain about receiving wrong-number calls.  (Dkt. No. 270 at 5–7.)  But this argument is based on a misimpression of how Taylor considered inbound calls in his analysis.  Instead of merely relying on the fact of a call, Taylor looked to how the caller interacted with the TWC account—through paying a bill, seeking technical support, or changing services—as evidence that the phone number was associated with that particular account.  (Taylor ¶¶ 21, 24; Dkt. No. 279 at 11–14.)  Thus properly understood, the Court sees no flaws with how Taylor chose to interpret these calls.

Second, Plaintiffs contend that Taylor improperly ignored call recordings in which the caller self-identified with a name matching the LexisNexis data rather than the TWC customer.  (Dkt. No. 270 at 4–5.)  As Time Warner cogently explains, however, Taylor noted these call recordings in his analysis but had persuasive reasons to conclude that—at the time the alleged mismatched calls were made—each of these challenged numbers was nonetheless associated with the TWC customer Time Warner was attempting to reach.  (Dkt. No. 279 at 14–19.)

Third, and finally, Plaintiffs contend that Taylor improperly ignored CNAM data when it matched LexisNexis data.  (Dkt. No. 270 at 7–8.)  But as Taylor competently explained in his report, "CNAM reports only <u>current</u> name-number relationships," and thus "CNAM data cannot show wrong-party contact during the historical time period" when the allegedly mismatched calls

2–3.)  Even if the Court were inclined to strike portions of Taylor's results for failure to account for contradictory information, the unchallenged aspects of his analysis that are not infected by these alleged errors would still be admissible.  *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) (reasoning that the entirety of an expert's testimony should not be excluded on the basis of an error in "one small part" of the analysis).

were made.  (Taylor ¶ 25.)  Thus, there is nothing improper about Taylor's decision not to rely on current CNAM data to determine historical number assignment.

Overall, Plaintiffs characterize Taylor's analysis as "cherry picking" the data favorable to Time Warner and ignoring that which contradicted his results.  (Dkt. No. 295 at 4.)  The Court disagrees.  Taylor did not "ignore[] a large amount of information that calls many aspects of [his analysis] into question."  *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005).  Rather, Taylor expressly acknowledged the allegedly unfavorable data in his report (*see* Taylor at ¶ 22 & tbl. 1), and there are persuasive reasons that Taylor reached the results he reported notwithstanding this data (*see* Taylor ¶¶ 21, 24–26).  The Court thus concludes that Taylor clearly explained his methodology and reasonably engaged with the relevant data, and the allegedly unfavorable information identified by Plaintiffs does not "cast doubt" on Taylor's analysis or results.  *In re Rezulin*, 369 F. Supp. 2d at 425.

Time Warner has satisfied its burden of demonstrating that the Taylor report is admissible at this stage in the litigation to assess whether the requirements of Rule 23 have been satisfied.  Accordingly, Plaintiffs' motion to strike Taylor's expert report is denied.

## 2.     Expert Report of Ken Sponsler

Plaintiffs also move to strike the expert report of Ken Sponsler.  (Dkt. No. 271.)  Sponsler is the Senior Vice President of CompliancePoint Litigation Services, which "provides consulting services" to help "companies understand consumer contact standards and regulations and then implement operational procedures to ensure compliance."  (Dkt. No. 227 ("Sponsler") at 1–2.)  Sponsler has over a decade of experience in the consumer marketing industry, and he has given expert testimony in numerous TCPA cases.  (Sponsler at 2–8.)

In this case, Sponsler submitted an expert report in support of Time Warner's opposition to class certification.  Sponsler's report focuses on the feasibility of using existing data sources to

definitively determine the subscriber or user of a particular cell phone number at a specific point in the past.  (Sponsler at 1.)  Significantly, Sponsler opined that "[i]t is not possible to reliably identify the subscriber of a particular mobile telephone number at a historical point in time, primarily because no authoritative consolidated data source exists to identify that person." (Sponsler at 11 (emphasis omitted).)  Regarding the specific reverse-lookup database employed by Weir—LexisNexis—Sponsler opined that it was unreliable.  (Sponsler at 25.)  Moreover, as relevant here, Sponsler opined that "it is not possible to evaluate the accuracy of call disposition records generated by an IVR system without auditing those records or examining the IVR system to assess its reliability."  (Sponsler at 28.)

In moving to strike the report, Plaintiffs identify two alleged deficiencies in Sponsler's conclusions.  First, Plaintiffs challenge Sponsler's opinion regarding the reliability of the LexisNexis data at issue because Sponsler has not personally used the specific LexisNexis product at issue or tested its reliability.  (Dkt. No. 272 at 2–5.)  Second, Plaintiffs argue that Sponsler's opinion regarding the accuracy of IVR systems lacks the necessary support.  (Dkt. No. 272 at 5–6.)  On these bases, Plaintiffs request that Sponsler's report be "stricken in full." (Dkt. No. 296 at 1.)

Time Warner responds that Sponsler's opinion is supported by sufficient facts and data. (Dkt. No. 280.)  But Time Warner also notes that the two opinions challenged by Plaintiffs make up only a "small portion" of Sponsler's overall report (Dkt. No. 280 at 4), and that Plaintiffs do not challenge "Sponsler's core opinion that there is no data source that can accurately identify historical subscribers or users of cellular telephones" (Dkt. No. 280 at 6).  In reply, Plaintiffs dispute whether "Sponsler's testimony on the reliability of Lexis data is just a 'small portion' of his overall opinions."  (Dkt. No. 296 at 2.)

The Court agrees with Time Warner's characterization of the challenged opinions in the context of Sponsler's overall report. The majority of the "opinions" section of the document focuses on the availability of historical subscriber and customary user data, based on Sponsler's experience in the industry, declarations from industry participants, white papers, and documents from the FCC. (Sponsler at 10–23.) Plaintiffs do not contest the specific opinions offered by Sponsler on these points or dispute the sources on which he relies. Rather, Plaintiffs question only whether Sponsler has a sufficient foundation to conclude that the data underlying the specific LexisNexis tool used by Weir was unreliable, and that IVR systems have certain rates of inaccuracy in terms of how they record the outcomes of the calls they make. (Dkt. No. 272 at 2–6; *see* Sponsler at 25–30.)

Accordingly, the Court determines that striking Sponslor's entire expert report would not be called for on the basis of the specific objections raised by Plaintiffs. *See, e.g.*, *In re Pfizer*, 819 F.3d at 665–67; *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, No. 07 Civ. 6611, 2011 WL 3586468, at *3 (S.D.N.Y. Aug. 12, 2011) (striking specific portions of an expert report while allowing other portions of the report). And ultimately, the Court need not decide whether Rule 702 requires excluding the two challenged portions of Sponsler's report. Even disregarding those two specific opinions offered by Sponsler, the Court would deny Plaintiffs' motion for class certification.

## B.      Motion to Strike Declarations for Untimely Disclosures

On January 29, 2019, Plaintiffs moved to strike eleven declarations submitted by Time Warner with its opposition to the motion for class certification. (Dkt. No. 252.)[6] According to

---

[6]      The eleven declarations that Plaintiffs seek to strike are from: Marc Bacon (Dkt. No. 241) and Mary Hillis (Dkt. No. 242) from LexisNexis; Leianna Cooper (Dkt. No. 231) and Sam Weintraub (Dkt. No. 233), who are affiliated with Time Warner; Jefferson Stalnaker (Dkt.

Plaintiffs, these witnesses were not properly identified in Time Warner's initial disclosures and the declarations must be stricken under Rule 37(c). (Dkt. No. 252 at 1–3.)[7]

Under Rule 26(a)(1), parties are required to provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). And under Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Time Warner responds that these witnesses were adequately disclosed in supplemental initial disclosures on September 28, 2018. (Dkt. No. 253 at 2.) In the supplemental disclosures, Time Warner noted that it would seek to rely on corporate witnesses from various entities, including: Time Warner, First Orion Corporation, the "major U.S. cellular telephone carriers," and "each provider of . . . any 'reverse lookup' database" upon which Plaintiffs would rely to identify class members. (Dkt. No. 253 at 4–5(omission in original).) Plaintiffs now seek to strike declarations of representatives from these entities.

"The purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary with new evidence." *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012). In the context of this motion for class certification, the

No. 244) from First Orion Corporation; and representatives from T-Mobile, Sprint, Verizon, and AT&T (Dkt. Nos. 234–238, 243).

[7]    As Time Warner notes in response, the declaration of one of these witnesses was actually produced to Plaintiffs in September 2016. (Dkt. No. 253 at 5.) Accordingly, in their reply brief in support of class certification, Plaintiffs acknowledge that they seek to strike ten declarations. (Dkt. No. 262 at 35.)

identification of the corporate entities from which Time Warner would seek representatives as witnesses in the September 28, 2018 supplemental disclosures was sufficient to put Plaintiffs on notice of these witnesses. *See Medpace, Inc. v. Biothera, Inc.*, No. 12 Civ. 179, 2013 WL 6158181, at *2 (S.D. Ohio Nov. 25, 2013); *Krawczyk v. Centurion Capital Corp.*, No. 06-C-6273, 2009 WL 395458, at *6 (N.D. Ill. Feb. 18, 2009) (holding that disclosure that defendants would rely on unnamed corporate witnesses "adequately notified [p]laintiff that [d]efendants might use information from company representatives to support their claims or defenses").

Furthermore, as Time Warner notes, Plaintiffs have not identified any prejudice suffered from the allegedly late disclosures. (Dkt. No. 253 at 5.) Though Plaintiffs complain that they were put "in a position where they have to respond to declarations from previously undisclosed 11 facts witnesses even though fact discovery is now closed," they specifically state that "reopening discovery or . . . proving additional time" would not remedy the late disclosure. (Dkt. No. 252 at 5.) And although invited to respond further to Time Warner's arguments in their class certification reply brief (Dkt. No. 254), Plaintiffs reiterate therein that the declarations should be stricken without explaining what prejudice, if any, resulted from the failure to disclose the specific names of corporate representatives.

With no indication to the contrary, the Court concludes that striking the declarations at issue is not necessary because any late disclosure was "harmless." Fed. R. Civ. P. 37(c)(1). Accordingly, the motion to strike these declarations is denied.

## III.    Motion for Class Certification

Plaintiffs have moved for class certification under Rule 23(b)(2) and (b)(3), seeking to certify a class consisting of:

> All individuals in the United States who (1) from October 16, 2013 to the date that class notice is disseminated, (2) received one or more calls, (3) on either their cellular or residential telephone, (4) where Defendant placed the call using its IVR

Platform, (5) the attempt status in Defendant's call log for at least one of the calls that they received is listed as "Live_Voice" or "Answering_Machine", and (6) they are not listed in Defendant's records as the intended recipient of the call.

(Dkt. No. 210.) Plaintiffs also ask the Court to appoint Hunter and Villa as class representatives and to appoint Bursor & Fisher, P.A.; Hughes Ellzey, LLP; and Siri & Glimstad LLP as class counsel. (*Id.*) After setting forth the applicable legal standard, the Court first addresses the proposed class insofar as Plaintiffs seek damages under Rule 23(b)(3), and then the request to certify a class for injunctive relief under Rule 23(b)(2).

## A.    Legal Standard

Class certification is governed by Federal Rule of Civil Procedure 23. Section (a) of Rule 23 requires the party seeking certification to establish four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition, "the movant must show that the action is one of three types described in section (b)." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014). In particular, subsection (b)(3) requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). And also as relevant here, subsection (b)(2) provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The Rule 23 requirements are more than a "mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Rather, the party seeking class certification must actually establish [Rule 23's] requirements by a preponderance of the evidence." *Jackson*, 298 F.R.D. at 159. Courts must "conduct a rigorous analysis to determine whether a class action is appropriate, considering materials outside of the pleadings and weighing conflicting evidence as necessary." *Id.*

### B. Damages Class under Rule 23(b)(3)

Plaintiffs seek to certify a class for damages under Rule 23(b)(3). (Dkt. No. 210.) In opposing this motion, Time Warner contests Plaintiffs' ability to demonstrate commonality under Rule 23(a), as well as predominance and superiority under Rule 23(b)(3). Because the Court concludes that Plaintiffs have not adequately demonstrated predominance, it need not address the other two requirements.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted). The requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citation omitted).

Plaintiffs argue that the predominance requirement is satisfied here. (Dkt. No. 211 at 15–16.) In support, they point to a number of issues that they contend are common to the class, including whether Time Warner called class members using an artificial or prerecorded voice, whether Time Warner lacked prior consent to make those calls, and whether Time Warner's conduct was willful. Time Warner disputes whether *any* of these questions are indeed common

to the class, contending that they do not constitute "common questions as a matter of law" or are not "[]capable of common *answers*." (Dkt. No. 224 at 43.) But Time Warner argues foremost that individual issues—primarily concerning class membership and consent—will predominate over any common issues. (Dkt. No. 224 at 7–42.)[8]

### 1. Eligibility for Class Membership

One of the main thrusts of Time Warner's predominance argument is that, notwithstanding Plaintiffs' expert reports, identifying eligibility for class membership will require highly individualized determinations. The Court first addresses a threshold dispute between the parties, before considering Time Warner's argument that determining class eligibility will require individualized inquiries, along with Plaintiffs' counterarguments.

### a. Ascertainability

As an initial matter, the parties disagree as to whether determining eligibility for class membership is properly considered under the rubric of predominance or ascertainability.

The Second Circuit has recognized an "implied requirement of ascertainability" in Rule 23. *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (citation omitted). "The ascertainability requirement . . . asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). "This modest threshold requirement will only

---

[8]     Time Warner also contends that certain additional individualized determinations related to liability and damages would predominate even if Plaintiffs could establish eligibility for class membership and lack of consent to receive Time Warner's phone calls through common proof. (Dkt. No. 224 at 33–42; *see* Dkt. No. 262 at 9–14 (opposing these arguments).) Because various issues related to class eligibility and consent are not subject to generalized proof and are more substantial than any common questions, the Court need not address Time Warner's additional predominance arguments.

preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.*

Plaintiffs contend that the ability to identify class members goes to whether the class is ascertainable. (Dkt. No. 211 at 18–19; Dkt. No. 262 at 2.) Time Warner counters that difficulty in determining class membership is a factor considered under the predominance prong. (Dkt. No. 224 at 8.) Time Warner's understanding is correct.

As the Second Circuit has explained, "[a]scertainability does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23." *In re Petrobras*, 862 F.3d at 269. The issue is accounted for, in part, under the predominance requirement, which concerns itself with "classes that require highly individualized determinations of member eligibility." *Id.* at 268. Accordingly, where "potentially thousands of individualized and elaborate inquiries would be required to identify who is part of the class, . . . 'predominance' is not satisfied." *Calvo v. City of New York*, No. 14 Civ. 7246, 2018 WL 1633565, at *7 (S.D.N.Y. Apr. 2, 2018) (ellipsis in original) (quoting *Vogel v. City of New York*, No. 14 Civ. 9171, 2017 WL 4712791, at *7 (S.D.N.Y. Sept. 19, 2017)).

### b. Individualized Issues of Identifying Class Membership

Plaintiffs take the position that this is not a case that requires individualized inquires to determine class membership because, employing the methodology of Colin Weir, they will "use a straightforward and court-approved procedure for identifying 'wrong number' class members." (Dkt. No. 211 at 18.) But, as the expert reports and declarations submitted by Time Warner effectively establish, eligibility for class membership in this case cannot be reliably determined

through the Weir methodology.  And Plaintiffs have identified no other source of generalized proof that can accomplish the task.

To support its argument that membership in the proposed class can be reliably established only through individualized inquiries, Time Warner asserts the existence of multiple problems with reverse-lookup databases in general—and with Weir's methodology in particular. Plaintiffs' experts claim that LexisNexis reverse-lookup data demonstrates the identity of a customary user of a particular phone number at a point in time, and that comparing that data to Time Warner's call records can establish the occasions on which Time Warner's IVR Platform made wrong-number calls.  (Weir ¶¶ 18, 24; Dkt. No. 214 ¶¶ 19–21.)  This process puts a lot of stock in the ability of the reverse-lookup data to accurately identify the customary user of a phone number at a discrete point in time.

But representatives from LexisNexis disclaim the data's capacity to fulfill this purpose. With respect to the particular product used by Plaintiffs' experts, one LexisNexis representative averred that it "cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis.  Nor can [it] be used to identify when a telephone number was 'reassigned' from one person to another, or when the 'customary user' of a phone number changed."  (Dkt. No. 241 ¶ 13; *see also id.* ¶ 6; Dkt. No. 242 ¶¶ 6–7.)

Other reverse-lookup database providers acknowledge similar shortcomings in their products.  (*See* Dkt. No. 227 at 24 & nn. 22–23.)  And the FCC has expressly recognized that "commercial databases" that track phone number assignment "are not comprehensive." *Advanced Methods to Target and Eliminate Unlawful Robocalls*, Second Report and Order, CG Docket No. 17-59, FCC 18-177, ¶¶ 6, 64 (Dec. 13, 2018), https://docs.fcc.gov/public/attachments/FCC-18-177A1.pdf.

Beyond these general concerns, Time Warner points to several specific problems with the LexisNexis data on which Plaintiffs' expert relies. (*See* Dkt. No. 224 at 16–19.)[9] For instance, LexisNexis lacked any information for 3% of the phone numbers that Weir subjected to his analysis. (Dkt. No. 225 ¶ 28.) And for 17.7% of the rows of data returned to Weir for the phone numbers queried, the LexisNexis data did not specify the date that a particular phone number first became associated with a particular customary user. (Dkt. No. 225 ¶ 29.) For these instances of missing data, individualized analysis would be required to determine whether the holders of the numbers belong in the class. (*See* Dkt. No. 224 at 16–17, 19.)

Moreover, even when the data included a date by which a number had first become associated with a particular customary user, that is not a "reliable proxy" for the date of the number's reassignment. (Dkt. No. 241 ¶ 7.) Taking Plaintiff Villa's number as an example, at the time that she was receiving the alleged wrong-number calls from Time Warner, the LexisNexis data identifies the phone number as still being associated with the prior holder, TWC customer AS. (Dkt. No. 225 ¶ 47.) In other words, Plaintiffs' methodology would not identify Villa as a member of the proposed class. (Dkt. No. 224 at 18.) And for any member of the class identified through the data, individualized inquiries would be required to definitively determine when reassignment occurred in relation to the alleged wrong-number calls received.

There is no reason to suspect that these issues are unique to the specific reverse-lookup tool employed by Plaintiffs' experts in this case. That is perhaps why several courts have rejected proposals to use such tools to identify the users of particular phone numbers for the sake of determining class membership. *See, e.g., Jacobs v. Quicken Loans, Inc.*, No. 15 Civ. 81386,

---

[9]    Significantly, Plaintiffs do not attempt to refute these specific flaws that Time Warner identifies in the LexisNexis reverse-lookup data. Instead, Plaintiffs offer general arguments about their burden at the class certification stage, discussed below in Section III.B.1.c.

2017 WL 4838567, at *3 & n.4 (S.D. Fla. Oct. 19, 2017); *Sherman v. Yahoo! Inc.*, No. 13 Civ. 41, 2015 WL 5604400, at *6 (S.D. Cal. Sept. 23, 2015) ("Plaintiff's belated proposal to utilize a reverse lookup also does not provide objective, verifiable criteria for identifying class members."); *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 524–25 (E.D. Wis. 2014) (noting the inaccuracies of reverse lookup services and concluding that use of such services alone could not adequately ascertain class members).

In addition to these flaws with reverse-lookup data, Time Warner points to errors in Weir's methodology more specifically. (Dkt. No. 224 at 19–27.) One of these alleged errors pertains to name-matching efforts, to determine whether a customary user identified by LexisNexis is the same individual associated with the phone number in Time Warner's records. (Dkt. No. 224 at 19–21.) Under Weir's methodology, he determined that the customary user in the LexisNexis data matched the customer in Time Warner's records if they had the same first name or last name. (Dkt. No. 228-7 at 119:5–120:2; Dkt. No. 225 ¶ 39.) But as Time Warner demonstrates—due to spelling variations and business names—this name-matching process results in numerous false "mismatches." (Dkt. No. 224 at 20–21; Dkt. No. 232 ¶¶ 16–53.) Plaintiffs' methodology would thus falsely consider these customary users to be members of the proposed class, and individualized inquiry would be required to prove that they had consented to receive calls associated with the TWC account.

Time Warner's expert, John Taylor, also undertook substantial investigation and analysis to disprove two illustrative examples given in Weir's report of wrong-number calls. (*Compare* Weir ¶ 26, *with* Taylor ¶¶ 30–33; s*ee* Dkt. No. 224 at 22–24.) And out of a sample of 75 alleged wrong-number call recipients, Taylor conducted an individualized inquiry and determined that 65 of the recipients were properly called in connection with the TWC account at issue. (Taylor

¶¶ 22–23; *see supra* Section II.A.1.)[10]  Significantly, Plaintiffs do not even dispute that Taylor disproved 40 of the alleged mismatches out of the sample of 75.  (Dkt. No. 279 at 2–3.)  This demonstration of individualized investigation undertaken by Taylor — disproving a substantial number of Weir's alleged mismatches — puts the lie to the accuracy of Plaintiffs' proposed methodology to identify class members.

From the foregoing, Time Warner has persuasively demonstrated that Weir's methodology is incapable of accurately and reliably identifying a class of individuals that have received wrong-number calls.  As a result, significant individualized inquires would be required to determine whether the individuals Plaintiffs deem to be wrong-number call recipients are indeed properly considered members of the proposed class.

### c.      Plaintiffs' Counterarguments

Faced with the argument that their methodology cannot accurately identify recipients of wrong-number calls and that any class trial would thus devolve into thousands of mini-trials to determine eligibility for class members, Plaintiffs offer three responses.

First, Plaintiffs contend that they are not required to present a definitive method for identifying class members at this stage.  (Dkt. No. 211 at 18; Dkt. No. 262 at 14, 28–29.)  But this argument ignores the fact that Plaintiffs bear the burden of satisfying the Rule 23 requirements, *Jackson*, 298 F.R.D. at 159, including predominance.  And as explained above, the

---

[10]      In their reply brief in support of class certification, Plaintiffs again take issue with Taylor's conclusion that because he disproved 65 out of 75 alleged mismatches, the Weir methodology has an 86% error rate.  (Dkt. No. 262 at 16, 21.)  But as the Court has explained, this rate is not misleading because it aims only to describe the rate of false positives.  And an estimation of the rate of false positives is particularly helpful, because under the predominance inquiry the Court is concerned with the tendency of Weir's methodology to overestimate membership in the class and the extent to which Time Warner will be required to resort to mini-trials challenging individuals' eligibility for class membership.  (*See* Dkt. No. 279 at 7.)

predominance inquiry considers the means of determining membership in the proposed class. *See Calvo*, 2018 WL 1633565, at *7 ("If individualized questions as to membership in the proposed class predominate over common questions, class certification is precluded."). Plaintiffs thus need to demonstrate that common questions predominate over any individualized issues involved in determining class membership.

Second, Plaintiffs ague that, because other courts have relied on reverse-lookup tools to identify class members in TCPA cases, this approach has been deemed sufficiently reliable to be employed in this case. (Dkt. No. 211 at 19–20; Dkt. No. 262 at 20–21; Dkt. No. 304 at 2.) Time Warner counters that "none of those courts seriously grappled with the problems" inherent in reverse-lookup technology that Time Warner emphasizes here. (Dkt. No. 224 at 15 n.10; *see id.* at 11 n.4.)

Based on the particular records and arguments before them, other courts have permitted the use of reverse-lookup data to identify class membership. *See, e.g.*, *Bakov v. Consol. World Travel, Inc.*, No. 15 Civ. 2980, 2019 WL 1294659, at *12, 18 (N.D. Ill. Mar. 21, 2019); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 302 (N.D. Cal. 2017). But this Court must conduct a "rigorous analysis" of the specific facts before it to ensure that Plaintiffs have satisfied each Rule 23 requirement in the context of this case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). Although reverse-lookup methodologies have been determined to satisfy these requirements in other cases, the methodology proposed here is not capable of reliably identifying wrong-number calls on a class-wide basis.

Third and finally, in their reply brief Plaintiffs offer a revised method for identifying class members. They suggest that after Weir's methodology is employed to identify mismatched numbers and suspected wrong-number calls, the data can be cross-referenced against other

reverse-lookup or Caller ID databases, or confirmed through subpoenas to telephone carriers. (Dkt. No. 262 at 23–24.) Then, class membership can be confirmed through the use of affidavits in the claims administration process, whereby prospective class members can attest to having received wrong-number calls from Time Warner. (Dkt. No. 262 at 25–28; Dkt. No. 265 ¶ 48.) However, even if the Court were to consider these belatedly proposed steps in Plaintiffs' methodology—and the new legal arguments implicit therein—they would not sufficiently cure the predominance issues regarding class eligibility.

With respect to the first new step: cross-checking the LexisNexis mismatch results against other databases is unlikely to rectify any errors when those databases suffer their own serious shortcomings. (Taylor ¶ 25; Sponsler at 23–24.) As to the use of telephone carrier records, Plaintiffs' own expert—Randall Snyder—specifically testified that Plaintiffs' methodology for identifying class members did not rely on issuing subpoenas to cell phone carriers because such a process would be "an arduous task" and "not feasible." (Dkt. Nos. 228-4 through 228-5 at 184:3–14.) And even if Plaintiffs could amass subscription data from phone carriers, Snyder and representatives from various carriers have averred that it would be incomplete due to the use of family plans and prepaid phones. (Dkt. Nos. 228-4 through 228-5 at 184:16–19; *see, e.g.*, Dkt. No. 234 ¶¶ 3–5, 8; Dkt. No. 243 ¶¶ 4, 6–7.) *See also Sherman*, 2015 WL 5604400, at *7 (noting that carrier data is "riddled with gaps"). Moreover, as Time Warner notes (Dkt. No. 290 at 6), any conflicts between the LexisNexis results and other data sources would require individualized inquiry to determine whether inclusion in the class was proper.

At the second new step, the proposed use of class member affidavits also fails to cure the predominance issues inherent in identifying membership in the proposed class. Given the significant issues with class-member identification discussed above, soliciting sworn affidavits

from the individuals notified through Weir's methodology and relying on their memories of calls received years in the past would be "an invitation to speculate, or worse." *In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig.*, No. 13 Civ. 150, 2015 WL 5730022, at *5 (S.D.N.Y. Sept. 30, 2015) (cleaned up). Under such a method, especially in light of the damages award available, "the risk of false positives is great." *Id.*

Furthermore, Time Warner would have a due process right to challenge the veracity of those affidavits at trial. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *Gordon v. Caribbean Cruise Line, Inc.*, No. 14 Civ. 5848, 2019 WL 498937, at *11 (N.D. Ill. Feb. 8, 2019). And in light of the concerns about the accuracy of such affidavits, the Court would reasonably expect those challenges to be abundant. Consequently, the use of self-identification affidavits would not forestall individualized inquiry regarding when reassignment may have occurred and whether putative members indeed received wrong-number calls.

As Plaintiffs note (Dkt. No. 262 at 26–27), the Second Circuit has signaled its approval of the use of sworn affidavits to identify purchasers of products in a deceptive marketing class action, *see Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018). In the context of this case, however—with the incentive to claim class membership to benefit from high-value damages claims (Dkt. No. 224 at 46; *see* Dkt. No. 240 ¶¶ 6–18), strong evidence that the group solicited to submit these affidavits will include individuals who are not proper class members (*see* Taylor ¶¶ 22–23), and a commitment from the defendant to challenge these affidavits at trial (Dkt. No. 290 at 4, 9)—the proposal to use such affidavits would not render the issue of eligibility for class membership capable of generalized proof at trial.

### 2. Consent

In the specific circumstances of this case, the determination of class membership discussed above is inextricably intertwined with the issue of consent. That is because all the

phone numbers dialed by the IVR Platform were submitted by customers who gave permission to be contacted regarding their TWC accounts. (Dkt. No. 228-8 at 134:14–24, 144:8–11.) It is clear, then, that at the time a phone number was entered into the TWC account records, Time Warner had consent to call that number.[11] And any calls to that number made while Time Warner possessed consent do not violate the TCPA. *See Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 843 (S.D.N.Y. 2017) ("[A] call is not unlawful if made 'with the prior express consent of the called party.'" (quoting 47 U.S.C. § 227(b)(1)(A)).

Plaintiffs argue that Time Warner subsequently lost consent to call millions of those numbers through reassignment. Only where reassignment has occurred and Time Warner has lost consent can the newly reassigned holder of a number demonstrate class membership. For purposes of the predominance inquiry, the Court asks whether the alleged widespread loss of consent is capable of generalized proof or would require significant individualized inquiry. In doing so, the Court first addresses two attempts by Plaintiffs to limit the Court's consideration of consent, and then addresses one additional way in which consent may require individualized inquiry in this case.

### a.    Plaintiffs' Threshold Arguments

At the outset, Plaintiffs argue that issues of consent should not be allowed to defeat class certification for two reasons. First, they point out that consent is an affirmative defense on which Time Warner will bear the burden of proof at trial. (Dkt. No. 262 at 8–9.) But that does not

---

[11]    The parties dispute whether Time Warner was required to obtain prior express consent in written form to make the collection calls at issue. (*See* Dkt. No. 211 at 12; Dkt. No. 224 at 43 n.35.) Time Warner is correct that the written consent requirement applies only to calls "containing advertisements or telemarketing." *See Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 844 (S.D.N.Y. 2017). And as the Court determined earlier in this action, Plaintiffs have not established that they received any such calls. *Mejia*, 2017 WL 3278926, at *10–11.

foreclose consideration of consent at the class certification stage. "[W]hile it is well established that the existence of a defense potentially implicating different class members differently does not *necessarily* defeat class certification, it is equally well established that courts must consider potential defenses in assessing the predominance requirement." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) (internal citation omitted). "Courts have been reluctant to deny class action status because affirmative defenses might be available against different class members *as long as the defenses do not overshadow the primary claims*." *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653, 2014 WL 1013835, at *8 (S.D.N.Y. Mar. 17, 2014) (emphasis added) (brackets and citation omitted). Accordingly, if individual issues of consent overshadow generalized questions of liability, class certification is improper.

Second, Plaintiffs fall back on their proposed class definition, arguing that consent is necessarily a non-issue because the class is defined to include only those who did not consent to be called by Time Warner. (Dkt. No. 211 at 15–16; Dkt. No. 262 at 3–4.) At the risk of feeding a fed horse, the Court reiterates that the ability to determine class membership—and whether such membership is capable of generalized proof or subject to individualized inquiry—is within the territory of the predominance requirement. And whether or not a particular individual consented to receive a call from Time Warner goes to whether that individual is a proper class member in this action. Therefore, Plaintiffs' efforts in crafting a class definition to exclude individuals who do not have valid TCPA claims do not preclude consideration of consent.

### b. Individualized Issues of Consent

In addition to the issues with the methodology for identifying class members discussed above, one additional factor relevant to consent merits some discussion in the Court's

predominance inquiry.[12]  This factor pertains to consent through intermediaries.  Even where

Plaintiffs' methodology correctly identifies that a TWC accountholder differs from a customary

user of the phone number at issue, Time Warner argues that it may still possess valid consent if

the customary user has a relationship with the TWC accountholder.  (Dkt. No. 224 at 28–30.)[13]

Lending support to this point, several courts have recognized that family members often

provide consent to call one another's phones and concluded in part on this basis that the issue of

consent requires individualized inquiry.  *See, e.g.*, *Tomeo v. CitiGroup, Inc.*, No. 13 Civ. 4046,

2018 WL 4627386, at *10 (N.D. Ill. Sept. 27, 2018); *Jacobs*, 2017 WL 4838567, at *3; *Davis v.

AT&T Corp.*, No. 15 Civ. 2342, 2017 WL 1155350, at *6 (S.D. Cal. Mar. 28, 2017).

Plaintiffs respond that family members do not have carte blanche to consent to calls on

behalf of their relative; rather, any intermediary providing consent must be formally acting as an

authorized agent.  (Dkt. No. 262 at 7.)  Accepting that there are authorization requirements that

relationships alone do not satisfy, however, those requirements simply underscore the necessity

of individualized determinations to determine whether the consenting individual possessed the

---

[12]     Time Warner also raises a second factor relevant to consent, relating to the scope
of TWC customers' consent to be called.  Even if a call from the IVR Platform did not reach the
intended TWC customer, Time Warner argues that there would still be a question as to whether
the recipient of the call was a different TWC customer whose consent to be contacted extends to
wrong-number calls.  (Dkt. No. 224 at 30–32.)  However, Time Warner employed certain
standardized contracts by which customers consented to be called (see Dkt. No. 240 ¶ 5), and
Time Warner is capable of determining from its records whether an individual is a current or
former customer (Dkt. No. 263-2 at 146:25–47:8).  Assuming that it is possible to consent to a
wrong-number debt collection call at all (*but see* Dkt. No. 262 at 5–6), the Court is not persuaded
that excluding prospective class members who have consented on this basis would necessarily
require time-consuming individualized determinations.

[13]     Time Warner also argues that where the accountholder differs from a customary
user, it may nonetheless retain consent because either the subscriber consented to be called, or
the TWC accountholder may be an additional customary user that the reverse-lookup data did not
identify.  (Dkt. No. 224 at 27–28.)  Plaintiffs do not refute these points, and the Court considers
them as additional reasons that the issue of consent may require individualized inquiries.

requisite agency relationship. And contrary to Plaintiffs contention (Dkt. No. 262 at 7–8), the prospect of familial consent issues in this case is not too speculative to be irrelevant to class certification. (*See* Dkt. No. 229 ¶¶ 23–28; Dkt. No. 231 ¶¶ 5–9; Taylor ¶ 27.)

The Court thus concludes that individualized inquiry will be required to determine whether putative class members may be related to the TWC accountholders associated with their phone numbers and whether these relatives have validly provided consent to call the numbers. In other words, there is no generalized means of proof to resolve whether Time Warner retains consent to call a particular class member on the basis that consent originated with a relative.

Beyond familial consent, many of the other issues discussed above (*supra* Section III.B.1) are also relevant to whether the widespread loss of consent alleged by Plaintiffs is subject to generalized proof, given the interrelatedness of consent and class membership. Among these issues are the fact that neither Plaintiffs' methodology nor any other source of data currently in existence can definitively determine whether the reassignment of a phone number has occurred or the date of any such reassignment (*see* Dkt. No. 241 ¶ 13; Sponsler at 20–23), and the estimation by Time Warner's expert that 86% of the wrong-number call recipients identified by Plaintiffs' methodology were actually properly associated with the TWC account at issue—and thus may have consented to be called by Time Warner (Taylor ¶¶ 22–23).

As the foregoing demonstrates, Time Warner "has put forward an evidentiary basis from which to conclude that adjudicating whether or not members of the class consented to its calls lacks a common method of proof." *Revitch v. Citibank, N.A.*, No. 17 Civ. 6907, 2019 WL 1903247, at *4 (N.D. Cal. Apr. 28, 2019). And overall, the Court concludes that these issues of individualized consent would predominate at trial.

This conclusion is particularly apt given the starting point for the calls in this case: an assumption of consent. Because the liability in this case hinges primarily on whether the phone numbers at issue were indeed reassigned, Time Warner understandably has "a possible [consent] defense against many class members," the inquiry into which "is likely to dwarf the much simpler question of whether Defendant called a given class member with a prohibited system." *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 460 (M.D. Fla. 2018) (reasoning that where a defendant "only calls numbers in its records" in an attempt to reach "actual known customers," consent likely predominates).

In joining the "chorus of other courts faced with TCPA class actions that have found such individualized inquiries on the consent issue precluded class certification," the Court finds itself in good company. *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 541 (D. Minn. 2017) (citation and internal quotation marks omitted); *see, e.g.*, *Tomeo*, 2018 WL 4627386, at *8–12; *Jacobs*, 2017 WL 4838567, at *2; *Davis*, 2017 WL 1155350, at *5–6; *Shamblin v. Obama for Am.*, No. 13 Civ. 2428, 2015 WL 1909765, at *12 (M.D. Fla. Apr. 27, 2015).

### 3. Conclusion

"[P]redominance is a comparative standard," under which plaintiffs must demonstrate that the common questions in a case are more substantial than those affecting individual class members. *In re Petrobras*, 862 F.3d at 268. Plaintiffs have failed to do so here.

Any common issues regarding how class members were called by the IVR Platform, or the shared source of records for those calls, are overshadowed by the individual inquiries that would be required to determine whether the alleged wrong-number recipients identified by Plaintiffs were eligible for class membership or ineligible on grounds of consent. Accordingly, Plaintiffs' request to certify a class under Rule 23(b)(3) is denied.

## C.      Injunctive Relief under Rule 23(b)(2)

Plaintiffs also seek to certify a class under Rule 23(b)(2).  (Dkt. No. 210.)  Time Warner raises several arguments in opposition to certifying a class for injunctive relief, including that Plaintiffs lack standing to seek an injunction because they are under no threat of receiving future wrong-number calls through Time Warner's calling systems.  (Dkt. No. 224 at 47.)

 "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the[] elements" of Article III standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Moreover, a "plaintiff seeking to represent a class must personally have standing."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016); *see also Spokeo, Inc.*, 136 S. Ct. at 1547 n.6.  And standing must be demonstrated separately "[f]or each form of relief sought."  *Nicosia*, 834 F.3d at 239.  For injunctive relief in particular, plaintiffs lack standing if "they are unable to establish a 'real or immediate threat' of injury."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  A plaintiff's past injuries "do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."  *Id.*

In the operative complaint, Plaintiffs did not allege that they suffered a real or immediate threat of future wrong-number phone calls from Time Warner.  Rather, all of the allegations specific to the named plaintiffs pertain to *past* phone calls received.  (Compl. ¶¶ 19–46.)  And as Time Warner demonstrates in its opposition to class certification, Plaintiffs in fact *did not* face a real threat of future wrong-number calls at the time they became named plaintiffs in this action.  Villa and Hunter acknowledge that Time Warner had stopped calling their cellphone numbers by December 8, 2015, and February 10, 2016, respectively.  (Dkt. No. 228-2 at 3.)  Time Warner's records indicate that the two phone numbers were removed from its account records and internal calling system on February 4 and March 21, 2016.  (Dkt. No. 229 ¶ 39.)  Moreover, David

Zitko—a senior manager at Time Warner who provided extensive testimony about Time Warner's IVR calling system—averred that, as matter of technological functioning, the system is incapable of placing calls to a telephone number unless the number is listed in the account records for a customer. (Dkt. No. 229 ¶¶ 2, 39.) And Zitko further averred that Time Warner's internal policies prohibit the calling of numbers that have been removed from Time Warner's accounts. (Dkt. No. 229 ¶ 39.)

As of March 21, 2016, then, neither named plaintiff faced any real or immediate risk of receiving future wrong-number calls from Time Warner. Therefore, at the time Hunter and Villa were added as named plaintiffs in this action with the filing of an amended complaint on March 28, 2016 (Dkt. No. 45), they lacked standing to seek injunctive relief.

Plaintiffs characterize Time Warner's standing argument as "based on . . . self-serving and speculative assertion." (Dkt. No. 262 at 32.) But they offer no testimony or other evidence contradicting the declaration of David Zitko, nor do they explain how Hunter and Villa continue to face the threat of wrong-number calls from Time Warner. As the parties "asserting subject matter jurisdiction," Plaintiffs' silence on this point is surprising in light of their "burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).[14]

Instead of affirmatively demonstrating standing, Plaintiffs contend that Time Warner's voluntary conduct in ceasing the illegal calls should not prevent Hunter and Villa from seeking injunctive relief. (Dkt. No. 262 at 32.) However, this argument is based on the voluntary

---

[14] Plaintiffs make no argument that the doctrine of standing is categorically inapplicable here, or that their standing should be understood to relate back to the filing of earlier complaints in this action, which were filed before they were named plaintiffs. *See Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 150–51 (2d Cir. 2006). The Court declines to address the potential success of any such forfeited arguments.

cessation doctrine, which applies in the context of mootness but cannot save claims that plaintiffs otherwise lack standing to assert. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–91 (2000). As the Supreme Court has explained, the voluntary cessation doctrine can be used to "refute the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). But it cannot "substitute for the allegation of present or threatened injury upon which initial standing must be based." *Id.*

Here, Hunter and Villa have not demonstrated that they possessed the initial standing to seek injunctive relief when they first asserted claims against Time Warner this action. Because the Plaintiffs "lack standing to seek a forward-looking injunction," their request to certify a class under Rule 23(b)(2) is thus denied. *In re Avon*, 2015 WL 5730022, at *8.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is DENIED.

With respect to the pending motions to strike: Plaintiffs' motion to strike the expert report of John Taylor is DENIED. Plaintiffs' motion to strike eleven declarations from fact witnesses is DENIED. Plaintiffs' motion to strike the expert report of Ken Sponsler is DENIED as moot, and Time Warner's motions to strike are DENIED as moot.

The Clerk of Court is directed to close the motions at Docket Numbers 210, 246, 248, 252, 269, 271, and 285.

SO ORDERED.

Dated: August 14, 2019
    New York, New York

_____
        J. PAUL OETKEN
    United States District Judge